# REPORT OF THE COMMISSION ON THE EVALUATION OF PAIN

Govt Pub
US
HE 3.2:P 16

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Refer to: _____    Commission on the Evaluation of Pain

JUN 2 0 1986

Honorable Otis R. Bowen, M.D.
Secretary of Health and Human Services
Washington, D.C. 20201

Dear Mr. Secretary:

As required by Section 3 of Public Law 98-460, there is herewith
enclosed for transmittal to the Chairman of the Senate Finance
Committee and the Chairman of the House Ways and Means Committee
the Report of the Commission on the Evaluation of Pain that was
appointed on April 1, 1985.  The report reflects the Commission's
discussions and recommendations on the issue of disability due
primarily to pain in determining eligibility for disability
benefits under titles II and XVI of the Social Security Act, as
amended.

Sincerely yours,

*Kathleen M. Foley M.D.*

Kathleen M. Foley, M.D.
Chair

LIBRARY
UNIVERSITY OF CALIFORNIA
SANTA BARBARA

APR 24 1987

DEPOSITORY
GOVT. PUBLICATIONS DEPT.

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

**TABLE OF CONTENTS** CONTINUED

Page

37      Part Two: The Commission

41      Meetings
41        May 1, 1985
41        June 13–14, 1985
42        August 8–9, 1985
43        September 5–6, 1985
44        October 24–25, 1985
44        January 30–31, 1986

45      Consultation with the National Academy of Sciences

47      Data on Pain and Social Security Claimants

49      National Uniformity

51      Defining Pain
51        Understanding and Defining Pain
56        Classification of Individuals with Chronic Pain

59      Malingering


65      Part Three: Commission Discussion Areas


69      Summary of Discussion Subjects

        Subject of Discussion
71        Statutory Pain Standard
75        Lack of Knowledge: Inadequate Tools and Techniques
81        Lack of Reliable Method For Measurement of Pain
89        Facilities to Evaluate Pain
95        Consequences of Granting or Denying Benefits
103       Reactivation/Vocational Rehabilitation Experiment
104         Proposal for Reactivation/Vocational Rehabilitation Experiment(s)
107         Outline of Proposed Experiment(s)
107           I. Purpose
108           II. Design
110           III. Selection Criteria
114           IV. Conditions of Participation
115           V. Followup

# TABLE OF CONTENTS

*Page*
v        Commission Members

ix       Authority

xi       Executive Summary
xvii         Findings
xxi          Recommendations


xxvii    Preface

**Report of the Commission on the Evaluation of Pain**

3        Note to the Reader


7        Part One: The Social Security Disability Programs


11       Overview
11           Benefit Amounts
12           Basic Disability Program Definitions
13       Determining Eligibility — The Sequential Evaluation Process
19       Rehabilitation Incentives
23       The Administrative Structure
25       The Administrative Appeals Process
25           Request for Reconsideration
25           Request for Review by Administrative Law Judge
26           Request for Review by Appeals Council
26           Request for Federal Court Review
27       Comparison to Other Income Maintenance Programs—General
27           Comparison to Veterans' Administration Benefits Programs
29           Comparison to Workers' Compensation Programs
31           Comparison to Private Insurance Industry

**TABLE OF CONTENTS** CONTINUED

*Page*

121    **Minority Opinion**

      **Appendices**

135    Appendix A   Glossary
149    Appendix B   Outline of Study Being Conducted by the Institute of Medicine
153    Appendix C   Summary of National Study of Chronic Pain Syndrome
165    Appendix D   Present Value of Selected Benefit Amounts
169    Appendix E   Sample Pain Questions
183    Appendix F   Court Decisions: Evaluation of Pain

189    **Bibliography**

*BYRON C. PEVEHOUSE, M.D.,* Chairman, Department of Neurosurgery, Pacific Presbyterian Medical Center, and Clinical Professor, Neurological Surgery, University of California, San Francisco, CA.

*EDWARD E. SAMMONS, M.D.* Since September 1985, Dr. Sammons has been Medical Director of the Pain Control and Rehabilitation Institute of Georgia, Inc., in association with Dr. Brena. Dr. Sammons was formerly Director, Woodruff Center, Emory University Clinic, Atlanta, GA.

*GERALD C. ZUMWALT, M.D.,* physician in private practice in Sapulpa, OK.

## REHABILITATION

*WILBERT FORDYCE, Ph.D.,* Professor of Clinical Psychology, Department of Rehabilitation Medicine and Pain Service, University Hospital, University of Washington, Seattle, WA.

## NURSING

*VERNICE FERGUSON, R.N.,* Deputy Assistant Chief Medical Director for Nursing Programs and Director, Veterans Administration Nursing Service, Washington, D.C.

## LAW

*WILL D. DAVIS,* senior partner in the law firm of Heath, Davis, and McCalla, P.C., Austin, TX.

*DAVID A. KOPLOW,* Assistant Professor of Law and Director, Center for Applied Legal Studies, Georgetown University Law Center, Washington, D.C.

*JOHN A. NORRIS,* President, Norris and Norris, Boston, MA and board chairman of the American Society of Law and Medicine, named as a Commission member on April 1, 1985. Mr. Norris resigned June 1, 1985, to become Deputy Commissioner of the Food and Drug Administration.

# PAIN COMMISSION MEMBERS

## PHYSICIANS

*KATHLEEN M. FOLEY, M.D.,* Chair, Chief of Pain Service and Associate Attending Neurologist at the Memorial Sloan-Kettering Cancer Center in New York, NY. Professor of Neurology and Pharmacology, Cornell University Medical College, New York, NY.

*RICHARD BLACK, M.D.,* Associate Professor of Anesthesiology and formerly Director, Pain Clinic, The Johns Hopkins Medical Institutions, Baltimore, MD.

*STEVEN F. BRENA, M.D.* Since September 1985, Dr. Brena has been Chairman of the Board of the Pain Control and Rehabilitation Institute of Georgia, Inc. Dr. Brena was formerly Director of the Pain Control Center at Emory University and is presently Clinical Professor of Rehabilitation Medicine, Emory University, Atlanta, GA.

*HAROLD CARRON, M.D.,* Professor, Department of Anesthesiology, Georgetown University School of Medicine, Washington, D.C. Dr. Carron was formerly Director of the Pain Center at the University of Virginia, Charlottesville, VA.

*ERIC J. CASSELL, M.D.,* Clinical Professor of Public Health, Cornell University Medical College and Director, Cornell's Program for Study of Ethics and Values in Medicine, New York, NY.

*DAVID W. FLORENCE, M.D.* Since January 15, 1986, Dr. Florence has been Director of Medical Affairs, Peoples' Community Hospital Authority of Michigan, Wayne, MI. Dr. Florence was formerly Chief of Medical Rehabilitation Services, Industrial Commission, State of Ohio, Columbus, OH.

*MARC HERTZMAN, M.D.,* Director of Inpatient Services and Professor, Department of Psychiatry and Behavioral Sciences, The George Washington University Medical Center, Washington, D.C.

*HILARD L. KRAVITZ, M.D.,* specialist in internal medicine in private practice, Los Angeles, CA and Attending Physician in medicine, Cedars-Sinai Medical Center, Los Angeles, CA.

## STAFF

NANCY J. DAPPER — Executive Director

Suzanne DiMarino
Victoria R. Dorf
Nancy W. Mercer
Gary W. Thorne

*W. LANE PORTER*, J.D., M.P.H.*, Attorney-at-law and consultant in health care matters, Washington, D.C.

*PAUL ROSENTHAL*, Chief Administrative Law Judge, Social Security Administration, Office of Hearings and Appeals, Arlington, VA.

## INSURANCE

*LEE B. CANFIELD*, CLU, ChFC, insurance executive, Northwestern Mutual Life Insurance Company of Milwaukee, Chicago, IL.

*GERALD S. PARKER*, CLU, RHU, disability and health insurance consultant, Old Greenwich, CT, and retired Vice President, health insurance, The Guardian Life Insurance Company of America, New York, NY.

*CHARLES E. SOULE*, Executive Vice President and Director, Paul Revere Life Insurance Company, Worcester, MA and Chairman, Disability Committee of Health Insurance Association of America.

## EX OFFICIO

*PATRICIA M. OWENS*, Associate Commissioner for Disability, Social Security Administration, Baltimore, MD.

*PETER CHODOFF*, M.D., Chief Medical Officer, Office of Disability, Social Security Administration, Baltimore, MD.

---

*Sworn in August 8, 1985.

# AUTHORITY

Section 3, subsection (b) of the Social Security Disability Benefits Reform Act of 1984, (Public Law (P.L.) 98-460), directed the Secretary of Health and Human Services (HHS) to appoint a special Commission on the Evaluation of Pain to conduct a study, in consultation with the National Academy of Sciences (NAS), on the evaluation of pain in determining under titles II (Social Security) and XVI (Supplemental Security Income) of the Social Security Act, as amended, whether an individual is under a disability. As required by subsection 3(b)(2) of P.L. 98-460, the 20 members of the Commission represent expertise in the fields of medicine, law, insurance, and disability program administration with significant concentration of expertise in the field of clinical pain. The purpose of the Commission is to study the evaluation of pain in determining eligibility for disability benefits under titles II and XVI of the Social Security Act, as amended, and to make recommendations to the Secretary of HHS on how pain should be considered in the evaluation of disability.

also, with the aid of the consultative services of the NAS, reviewed extensive literature on pain and disability and heard expert testimony on the latest methodologies for the measurement of pain and pain behavior. The collective observations and conclusions of the Commission are reflected in the appended summary of the Commission's Findings and Recommendations and discussed in detail in the formal Report.

## SOCIAL SECURITY ACT PAIN STANDARD

Under existing Social Security law, in order for pain to be considered in evaluating disability, there must first be a medically determinable physical or mental impairment which could reasonably be expected to produce pain. Once such an impairment is established, SSA will consider statements from the individual, his or her doctor, and others concerning any restrictions caused by pain. If, however, there is no underlying physical or psychiatric impairment which could reasonably explain the pain, then disability cannot be established.

## DEFINING PAIN

Pain is a complex experience, embracing physical, mental, social, and behavioral processes which compromises the quality of life of many individuals. The Commission acknowledges the difference between two categories of pain, acute and chronic. As a symptom, acute pain is handled relatively well under current law. The problem is in the evaluation of individuals with chronic pain. In those individuals with objective laboratory and clinical evidence of a physical or mental impairment which could reasonably be expected to cause the pain alleged, evaluation proceeds in the manner by which all other symptoms are handled. However, there is now a recognized chronic pain syndrome (CPS) in which the pain persists beyond the expected healing time of the injury or illness and in which there is a lack of objective laboratory and clinical evidence of physical impairment which could reasonably cause the reported pain. Numerous medical, psychological, sociological, and economic factors contribute to this syndrome. The Commission addressed the differences between claimants with chronic pain and those with CPS and recognized that SSA's adjudicative problems were due in part to a lack of a systematic evaluation approach to such claimants and in part to the complexity of addressing a subjective experience such as pain in the evaluation of disability.

As a preliminary to its full discussion of the evaluation of pain and pain behavior in determining disability, the Commission defined four groups of chronic pain claimants: (A) chronic pain, inability to cope, insufficient documented impairment (chronic pain syndrome) – not covered by current law; (B) chronic pain, competent

# EXECUTIVE SUMMARY

Since the early 1980's, an increasing number of court cases presented challenges to existing Social Security Administration (SSA) policy on the evaluation of pain as a factor in determining disability. Thus, attention was focused on the need for a careful review and evaluation of that policy.

During the Congressional deliberations on H.R. 3755 (Public Law (P.L.) 98-460, The Social Security Disability Benefits Reform Act of 1984), several Members noted the influence the federal courts were exercising in defining various pain standards in the disability program. The decisions regarding pain varied considerably from Circuit to Circuit, and primarily addressed how a claimant's allegation of pain was to be assessed and evaluated in deciding whether a claimant was under a disability. Some Members were concerned that the court opinions had gone beyond what the Congress had intended by giving too much weight to allegations, thereby redefining the concept of disability. These Members believed that the court pain standards were improper and beyond the intent of Congress. Other Members were concerned that SSA had been too restrictive in its interpretation of how to evaluate pain, thereby wrongly denying benefits. At the same time, the Congress recognized the need to express clear Congressional intent and did so by authorizing a statutory standard for the evaluation of pain to apply to all disability decisions during the period in which SSA policy could be evaluated in the light of adjudicative experience and current medical knowledge.

Thus, section 3 of P.L. 98-460 incorporated the existing SSA policy for the evaluation of pain into the statute for the first time, but with a "sunset" date of December 31, 1986. At the same time, section 3 required the Secretary of Health and Human Services to appoint a Commission on the Evaluation of Pain to study, in consultation with the National Academy of Sciences (NAS), the evaluation of pain in determining eligibility for disability benefits under titles II and XVI of the Social Security Act, as amended, and to make recommendations on how pain should be considered in the evaluation of disability under these programs. The Secretary must report the Commission's findings to the Senate Finance Committee and to the Committee on Ways and Means of the House of Representatives.

A 20-member Commission, with collective expertise in the fields of medicine, law, insurance, and disability program administration with significant concentration of expertise in the field of clinical pain, was appointed on April 1, 1985. The members of the Commission have devoted considerable personal time and effort to provide a thorough and objective review of the issues raised by the Congress and others, and have consulted with the NAS to enable them to carry out their charge, and with SSA to ensure the practical application of their findings and recommendations.

The Commission has carefully studied the Social Security disability programs, the policies and procedures with respect to the disability evaluation process in general, and the evaluation of pain in determining disability in particular. The Commission has

the magnitude of this group of claimants with pain who seek Social Security disability benefits or the number of individuals who are denied on the basis of insufficient documented findings. Therefore, the Commission recommends that SSA create a dedicated data management system to monitor both allowances and selected sample denials in which pain forms a substantial element of the claim and to follow such cases at each stage of the disability process.

## CONSULTATION WITH THE NATIONAL ACADEMY OF SCIENCES

The Commission could not fully determine the magnitude of the problem of pain and the evaluation of pain in the Social Security disability claimant population in the time allotted without the aid of the NAS. The Institute of Medicine (IOM) of the NAS contracted for a review of the published literature on pain and disability and arranged for a panel presentation on the possible impact payment of disability benefits, particularly for disability on the basis of pain, would have on chronic pain behavior and on the rehabilitation of claimants with chronic pain. On September 30, 1985, at the recommendation of this Commission, SSA contracted with the IOM for a major study on the relationship of pain, chronic illness behavior, and disability to supplement the Commission's work. The Commission recommends funding of the most promising areas of research in the field of chronic pain and its assessment identified by the IOM study.

## IMPROVEMENT OF SSA DEVELOPMENT OF PAIN IN DISABILITY CLAIMS

The Commission notes that, within the construct of the existing administrative and program structure, there are a number of steps SSA can and must take to improve and refine existing procedures for claims development and adjudication where pain is a factor. These include improved training of personnel at all adjudicative levels, redesign of disability applications to collect more information about pain and pain behavior, development of more efficient data gathering forms and questionnaires, increased use of personal interviews and face-to-face examinations earlier in the decisionmaking process, and use of trained pain specialists, where possible, in the examination and evaluation of claims where pain is a significant factor in the claimant's allegations. The adoption of these steps will provide SSA with better information about the claimant's pain from the claimant, his or her treating and consulting sources, and others, as well as provide a better data base for management information. The Commission specifically recommends that SSA obtain the consultative services of experts in the design and testing of forms and questionnaires to ensure the appropriateness of the final

coping, insufficient documented impairment – not covered by current law; (C) chronic pain, inability to cope, documented impairment sufficient – covered by current law; and (D) chronic pain, competent coping, documented impairment sufficient – covered by current law. The Commission recognized the problems of all claimants with chronic pain, but was particularly concerned with the adjudicative problems raised by the first two groups.

At the request of SSA, the Commission considered whether psychogenic pain disorder is descriptive of individuals in these groups. Using the definition of psychogenic pain found in the Diagnostic and Statistical Manual of Mental Disorders, Third Edition (DSM III), the Commission questioned several expert witnesses about psychogenic pain and concluded that it is not the same as chronic pain or chronic pain syndrome. The Commission found that chronic pain and chronic pain syndrome are not psychiatric disorders. Thus, while there was agreement that psychogenic pain, as defined in DSM III, can appropriately be evaluated as a mental disorder, the Commission believes that chronic pain and chronic pain syndrome cannot.

## STATUTORY STANDARD

The Commission reviewed the current information about clinical pain states, pain measurement, and the relationship of pain to disability in the context of the existing Social Security disability programs and, specifically, the recently enacted statutory standard for the evaluation of pain in determining disability. The Commission found that the current statutory language adequately and appropriately calls attention to the necessity of considering pain in adjudicating disability cases. Although some members believed that the statutory standard might be improved, the consensus was that any modification would be premature without more specific data about pain and disability. Thus, the Commission recommends that the statutory standard be extended until additional data are obtained.

## NEED TO ASSESS MAGNITUDE OF PROBLEM

The Commission recognized that the Social Security Act requires that an individual have a medically determinable impairment which can reasonably be expected to produce the alleged pain. The Commission also recognized that there are individuals who allege significant restrictions because of pain and who demonstrate chronic illness behavior who are currently not eligible under the Act because they have insufficient documented findings to substantiate the degree of pain alleged. However, the Commission found there is insufficient data on

## REACTIVATION/VOCATIONAL REHABILITATION EXPERIMENT

Although there are several provisions in the Social Security law which encourage rehabilitation, the Commission was generally critical of the rehabilitation aspects of the disability programs and considers these provisions inadequate to overcome the inherent financial and social advantages to continued entitlement to benefits. The Commission strongly recommends that there be an experiment or experiments to study whether there should be a disability category for impairment due primarily to pain and to assess the feasibility, efficacy and cost effectiveness of rehabilitation. The Commission believes such an experiment or experiments should incorporate the criteria developed by the Commission to evaluate the desirability of incorporating those or similar criteria into the Listing of Impairments. Further, the Commission recommends that the experiment or experiments provide a time-limited monthly stipend equal to the monthly disability benefit the person would have received had disability benefits been awarded as an incentive for participation.

## CONSEQUENCES OF GRANTING OR DENYING DISABILITY

The Commission is concerned that there are possible adverse consequences of awarding or denying disability benefits that cannot be ignored in evaluating whether there should be a Listing category for impairment due primarily to pain. Many experienced Commission members indicated that the availability of public and private disability programs, financial and other, are sometimes strong disincentives to rehabilitation and return to work. On the other hand, income from these benefit programs is often a major factor in an individual's maintaining self and family without economic deprivation and attendant potential health-jeopardizing stresses. Finally, award of disability benefits is often used as a substitute compensation for unemployment, creating a "sick" person out of one who could be at least partially productive. The Commission believes this often results in health care overutilization and recommends that alternative programs for the support of the occupationally disabled be explored.

design. The Commission believes that while many of these actions can be initiated by SSA under existing administrative authority, sufficient funds should be made available to allow these changes to be rapidly incorporated into current disability program policy and procedures.

## AVAILABILITY OF METHODS TO MEASURE PAIN

The Commission holds that pain is a complex experience with social and psychological factors complicating attempts at measurement. The Commission recognizes that the assessment of claimants with chronic pain requires a multidimensional approach to allow for correlation of functional limitations with reported pain and that SSA is necessarily limited to relying on observations of pain behavior by physicians, State and SSA interviewers, and the claimant's own reports of his or her pain. At the same time, there is a clear Commission consensus that malingering is not a significant problem and that increased attention to subjective evidence in the evaluation of the existence and nature of pain will not significantly alter the ability of trained professionals, medical and other, to recognize malingering where it is present.

## A LISTING CATEGORY FOR IMPAIRMENT DUE PRIMARILY TO PAIN

The Commission considered at length the appropriateness of establishing a listing level category for impairment due primarily to pain for evaluation of individuals who have minimal or no physical findings and who would not be found disabled under existing law, but who show significant chronic illness behavior. Thus, the Commission developed a set of criteria descriptive of individuals where pain is the primary impairment. The Commission members did not agree that this set of criteria necessarily accurately or best described disability as defined by the Social Security Act. Discussion on this issue was intense and extended, with some members wanting to recommend the proposed criteria be adopted by SSA as a new disability listing without further study or delay. Although a minority of members drafted a separate opinion in support of this position (see page 121), the majority believed that there was insufficient data for such a recommendation.

Therefore, the Commission recommends that, concurrent with an assessment of the magnitude of the problem, the criteria developed by the Commission be used to select participants for an experiment or experiments to determine whether the set of criteria, in fact, correctly defines disability, and that such an experiment or experiments include a reactivation/vocational rehabilitation experiment.

## INCIDENCE OF MALINGERING

5. There is a clear consensus that malingering is not a significant problem, that it can be diagnosed by trained professionals, medical and other, and that increased attention to subjective evidence in the evaluation of the existence and nature of pain will not significantly alter this.

## UNAVAILABILITY OF METHODOLOGIES FOR MEASURING PAIN

6. Numerous attempts have been made to try to develop methodologies for measuring pain objectively. This is, as yet, not possible because pain is inherently a subjective personal experience and we are necessarily limited to observations of pain behavior, including the person's reports. With acute pain, attempts at measurement have met with some success, at least in experimental settings and in a limited number of clinical settings where patients have been taught to describe the quality and intensity of pain and their degree of relief, using measurement tools that have established validity. Chronic pain, however, is a more complex entity, with additional social and psychological factors requiring a multidimensional approach to assess the person's report of pain.

## INADEQUACY OF DATA BASE ON DISABILITY DUE PRIMARILY TO PAIN

7. There is no existing system to "track" claimants with chronic pain in the current disability evaluation process. System management lacks longitudinal data for both awards and denials, broken down by such factors as type of impairment, adjudicative stage, and demographics.

# FINDINGS

## CHRONIC PAIN AND CHRONIC PAIN SYNDROME ARE INADEQUATELY UNDERSTOOD

1. Pain is a complex experience, embracing physical, mental, social, and behavioral processes, which compromises the quality of life of many Americans. Chronic pain and its consequences are inadequately understood by patients, the health care system, the public generally, and the Social Security Administration.

2. There are two basic categories of pain, acute and chronic. The distinctions between the two are important for proper assessment of disability. Acute pain, that is pain of recent onset and probable limited duration, is dealt with relatively well under current law. The problem is chronic pain, that is, constant or inter-mittent pain of long duration or pain which persists past healing.

3. Chronic pain patients may usefully be categorized according to two interrelated variables. The first is the extent of pathology, that is, the degree of iden-tifiable body damage. The second is the behavior of the individual which may be influenced by personal response and adaptation, that is, the extent to which the individual is able to deal effectively with his or her pain, or responds to advice and information about the pain from the health care system, past experi-ence, or significant persons in his or her environment. Together these two factors are powerful predictors of a person's potential capability to function and for return to work.

4. Chronic pain syndrome is a complex condition which has physical, mental, and social components. Both chronic pain and chronic pain syndrome can be defined in terms of duration and persistence in relation to the extent of demonstrated and observable pathology. However, chronic pain syndrome, as opposed to chronic pain, has the added component of certain recognizable psychological and socio-economic influences. While there may be some blurring of the boundaries between chronic pain and chronic pain syndrome, the characteristic psychological and sociological behavior patterns inherent in chronic pain syndrome provide a basis for trained clinicians to distinguish between the two conditions, and to differentiate the chronic pain syndrome from malingering and from serious emotional disorders. Chronic pain and the chronic pain syndrome are the primary focus of this Commission's report.

## CONSEQUENCES OF AWARDING OR DENYING DISABILITY

11. The Commission believes that in some instances the availability of public or private disability and medical benefits are disincentives and may influence the persistence and continuation of pain behavior. A requirement of objective medical evidence encourages excessive and often fruitless pursuit of such evidence. The pursuit itself then risks promoting iatrogenically induced complications and further claimant commitment to a self-image as a disabled person. In other instances, however, income from public or private disability and medical benefits is the major factor insulating the recipient (and his or her family) from economic deprivation and attendant potential health-jeopardizing stresses. Further, the granting of disability benefits often is used as a sub-stitute compensation for unemployment resulting from occupational disability. As such it creates a "sick" person out of one who could be at least partially productive. As medical disability is far more expensive than occupational disability, requiring continued health care overutilization to continue to prove disability, alternative programs for support of the occupationally disabled should be explored.

Overall, on the basis of the available information, the Commission is unable to generalize on the number of claimants in either group, the magnitude of the conflicting pressures, or on the consequences of awarding or denying benefits to Social Security claimants.

## REQUEST FOR SPECIAL STUDY TO BE CONDUCTED BY THE NATIONAL ACADEMY OF SCIENCES

12. The limited time span allotted for the Commission is not sufficient to fully explore the complete subject of pain and disability. However, the Institute of Medicine of the National Academy of Sciences does have the capability to do additional work that the Commission views as necessary to meet its profes-sional responsibility to fully explore the interrelationship between pain, chronic illness behavior, and disability.

## EVALUATION OF PAIN
## IN DETERMINING DISABILITY UNDER SOCIAL SECURITY

8. There is a lack of knowledge on the part of health care professionals generally about chronic pain and chronic pain syndrome and about their impact on the disability system. The complexity of the problem of chronic pain has generated predictable administrative difficulties, including incomplete data gathering and inconsistent decisionmaking. Participants in the Social Security process, including Social Security initial decisionmakers and appellate adjudicators, consulting physicians and others, do not have adequate guidance about pain and pain behavior or the distinction between acute and chronic pain or chronic pain syndrome.

9. The current disability system reflects the difficulties and uncertainties encountered by the medical profession in dealing with pain. The existing Social Security disability regulations appropriately include pain as a symptom to be fully assessed in evaluating disability. The regulations also deal adequately with pain as a component of certain listings and in other cases where pain is reasonably consistent with identified physical and mental impairments. In contrast, the Social Security Act does not allow a finding of disability when impairment is due primarily to pain which cannot be related to a medically determinable condition, especially where a claimant's pain reports may not correlate highly with physical findings.

## RETENTION OF A STATUTORY STANDARD

10. The introduction of a statutory requirement for the consideration of pain in evaluating disability has promoted a uniformity of adjudication at all levels within the Social Security Administration and in the courts which did not previously exist. The presence of the statutory standard is, by itself, a positive step. However, the standard will "sunset" on December 31, 1986, unless some action is taken. The expectation of the Congress was that this Commission would be able to complete its mandated study of the issues, evaluate the appropriateness of the standard, and recommend extension, modification, or termination in time for the Congress to act prior to the sunset date. In view of the complexity of the issues, the Commission realized that this expectation was overly optimistic. It was the considered opinion of the Commission that the current statutory language adequately and appropriately calls attention to the necessity of considering pain in adjudicating disability claims and that there is no need for clarification or modification of the statutory language at this time. Any proposed modification would, therefore, be premature in light of the clear need for additional data.

## MEDICAL-VOCATIONAL ASSESSMENT
## OF IMPAIRMENT DUE PRIMARILY TO PAIN

4. For more accurate consideration of cases in which pain is a substantial element but the impairment does not meet or equal any Listing, the "sequential evaluation process" (20 CFR 404.1520/ 416.920) ought to take greater account of the ways in which pain can inhibit functional capacity. This should be accomplished in two ways:

a. Improve the definition of "residual functional capacity" (20 CFR 404.1545 *et seq.*/416.945 *et seq.*) to consider explicitly the possible restrictions created by pain upon a claimant's ability to carry out the strength-related demands of basic work activities, i.e., sitting, walking, standing, lifting, carrying, pushing, pulling. Regulations should require disability decision-makers to consider in detail whether the reported pain interferes with ability to undertake physical exertion and should rely, as much as is practicable, on observations of the claimant's performance of the basic strength-related demands of work activities or comparable activities. Work evaluation should be used where indicated.

b. Pain should also be more fully incorporated into the analysis of nonexertional employment-related limitations, i.e., mental, sensory, and environmental limitations. The notes and examples accompanying the Medical-Vocational Guidelines (20 CFR 404. Subpart P, Appendix 2, Section 200.00), as well as in the main portion of Subpart P, should be expanded to elaborate instances where reported pain, especially in concert with other limitations, whether exertional, mental, sensory, environmental, postural, etc., can be significant in the medical and vocational analysis of disability.

## NEED TO SPECIFICALLY ADDRESS THE ISSUE OF PAIN
## IN DECISIONMAKING AND IN DECISION RATIONALE

5. Regulations should require decision-makers at each stage and at all levels of adjudication of a disability case to specifically address the issue of pain whenever it is raised by the claimant or the record, and to state explicitly all findings and the basis for such findings regarding the nature, extent, and severity of pain.

# RECOMMENDATIONS

## NEED FOR ADDITIONAL TRAINING AND REDESIGN OF FORMS AND QUESTIONNAIRES

1. The early stages of the disability claims procedure should be redesigned to adduce better information about pain and pain behavior. Several specific steps should be pursued toward this objective.

   These include:

   a. Additional training focused on issues of pain to be provided to State disability determination services employees, to administrative law judges, and to others within the Social Security disability system, in order to instruct government personnel about issues raised by pain complaints;

   b. Redesign of Social Security Administration application forms to alert interviewers and/or adjudicators to cases where pain is a substantial element and development of questionnaires to collect more information about pain at the earliest opportunity. The initial application form should have a new section providing the claimant a clear occasion to detail the pain, when present. Questionnaires and forms sent to treating and consulting physicians and, where appropriate, to the applicant, his or her family, friends, and other potential sources, should also have additional provision for eliciting detailed descriptions of pain behaviors, when applicable.

## NEED FOR INPUT BY SPECIALISTS IN PAIN BEHAVIOR AND PAIN MANAGEMENT

2. Whenever possible, additional use should be made of pain specialists as consultative examiners in appropriate cases.

   Unless specifically trained, health care professionals are not pain experts for this purpose.

## NEED FOR FACE-TO-FACE INTERVIEW IN PAIN CASES

3. Personal interviews or face-to-face examinations at the State disability determination services level should be required earlier in the decisionmaking process in pain cases to enable first hand personal evaluation to supplement paper reviews and telephone interviews.

## PROPOSAL FOR EXTENSION OF STATUTORY STANDARD

10. The current statutory standard for the evaluation of pain should be extended without modification for the duration of the experiment(s) being recommended by this Commission and for one year thereafter. Any modification in the statutory language should only be made after additional data is acquired as a result of the study being conducted by the Institute of Medicine of the National Academy of Sciences and through the experimental process.

## DEVELOPMENT OF IMPROVED DATA BASE

11. The Social Security Administration should create a dedicated data management system to monitor cases in which pain forms a substantial element of the claim. Detailed accounts should be maintained of the numbers and disposition of pain cases at each stage of the disability process. Allowances, as well as selected sample denials, should be monitored for subsequent developments over an extended period of time. The case records should include data on impairments, hospitalizations, other benefit programs applied for, and subsequent work history. All experiment cases should be included in the followup.

## FOLLOWUP STUDY BY THE INSTITUTE OF MEDICINE OF THE NATIONAL ACADEMY OF SCIENCES

12. The Institute of Medicine (IOM) of the National Academy of Sciences should be contracted to do a followup study in the areas of the intersection of medical illness and the symptom that is pain; the distinction between chronic and acute pain; how chronic pain develops; the development of chronic illness behavior as a result of chronic pain; specific interactions of chronic pain, disability and the determination of disability; avenues of research that might lead to a usable form of pain measurement; and what rehabilitation measures are suggested for dealing with individuals with chronic pain and chronic illness behavior. On September 30, 1985, the IOM was contracted to perform the above study and to report to the Social Security Administration in December 1986.

## REMAND OF CERTAIN CASES AT ADMINISTRATIVE LAW JUDGE LEVEL

6. In any case where disabling pain is alleged for the first time at the administrative law judge (ALJ) stage, and the ALJ is unable to otherwise dispose of the case (e.g., by awarding benefits on medical or medical-vocational grounds or denying benefits based on the claimant's failure to satisfy the nonmedical eligibility requirements), the ALJ should be required to remand the case back to the State disability determination services for further development and evaluation by a physician of the record regarding pain.

## NEED TO ASSESS THE MAGNITUDE OF THE PROBLEM

7. There should be an experiment or experiments to assess the magnitude of the problem of disability evaluation where impairment is alleged due primarily to pain and to evaluate whether there should be a listing category for "impairment due primarily to pain."

## NEED TO ASSESS THE FEASIBILITY AND COST EFFECTIVENESS OF REHABILITATION

8. SSA should continue to foster studies directed toward elucidating objective methods for identifying chronic pain as disabling in the absence of objective evidence of physical or mental impairment which could reasonably be expected to cause the reported pain. The results of any experiment(s) carried out pursuant to this Commission's recommendations should be used to determine how pain should be evaluated in determining whether chronic pain is disabling and in making disability determinations.

## NEED TO DEVELOP CRITERIA FOR DETERMINING DISABILITY WHERE IMPAIRMENT IS DUE PRIMARILY TO PAIN

9. Any experiment(s) to determine the magnitude of the problem of evaluating pain where the alleged impairment is due primarily to pain should include a study of the feasibility, efficacy, and cost effectiveness of reactivation and rehabilitation.

## FOLLOWUP COMMISSION TO ASSESS THE RESULTS OF THE EXPERIMENT(S) AND THE NATIONAL ACADEMY OF SCIENCES STUDY

13. Congress and the Department of Health and Human Services should appoint a new Commission as soon as feasible after the conclusion of the experiment(s) to assess the success of the criteria for determining disability based on impairment due primariiy to pain and of the rehabilitation program, to review the findings of the study being conducted by the Institute of Medicine (IOM) of the National Academy of Sciences, to survey the interim progress in evaluating pain, and to reaffirm the national focus upon the issue of pain. The new Commission should include one or more members with expertise in the deliberations, findings, and recommendations of this Commission and with the findings and results of the study being conducted by the IOM on the intersection of pain and disability.

# PREFACE

In August 1980, the Social Security Administration (SSA) substantially revised its regulations. As part of the 1980 revision, the regulatory sections 20 CFR 404.1529 and 416.929 (45 FR 55566), referring to the evaluation of symptoms, were expanded to provide specific mention of pain as a symptom to be considered and evaluated in determining disability. These sections affirmed that symptoms, such as pain, cannot form the basis of a finding of disability unless there are medical signs and findings of an impairment that could reasonably be expected to produce such symptoms. The regulatory language was further defined through issuance of Social Security Ruling (SSR) 82-58 which, for the first time in a Ruling, provided an indepth discussion of SSA's policy for the consideration of allegations and reports of symptoms, and particularly pain, in evaluating disability. The policy was codified in 1984 in subsection 3(a)(1) of Public Law (P.L.) 98-460 (The Social Security Disability Benefits Reform Act of 1984).

Thus, for the first time a statutory pain standard was established. This standard, which essentially codified the existing Social Security policy for evaluation of pain, had been carefully considered by Members of the Senate Finance and House Ways and Means Committees during the debate on P.L. 98-460. The Members were aware of a number of court criticisms and challenges to the existing SSA policy for evaluation of pain. Some were concerned that failure to act legislatively would lead to judicial – rather than administrative – set standards for the evaluation of pain cases, and that court-fashioned standards could have the effect of greatly increasing awards, thus increasing program costs. At the same time, other Members believed that SSA's policy regarding pain had been too restrictive, that the courts had not misinterpreted the intent of the Social Security Act, and that some change in the existing policy was in order.

The complexity of the issue resulted in the decision to incorporate existing pain policy, as expressed in regulations and expanded in SSR 82-58, into the statute with a "sunset" date of December 31, 1986. At the same time, the provision in subsection 3(b) of the same law, directed the Secretary to appoint this Commission to study the current pain evaluation policy and recommend appropriate changes and to work in consultation with the National Academy of Sciences which has the experience and resources to aid the Commission in its study.

In submitting this report, the Commission wants to acknowledge the consistent responsiveness and support Nancy J. Dapper, Executive Director, and her staff have provided. Their conscientious efforts on our behalf have enabled the Commission to fulfill its mandate efficiently and productively.

# NOTE TO THE READER

This report of the Commission on the Evaluation of Pain is organized into three parts.

Part One presents a summary of the existing Social Security disability programs, to include the definitions which apply under current rules and regulations, and the procedures which are followed by the Social Security Administration (SSA) in evaluating and determining disability under those rules and regulations.

Part Two contains the definitions for pain, chronic pain, and chronic pain syndrome which were used by the Commission in discussing the issues and in formulating the Commission Findings and Recommendations, describes the administrative and operational decisions which were made by the Commission in carrying out its study and in working with the National Academy of Sciences, and comments on certain SSA preliminary studies on the evaluation of pain in determining disability.

Part Three reports on the discussions held by the Commission. These discussions reflect the major areas of concern as determined by the Commission during its study, in the light of current knowledge of pain and pain behavior, and in the context of the Commission's understanding of the administrative and operational problems of managing the Social Security disability programs. Each of the major discussion areas concludes with a statement of the findings and recommendations which resulted from that discussion. A summary of the findings and recommendations appears as part of the Executive Summary which introduces this report.

Finally, the Commission realizes that many readers will be interested in further detail on one or more areas of discussion. Therefore, a series of appendices and an annotated bibliography are included as part of this report.

# REPORT OF THE COMMISSION ON THE EVALUATION OF PAIN

Part One

# THE SOCIAL SECURITY DISABILITY PROGRAMS

Part One: The Social Security Disability Programs

# TABLE OF CONTENTS

*Page*

| | |
|---|---|
| 9 | Introduction |
| 11 | Overview |
| 11 | Benefit Amounts |
| 12 | Basic Disability Program Definitions |
| 13 | Determining Eligibility — The Sequential Evaluation Process |
| 13 | Step 1 |
| 13 | Step 2 |
| 14 | Step 3 |
| 15 | Step 4 |
| 16 | Step 5 |
| 19 | Rehabilitation Incentives |
| 19 | State Vocational Rehabilitation Agency Referral |
| 19 | Trial Work Period |
| 19 | Impairment-Related Work Expenses Deductions |
| 20 | Extended Period of Eligibility |
| 20 | Extended Medicare Coverage |
| 20 | Special SSI Cash Benefits |
| 20 | Extended Medicaid Coverage |
| 20 | Plans for Achieving Self-Support |
| 21 | Demonstration Projects |
| 23 | The Administrative Structure |
| 25 | The Administrative Appeals Process |
| 25 | Request for Reconsideration |
| 25 | Request for Review by Administrative Law Judge |
| 26 | Request for Review by Appeals Council |
| 26 | Request for Federal Court Review |
| 27 | Comparison to Other Income Maintenance Programs—General |
| 27 | Comparison to Veterans' Administration Benefits Programs |
| 29 | Comparison to Workers' Compensation Programs |
| 31 | Comparison to Private Insurance Industry |

# THE SOCIAL SECURITY DISABILITY PROGRAMS

The Commission conducted its study in the context of the existing disability programs, recognizing that any consideration of the evaluation of pain would necessarily entail an understanding of the Social Security disability programs, in general, and consideration of the effect any proposal for the evaluation of pain would have on other aspects of the disability programs.

Thus, the Commission began its work by reviewing the current rules and regulations under which the Social Security Administration (SSA) evaluates pain in determining disability, the circumstances which led to the incorporation of a pain standard in the statute, and the particular questions which SSA brought to the Commission.

Information about the existing Social Security disability programs is presented in Part One of the report to provide the reader with the background which formed the base from which the Commission proceeded.

## Basic Disability Program Definitions

Under both the Social Security and the Supplemental Security Income programs disability is defined by law as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. A "physical or mental impairment" is further defined as that which results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques and which, by regulation, must be established by medical evidence consisting of signs, symptoms, and laboratory findings.

The regulations define *symptoms* as the claimant's own perception of his or her physical or mental impairments. *Signs* are anatomical, physiological, or psychological abnormalities which can be observed through the use of medically acceptable clinical techniques. In psychiatric impairments, signs are medically demonstrable abnormalities of behavior, affect, thought, memory, orientation, and contact with reality. *Laboratory findings* are manifestations of anatomical, physiological, or psychological phenomena demonstrable by replacing or extending the perceptiveness of the observer's senses. They include chemical, electrophysiological, roentgenological, or psychological tests.

# OVERVIEW

The Social Security Administration has responsibility for the administration of two disability programs, the Social Security Disability Insurance (SSDI) program provided for under title II, and the Supplemental Security Income (SSI) disability program provided for under title XVI of the Social Security Act, as amended.

Under the SSDI program, workers earn their disability protection by working in Social Security covered employment or self-employment. Thus, disability benefits payable under this program are considered an "earned right," comparable to retirement benefits, and are paid from Social Security Disability Trust Fund monies without regard to the person's income from private insurance, savings, investments, and the like.

The SSI program, like the SSDI program, provides for monthly payments on the basis of disability, using the same definition of disability as SSDI. However, unlike the SSDI program, under SSI there is no "work" requirement. Rather, the program was enacted in October 1972, as a Federally financed and administered replacement for various Federal-State public assistance programs for the needy aged, blind, and disabled, with monthly payments to be made from general tax revenues. The amount of the Federal payment is set by law. Under this "needs" based program, eligible disabled and blind individuals' income and resources must be within certain specified limits. Thus, regardless of the severity of an individual's impairment, entitlement to payments will be precluded if the income and resource limits specified in the law are exceeded.

## Benefit Amounts

Under the title II (Social Security) program, benefits are computed on the basis of the worker's past earnings and are payable to workers and their families. While benefits can range from a low of $1.00 to as much as $1444, in 1985 the average disability benefit for a disabled worker — with or without dependents — was $533. Family benefits, based on the disabled worker's primary insurance amount, averaged $891 a month. SSI payments are set by law. In 1985 the Federal SSI payments were $336 for disabled individuals and $504 where both husband and wife met all program requirements.

11

**Step 3 – Does the Individual Have an Impairment(s) Which Meets or Equals the Listing?**

The Listing of Impairments is a compilation of "disabling" impairments categorized generally by the major body systems. The level of severity required by statute is specified in terms of medical signs, symptoms, and findings for each impairment listed. Its use helps to assure that disability decisions have a sound medical basis, that there is consistency in decisionmaking throughout the country, and that the majority of persons who are disabled can be identified readily.

An individual is said to "meet" the listing when the medical evidence in file substantiates *all* of the signs, symptoms, and findings called for in the listing. When a finding is made that an individual "meets" a listing, it means that, in the absence of substantial gainful work activity, a finding of disability can be made on the basis of medical evidence alone. Conversely, if all of the criteria in the listing are not present, then the individual cannot "meet" the listing.

Some listed impairments include pain as a criterion. For example, Listing 1.04 (Arthritis) requires a history of persistent joint pain and stiffness. When pain appears as a criterion, it is ordinarily essential only that the pain be present in combination with the remaining criteria. Unless specifically stated in the listing, evaluation of the intensity or of the functionally limiting effects of the pain is not required to determine whether the documented findings match the requisite criteria.

An individual may also be found to be under a disability on the basis of medical factors alone if the level of severity and duration of the individual's impairment as shown by the signs, symptoms, and findings "equals" the level of severity and duration of a listed impairment. This is because the Listing of Impairments, although quite detailed and extensive, does not cover all possible "disabling" impairments or impairment combinations, nor does it include all possible sets of signs, symptoms, and findings that show the required level of severity and duration.

A program medical consultant must make the decision as to whether the impairment is of equivalent severity to a listed impairment by comparing the set of signs, symptoms, and findings which describe the individual's impairment with those specified for the listed impairment or the most closely analogous listed impairment. In no case, however, can an alleged or reported increase in the intensity of pain, no matter how severe, be substituted for a missing or deficient sign or finding to elevate impairment severity to equivalency to a listed impairment. For example, a reported increase in severe joint pain cannot be substituted for the required x-ray evidence of either significant joint space narrowing or significant bony destruction in Listing 1.04.

If the individual's impairment is found to meet or equal a listing, the claim is paid on a medical basis alone. If not, the adjudicator must move to Step 4 in the

# DETERMINING ELIGIBILITY —
# THE SEQUENTIAL EVALUATION PROCESS

Regulations, 20 CFR 404.1520/416.920 (50 FR 8727), require that an orderly adjudication process be followed in determining whether an individual meets the definition of disability on page 12. This process is called sequential evaluation, and it is applicable to initial entitlement decisions. (The process is somewhat different for determining continuing eligibility once a person is on the rolls.)

There are five steps in the sequential evaluation process:

Step 1 – Is the Individual Currently Engaging in Substantial Gainful Activity (SGA)?

Under this first step, a purely nonmedical determination is made as to whether or not the individual is "engaging in SGA." SGA means work for pay or profit and is generally evaluated using earnings guidelines set forth by regulation. Since January 1980, earnings above $300 per month are generally found to indicate SGA. Only income actually earned by the individual is counted in determining the SGA level and certain impairment-related work expenses may be deducted from earnings in determining SGA.

Where an individual is determined to be engaging in SGA, it is not necessary to go any further in the sequential evaluation process. A determination of "not disabled" can be made purely on the basis that the individual does not meet one of the factors in the basic definition of disability, i.e., they have not shown "inability to engage in SGA." The determination of "not disabled" can be

made regardless of any symptom, such as pain, which the individual may have which could be related to the impairment(s). If the individual is not engaging in SGA, the adjudicator must proceed to Step 2 of the sequential evaluation process.

Step 2 – Does the Individual Have a Severe Impairment?

An individual's impairment (or combination of impairments), is determined to be severe when it has more than a minimal effect on the individual's ability to perform basic work activities. Basic work activities involve the capacity for sitting, standing, walking, lifting, pushing, pulling, handling, seeing, hearing, communicating, and understanding and following simple instructions. Where pain is alleged, it must be shown that the impairment(s) is such as could reasonably produce the pain. Where the objective physical findings do not substantiate the presence of a physical impairment(s) capable of producing the alleged pain, the possibility of a mental impairment as the basis for the pain must be considered.

If an impairment(s) is found to be not severe, the claim is denied on medical grounds alone without consideration of vocational factors. If the impairment is found to be severe, the adjudicator must proceed to Step 3.

managerial ones, in which an individual can sit or stand with a degree of choice. In the latter situation, an RFC which indicates that the individual can sit only 30 minutes at a time would not necessarily preclude the ability to perform the job.

As the RFC is based on the medical findings, i.e., the symptoms, signs, and laboratory results, these must be complete enough to permit and support the necessary medical judgments concerning the individual's physical, mental, and sensory capacities and any environmental restrictions. Descriptions and observations of the individual's limitations, from the individual, his or her treating or examining physician, and others are considered in preparing the RFC. Where the individual alleges severe and persistent pain, the medical history and objective medical findings, such as the presence or absence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, etc., are considered usually reliable indicators of the intensity and persistence of the pain and the effect that such pain may have on the individual's work capacity. Where available, this type of evidence is always obtained and must be considered in reaching a conclusion as to disability.

However, there are situations in which the individual's alleged pain may suggest a greater restriction of function than can be shown by the objective physical and mental findings alone. In such cases, reasonable conclusions as to any limitations on the individual's ability to perform basic work activities may be made from consideration of other information. Details about the nature of the pain, the precipitating and aggravating factors, the type of medication or treatment to control the pain, and the effect the pain has had on the individual's work activities and patterns of daily living must be considered in conjunction with the medical findings. When multiple impairments are involved, the assessment of RFC must reflect the restrictions resulting from all impairments, whether severe or not.

A finding that the individual has the capacity to do his or her past relevant work (PRW) is usually sufficient basis for a finding that the individual is not disabled. However, if the individual is determined to be unable to do his or her PRW the adjudicator must proceed to Step 5.

Step 5 – Does the Individual Have the Residual Functional Capacity to Perform Other Work?

The inability to do PRW is not in itself a basis for a finding of disability. A person who is functionally and vocationally qualified to engage in SGA in other work may not be found disabled if (1) the range of work for which he or she is functionally and vocationally suited is sufficiently broad to constitute a reasonable outlook for making a vocational adjustment to substantial work, and (2) such jobs exist in significant numbers in the region where the individual lives or in several regions of the country.

sequential evaluation to determine whether the individual's impairment(s) prevents the performance of work he or she has done in the past. (Widows and widowers must meet or equal a listing to be entitled to disability benefits. Therefore, their claims are not considered beyond Step 3.)

Step 4 – Does the Individual Have the Residual Functional Capacity to Perform Past Relevant Work?

If the individual's impairment does not meet or equal the criteria of a listed impairment, yet there is a significant limitation in his or her ability to perform basic work activities, the sequential evaluation process dictates consideration of vocational factors.

In such situations, a residual functional capacity (RFC) assessment must be made to determine the individual's capacity to perform the physical or mental functions of work despite any limitations caused by the individual's medically determinable impairment(s). The functional capacity must be defined in terms of the individual's ability to function in a work setting.

An evaluation is made of the individual's exertional (basic strength) capacities (e.g., walking, sitting, standing, lifting, carrying, pushing or pulling), including an assessment of the individual's maximum RFC for sustained activity on a regular basis. The assessment also includes an evaluation of the individual's ability to perform such other significant physical functions and sensory characteristics as reaching, handling, seeing, hearing, and

speaking, which if limited may affect the individual's capacity for work for which he or she might otherwise be qualified.

Where an individual has a severe impairment which does not result in exertional limitations (e.g., certain mental, sensory, or skin impairments), consideration is given to nonexertional limitations which might result. Thus, the extent to which there is any restriction of the individual's ability to do such things as understand, carry out and remember instructions, respond appropriately to supervision, coworkers, and customary work pressures in a routine work setting must also be assessed.

The claimant's RFC is considered in determining whether he or she can meet the demands of jobs. For example, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. Thus, if the assessment of RFC indicates that the individual can sit only 30 minutes at a time, and a job requires that the individual remain seated, as at an assembly line, for one or more hours at a time, then the individual could not reasonably be expected to perform that assembly line job. On the other hand, there are some jobs in the national economy, typically professional and

Where an individual's impairment, including any related symptoms, such as pain, is solely nonexertional, the principles established in the regulations are applied in determining ''disability'' giving consideration to the rules for specific case situations described in Appendix 2 (i.e., use of the rules as a frame of reference). When the nonexertional impairment is a mental impairment, the ability to concentrate, to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and pressures in a work setting is considered.

If the individual's remaining physical or mental capacity is consistent with meeting the physical and mental demands of a significant number of jobs (in one or more occupations) in the national economy, and the individual has the vocational capacity (considering age, education, and past work experience) to make an adjustment to work different from that performed in the past, a finding that the individual is not disabled would be indicated. On the other hand, if the individual's physical or mental capacities, in conjunction with his or her vocational capabilities (considering age, education, and work experience), do not permit the individual to adjust to work different from that he or she performed in the past, a finding of disability is justified.

To determine the exertional requirements of work, jobs are defined as "sedentary," "light," "medium," "heavy," and "very heavy." The Social Security Administration uses the same definitions for classifying the exertional levels of work as are found in the *Dictionary of Occupational Titles* published by the Department of Labor (DOL). To evaluate an individual's skills and to help determine the existence in the national economy of work which the claimant is able to do, occupations are classified by the DOL as unskilled, semiskilled, and skilled.

Along with the RFC assessment, at Step 5 in the sequential evaluation consideration is given to the individual's age, education, and work experience. *Age* is a significant factor in determining whether an individual can do other types of work. The regulations (section 201(f) of Regulation No. 4, subpart P, Appendix 2) recognize the correlation between advancing age and the increasing inability to adapt to other work situations.

Other vocational factors considered at this stage in the evaluation process are *education and training*. Education generally refers to formal schooling, while training refers to skills and knowledge acquired through on the job training or through general experience in an industry or field of work.

Experience is also considered in evaluating an individual's vocational outlook. The jobs the individual has performed, the length of time spent at them, and the recency of the work are major factors in determining the individual's ability to work. Prior work experience is considered to allow a determination to be made as to the effects the individual's impairment(s) will have on the ability to utilize the remaining capacity to do other jobs.

The individual's RFC is used to determine whether or not he or she has the capacity to perform work other than that which he or she did in the past. The regulations require that the medical-vocational rules contained in Appendix 2 be used to direct or to guide the determination as to whether the individual is disabled. Where all factors relative to an individual coincide with those in a rule in the Appendix, that rule directs a conclusion as to whether the individual is "disabled." When all factors do not coincide with a rule (e.g., the individual has the RFC for more than light work but less than the full range of medium work), the rules are used as a frame of reference for determining whether the individual is "disabled." The rules in Appendix 2 can direct a decision only where all factors coincide and the individual's impairment, considering any related symptoms, such as pain, is exertional. Where the individual's impairment, and any related symptoms, such as pain, combines exertional and nonexertional components, the rules are used as a frame of reference for the determination. The exertional component is considered first using the applicable rule, and then the additional restriction(s) imposed by the nonexertional component is considered.

# REHABILITATION INCENTIVES

Although the primary mission of the disability program is to pay monthly benefits to those found to be disabled, a subsidiary objective is to help restore disabled individuals to productive activity. While some of the rehabilitation oriented provisions have existed from the inception of the title II disability program, others are more recent. Current program rehabilitation incentives include:

1. State Vocational Rehabilitation Agency Referral — Since enactment of P.L. 84-880 (the Social Security Amendments of 1956), disability claimants have been considered for referral to their State vocational rehabilitation (VR) agencies for possible VR services. Under the law, beneficiaries who refuse services offered by the State VR agency without good cause may have benefits suspended.

   Since 1981, when P.L. 97-35 (The Omnibus Budget Reconciliation Act of 1981) was enacted, Social Security will pay State VR agencies on a case-by-case basis for VR services provided to beneficiaries who subsequently go to work for a continuous period of 9 months of substantial gainful activity and who meet certain other requirements.

2. Trial Work Period — P.L. 86-778 (the Social Security Amendments of 1960) introduced the concept of the trial work period (TWP). Most disability beneficiaries are entitled to a TWP which allows them to render services in as many as 9 months (not necessarily consecutive) without affecting their disability benefits, if their impairment(s) remains disabling during this period. In the case of a title XVI disability

recipient, payments are made during the TWP if income and resources requirements continue to be met.

After completion of 9 months of trial work, the work performed is evaluated to determine if the individual has engaged in substantial gainful activity (SGA). In deciding whether work is SGA, all pertinent facts about the individual's work are considered, such as the nature of the duties, hours worked, productivity, pay, and any other factors related to the value of services. Usually, the best gauge of whether the work is SGA is the amount of pay received. Under current regulations (20 CFR 404.1574-1575/ 416.974-975, 49 FR 222.72), earnings from work activity averaging more than $300 a month by nonblind disabled individuals generally demonstrates the ability to engage in SGA.

3. Impairment-Related Work Expenses Deductions — This provision of P.L. 96-265 (the Social Security Disability Amendments of 1980) was enacted by the Congress to encourage disabled title II and nonblind disabled title XVI individuals who must incur unusual expenses in order to work. It provides that the cost to the disabled person of certain items and services needed by the person to work, even though also needed for normal daily activities (e.g., attendant care services, medical devices, etc.), can be deducted from earnings in determining if the person demonstrates the ability to engage in SGA. The

provision also states that these same impairment-related work expenses can be deducted, under certain circumstances, from earned income to determine a title XVI (SSI) recipient's countable earned income.

4. Extended Period of Eligibility — The extended period of eligibility (EPE) provision became effective in December 1980. This provision of P.L. 96-265 permits the reinstatement of Social Security disability insurance benefits and regular Supplemental Security Income (SSI) payments, without a new application or disability determination, to those disabled persons whose disability was previously ceased because of SGA if they discontinue SGA within the 15-consecutive-month period immediately following the TWP. Impairment severity must continue, and in the case of a title XVI (SSI) recipient all nondisability requirements must continue to be met.

5. Extended Medicare Coverage — Under P.L. 96-265, Medicare entitlement for title II disability beneficiaries who have not medically recovered can be extended for up to 24 months after the extended period of eligibility.

6. Special SSI Cash Benefits — Section 1619(a) of the Social Security Act, enacted as part of P.L. 96-265, provides special SSI cash benefits to individuals who would lose eligibility for SSI payments under the regular rules because they engage in SGA. The person must continue to have a disabling impairment and meet all other eligibility rules. The only difference between the regular rules and the special rules is that

the special rules allow a disabled person to remain eligible even though his or her earnings exceed the SGA level. This special temporary provision was enacted by the Congress as an experiment and will expire June 30, 1987.

7. Extended Medicaid Coverage — Section 1619(b) of the Social Security Act (P.L. 96-265) continues Medicaid coverage for working disabled (or blind) people under age 65 when their earnings (along with other income) become high enough to cause SSI cash benefits to stop. To qualify for extended Medicaid coverage under section 1619(b), a person must: (1) have a disabling condition, (2) need Medicaid in order to work, (3) not be able to afford equivalent medical coverage without assistance, (4) meet all nondisability requirements for SSI payment other than earnings, and (5) have had an SSI cash benefit (regular or special) payable for the month before the first month of coverage under section 1619(b). This special temporary provision was enacted by the Congress as an experiment and will expire June 30, 1987.

8. Plans for Achieving Self-Support — Any blind or disabled SSI individual can have a plan for achieving self-support (PASS). Introduced by P.L. 92-603 (the Social Security Amendments of 1972), a PASS allows a disabled or blind person to set aside income and/or resources for a work goal such as education, vocational training, or starting a business. Individuals can even set aside funds to

purchase work-related equipment. A PASS does not affect the SGA determination. Income and resources that are set aside are excluded only under the SSI income and resources tests.

To qualify for a PASS the individual must have a feasible work goal, a specific savings/spending plan, and must keep the funds that are set aside identifiable. The individual must then follow the plan and negotiate revisions as needed.

In addition to the above specific work incentive features in the law, several other initiatives are being implemented by the Social Security Administration to test different rehabilitation strategies. They include:

1. Demonstration projects, as required by section 505(a) of P.L. 96-265, to determine effective and efficient alternatives to the present program of rehabilitating disabled beneficiaries and to find more effective incentives to return beneficiaries to work.

2. Special SSA initiatives with private employers, unions, and State VR agencies to return disabled beneficiaries/recipients to work.

# THE ADMINISTRATIVE STRUCTURE

The aim of the Social Security Administration's (SSA's) adjudication process is to distinguish individuals who are truly unable to perform work activities because of severe mental or physical impairment(s), including consideration of the limiting effects of severe pain, from those who are still capable of performing work activities.

Both title II and title XVI disability claims originate in the district office (DO) with the filing of a disability application. The DO has responsibility for helping the claimant complete the application, obtaining and reporting the claimant's description of his or her disability, and assisting the claimant in identifying sources of medical information. In addition, the DO personnel provide the claimant with an explanation of the evidence needs and development practices, advise the claimant of his or her rights and responsibilities in connection with the claim, and can provide information on work incentives available under the title II and title XVI programs and about vocational rehabilitation services available through State agencies.

State agencies known as disability determination services (DDS) make disability determinations for SSA under policies and procedures set forth by SSA in regulation (20 CFR 404.1503/416.903). The agencies, located in each of the 50 States, the District of Columbia, Puerto Rico, and Guam, have primary responsibility for the initial and the reconsideration levels of disability determinations. Under regulations the DDS is authorized to make determinations about whether the claimant is disabled, the date

the disability began (onset), and the date the disability stopped (cessation). Thus, the DDS development is aimed primarily at resolving issues involving onset or cessation of disability, current severity, and duration of the impairment.

The actual determination of disability is a team decision, involving participation by both a disability examiner and a medical consultant. The medical consultant member of the team ensures the adequacy of the medical documentation, and provides advice on the necessity for the purchase of additional medical evidence, either through recontact with a source of record, such as a treating physician or a hospital medical records department, or through purchase of a consultative examination. The medical consultant also has responsibility for interpretation of medical reports or studies that may be received and for preparation of an assessment of residual functional capacity (RFC) when the claim cannot be adjudicated on the basis of medical factors alone.

The disability examiner is trained in the legal, administrative, and other nonmedical factors which must be considered as well as the specific functional implications of disorders identified in the Listings and has responsibility for the completeness of the medical evidence. The examiner also has responsibility for the evaluation of the claimant's RFC in conjunction with his or

her age, education, and work experience in assessing the claimant's ability to work.

State determinations are subject to review by SSA. Regulations (20 CFR 404.1503/416.903) allow SSA to change a DDS determination, whether favorable or unfavorable, without having to return the claim to the DDS. SSA, therefore, has the authority to (1) reverse a State decision of allowance or denial, (2) establish an earlier or later onset date than that established by the State, or (3) establish that disability began at an earlier or later date or ceased at an earlier or later date than established by the State. Further, SSA may make the change after action has been taken to implement the DDS decision. Where the SSA review raises a question as to the appropriateness of the DDS decision, the claim is usually returned to the DDS for additional development and/or consideration.

# THE ADMINISTRATIVE APPEALS PROCESS

## Request for Reconsideration

An applicant who is dissatisfied with the initial determination may file a request with the Social Security Administration (SSA) for reconsideration within 60 days after the date of receipt of the initial determination. As with the initial determination, the reconsideration determination is made by an examiner-medical consultant team in the State disability determination services (DDS). However, the reconsideration determination is made by a different examiner-medical consultant team than that which made the initial decision.

At the reconsideration level, primary responsibility for the development of medical evidence again rests with the DDS. When the claimant provides additional information or alleges a worsening of his or her condition, the DDS will undertake additional development to obtain all available information. The examiner-medical consultant team will then review all of the evidence and prepare a new determination.

## Request for Review by Administrative Law Judge

If the claimant is not satisfied with the reconsideration determination, he or she may file a request for hearing before an administrative law judge (ALJ) within 60 days after receipt of the reconsideration notice.

The hearing is conducted by the ALJ who decides matters of fact and law in accordance with the Social Security Act, the Social Security Regulations, and Rulings. The ALJ has the authority to request and receive evidence in contested issues from any source deemed necessary and can issue subpoenas.

The claimant may appear in person at the hearing and present witnesses and additional evidence, or he or she may choose to request that the ALJ do a paper review of the evidence of record plus any supplemental evidence submitted. While SSA does not have representation at the hearing or at any other administrative level, the claimant has the right to representation at all levels and may have an attorney or other representative present.

25

## Request for Review by Appeals Council

If the ALJ affirms the earlier decisions, the claimant has 60 days in which to file for an Appeals Council (AC) review. The AC may deny a request for review if it would result in no advantage to the claimant, or may grant review and affirm, modify, or reverse the ALJ's decision. Further, even if the claimant does not request a review of the ALJ decision, the AC has the authority to institute a review within 60 days on its own motion.

The AC usually sees only the hearing record developed by the ALJ (affidavits, documentary evidence and testimony obtained by the ALJ), and the SSA disability file. But, the AC may invite the claimant or the claimant's representative to submit additional evidence and, on rare occasions, the claimant (or representative) may appear before the Council. At times, the AC will request additional information before handing down a decision.

The AC is the last administrative level in the appeals process and represents the final decision of the Secretary.

## Request for Federal Court Review

If a claimant is still dissatisfied with the decision, section 205(g) of the Social Security Act gives claimants the opportunity to appeal adverse final decisions of the Secretary to the federal court system. The federal courts review the administrative record and must decide whether the final decision of the Secretary was supported by substantial evidence. The court may also consider allegations that the policies and regulations used in determining entitlement were inconsistent with the provisions of the Social Security Act. Further, the court may be asked to review constitutional questions related to the Social Security Act, regulations, or policies. Finally, Social Security claims may be appealed to the Courts of Appeal and to the Supreme Court.

# COMPARISON TO OTHER INCOME MAINTENANCE PROGRAMS — GENERAL

While the Social Security and Supplemental Security Income disability programs are, in some respects, similar to many public and private income maintenance programs, there are significant differences which explain why an individual entitled to payments under one plan or system may be found "not disabled" under the provisions of the Social Security programs. For example, unlike some other compensation programs, the Social Security definition of disability covers only long-term (i.e., more than 12 months duration or likely to end in death), total incapacitation. There is no provision for short-term, temporary compensation, nor is there compensation for partial loss of function. Further, there is no requirement that the illness or injury be work or job related. In contrast, the Department of Labor definition used in workers' compensation programs generally requires only that a job related illness or injury last 3 days or more and Veterans Administration disability programs permit compensation for partial disability.

To better understand the differences, the Commission compared the Social Security disability programs to the Veterans' Administration, workers' compensation, and private insurance industry programs. What follows is a summary of that comparison.

## Comparison to Veterans' Administration Benefits Programs

For purposes of comparison, the Commission limited review of the Veterans' Administration (VA) programs to the service connected (compensation) and nonservice connected (pension) programs. Like the title II (Social Security) program, the VA service connected compensation program is an entitlement program, but with eligibility limited to veterans of the armed forces. Under this program, benefits are payable to veterans who meet the program's definition of disability caused by physical or mental impairment incurred in the course of military service regardless of the veteran's income or resources. In contrast to the Social Security disability programs, the VA provides compensation for partial disability. A Rating Board determines whether the disability is service connected and the percentage of disability. The amount of monthly compensation is computed based on this percentage. When a veteran has multiple impairments, each disability is rated and an overall rating then determined by a formula which takes into account the separate and combined effects of the individual's impairments. Service connected disability is established regardless of the veteran's ability to engage in substantial gainful activity (SGA).

Eligibility for the VA nonservice connected pension program is limited to wartime veterans, but provides benefit payments for impairments sustained subsequent to

discharge from military service. This program is similar to Social Security in that it requires that the veteran be unable to engage in SGA. However, unlike the service connected disability program, entitlement to the nonservice connected pension requires that the veteran be totally and permanently disabled which, for purposes of this program, means that the aggregate rating of disability must generally be at least 60 percent. The nonservice connected pension is an income supplement, with the benefit amount directly related to the veteran's other available income. Thus, receipt of other benefits, such as Social Security or workers' compensation benefits, may result in a reduction of the veteran's nonservice connected pension.

A basic difference between the Social Security and VA programs is in the definition of disability. While Social Security requires a "medically determinable physical or mental impairment" be present, under the nonservice connected program, the VA only requires a finding of a disease or disorder "determined by the Administrator" to justify a finding of total and permanent disability and employs an average man concept to determine disability. Using this "average man" concept, the Rating Board will not only evaluate the medical findings, but will determine *the average impairment to earning capacity* caused by the particular impairment. In contrast, the Social Security Administration (SSA) evaluates disability on an individual case basis to determine the effect of the impairment on the particular individual's ability to engage in SGA.

The Commission was particularly interested in how the VA evaluates pain in rating disability for purposes of the VA pension programs. Like SSA, the VA does not consider pain, in and of itself, disabling.

Perhaps more interesting to the Commission is that the VA does not consider pain in excess of the underlying disorder as an exacerbation of impairment. This is significantly different from the SSA approach which, once the presence of an underlying medically determinable impairment which can reasonably produce pain is established, evaluates the additional functional restrictions on the individual which may result from the pain.

In 1985, 2.2 million service connected disabled veterans (2.5 million veterans and survivors) and 706,000 nonservice connected disabled veterans (1.5 million veterans and survivors) were receiving benefits. For veterans rated at 30 percent disability or greater, the average monthly service connected benefit was $537, while family benefits averaged $628. For the same period, monthly payments for veterans with nonservice connected disabilities rated as totally and permanently disabled averaged $296. However, because of the manner in which the VA computes nonservice connected payments, monthly family payments were lower, and averaged only $272 in 1985. In fiscal year '85 $14 billion, or approximately 60 percent of the total annual VA budget, was allocated for veterans and survivors receiving compensation and pensions with $8.3 billion going to service connected disabled veterans and $2.5 billion going to nonservice connected disabled veterans.

In addition to financial benefits, the VA also provides a number of other benefits to disabled veterans. Such benefits include medical treatment at VA facilities, provision of prosthetic devices, a special housing allowance for necessary modifications to the veteran's dwelling, a special automobile allowance for necessary modifications to the veteran's automobile, and vocational rehabilitation. While vocational rehabilitation is not mandatory for entitlement or continuation of VA benefits, the VA will pay tuition costs and a living stipend for veterans interested in participating in vocational rehabilitation. Further, when rehabilitative training has reached a maximum level, a vocational counselor will attempt to place the veteran either in a job he or she has previously performed or in a new occupation. Some, but not all, of the benefits listed above are also available to recipients of nonservice connected pensions.

## Comparison to Workers' Compensation Programs

Unlike the Social Security or Veterans Administration disability programs under which the same rules apply nationally, administration and requirements of workers' compensation (WC) programs may differ markedly from State to State with some 50 different State workers' compensation statutes.

The original purpose of WC laws was wage-loss replacement as a result of occupational injury or death of a worker; the amount of payment is calculated by a formula taking into consideration both the worker's prior wages and subsequent inability to maintain the prior income.

WC provides three kinds of benefits: (1) death benefits to the worker's survivors, (2) wage-loss payments to the worker due to disability, and (3) payment of hospital, medical, and rehabilitation expenses resulting from a work-related injury. Each State uses its own formula to calculate benefit rates.

Originally, many WC programs tied entitlement to the worker's inability to perform his or her former employment or to obtain other work suitable to his or her qualifications or training (earning impairment). For example, if the Department of Labor's (DOL) classification of the employee's work was "medium," the ability to perform work at the light or sedentary exertional levels would not prevent the award of WC. This has changed over the years so that currently many WC boards allow payment on the basis of a schedule of specific impairments which are written into the State statutes or regulations. Under this system, a worker receives a prescribed amount of money on the basis of the "scheduled" impairment distinct from, and in addition to, any other payment to which the worker may be entitled.

Most recently, some WC programs have adopted a system which allows benefits for the period of time during which the worker is actually unable to work, expecting that there will be a speedy recovery and vocational rehabilitation. Unlike the provisions of the Social Security disability programs, under this "wage-loss" system, temporary total disability is possible if the worker can establish that he or she "is not able uninterruptedly to do even light work due to physical limitation."

There are other notable differences between WC programs and the Social Security disability programs. For example, SSA programs do not require that an impairment or injury be work-related. In contrast, WC programs define disability as inability, *as a result of a work-connected injury*, to perform or obtain work suitable to the individual's qualifications and training. The degree of disability depends on the degree of impairment to earnings capacity which, in turn, is determined by comparing the individual's pre-injury earnings with post-injury earning ability. Further, the WC programs generally follow the DOL definition of disability which requires only that the job related illness or injury last 3 days or more. Thus, WC is payable for temporary disability. Under the Social Security programs, benefits are not payable for short-term disability since the law requires that the individual's disability must last for at least 12 months or be likely to end in death.

As with the other programs studied, the Commission was particularly interested in the evaluation of allegations of pain under WC systems. Under most WC systems, the focus is not on the continuing presence of pain, but on the stabilization of the underlying impairment. Although the diversity of WC programs means that there is a diversity of approaches to the evaluation of pain, generally, where the worker's alleged pain is of unknown etiology, there is little chance of receiving WC benefits. However, when there is an allegation of substantial pain and either minimal or equal underlying pathology capable of producing the pain, consideration is given to the disabling effect of the alleged pain.

Most recently, WC programs have employed the "odd-lot" doctrine in the evaluation of pain. Under this approach, a worker may be found to be totally disabled even if he or she is able to sporadically earn a living. The doctrine is usually applied where there is a minimum of physical or mental dysfunction but the worker maintains that he or she is unable to return to work. Under the odd-lot concept other factors, such as age, education, and work experience, are taken into consideration in assessing potential entitlement. Once a worker alleges entitlement under this doctrine, the burden shifts to the employer to prove that, notwithstanding the medical and nonmedical factors, there is employment that the worker can perform satisfactorily.

Rehabilitation is integral to WC programs. Usually, participation is not mandatory for entitlement or continuation of benefits, but once a worker is enrolled in a rehabilitation program, completion is often mandatory. Applying the rehabilitation requirement to the concept of pain management, the presumption is that once referred for a pain management program, the worker is

expected to complete the recommended program. However, the completion of the rehabilitation (or pain management) program would not necessarily guarantee reduction of the impairment level or return to employment. Since eligibility for WC depends on the inability to obtain suitable employment because of the presence of an impairment, the reluctance of employers to hire the worker because of the impairment means that a worker could continue to meet the WC definition of disability even after completing a vocational rehabilitation program.

Because there are some 50 different WC programs, there is no uniform compensation scale. Rather, cash benefits, which include impairment and disability benefits, are set by State statute with weekly benefit rates ranging from a low of $133 in Mississippi to a high of $1114 in Alaska.

## Comparison to Private Insurance Industry

Disability insurance has been provided by the private insurance industry for approximately one hundred years. The level of benefits, length of payment of these benefits, and the circumstances under which benefits are paid have all evolved with many changes and liberalizations throughout the history of the insurance business.

Disability benefits are generally available in two broad categories (1) group disability programs purchased by the employer, and (2) individual disability policies purchased by the individual. Industry statistics for the end of 1983 show that some 64 million Americans were covered under short-term (benefits payable for 12 months or less) disability programs, and 25 million Americans were covered for long-term (benefits payable up to age 65 or for life) disability programs.*

One important characteristic of the private insurance industry is that both the insurance program itself and the claim examination process take into consideration the individual circumstances of the claimant. Each person is considered solely upon his or her individual circumstances.

Accordingly, individual contact through personal interviews, observation and, occasionally, investigation are used in the selection process in initially evaluating the applicant for insurance as well as in the claim process. In contrast, under the Social Security disability programs, there are no medical selection criteria for eligibility for disability protection although there are both medical and nonmedical requirements for entitlement to disability benefits, which are described in other sections of this report, which must be met for entitlement to benefits.

Private insurance coverage and the Social Security disability programs differ in four

*Source Book of Health Insurance Data, 1985.

principal characteristics – definition, benefit period, waiting period, and benefit amount.

Various definitions of disability are used by the private sector. The more restrictive disability policies have definitions of disability that will pay benefits if the claimant "is unable to perform duties for which he or she is reasonably fitted by education, training, and experience." In most group and individual contracts this definition has been liberalized over time in various ways so that the most liberal disability contracts today contain a definition of disability that will provide benefits if the claimant is "unable to perform the duties of his or her occupation," even though he or she may be able to work at some other occupation. This type of contract is frequently purchased by medical and legal professionals. Further, private disability insurance contracts, particularly individual contracts, frequently provide partial or residual disability benefits for individuals who are partially disabled. In partial disability contracts, insurance is usually for a flat indemnity amount stated in the contract. In residual disability contracts, the payment depends on the insured's earnings upon return to work. In contrast, there is no provision for partial or residual disability payments under the Social Security disability programs.

Private disability insurance also differs from the Social Security disability programs in the length of time for which benefits are payable. In private insurance, benefit payments may be for 1, 2, 5, 10 years or even to age 65 or for life. Although the cost of the contract increases as the period of payment increases, the availability and popularity of policies paying to age 65 or for life has risen dramatically over the past 2 decades.

The third area of difference is that the waiting period in private insurance, the period of time before benefits are payable, is usually much less than the 5 month waiting period required under the title II disability program. Depending upon the policy selected by the buyer, the waiting period may be 7 days, 30 days, 90 days, or up to 1 year. The most common waiting period is 30 days.

Finally, there is a difference in the benefit amounts payable. Although group and individual contracts regularly provide indemnities from $1,000 to $5,000 per month, the average individual contract is $2,000 and some individual contracts provide benefits of up to $15,000 per month. Since the indemnity is related to the individual's pre-disability income, the payment is the same regardless of the insured individual's marital status or family size.

Part Two

# THE COMMISSION

Part Two: The Commission

# TABLE OF CONTENTS

Page
39        Introduction

41        Meetings
41            May 1, 1985
41            June 13–14, 1985
42            August 8–9, 1985
43            September 5–6, 1985
44            October 24–25, 1985
44            January 30–31, 1986

45        Consultation with the National Academy of Sciences

47        Data on Pain and Social Security Claimants

49        National Uniformity

51        Defining Pain
51            Understanding and Defining Pain
56            Classification of Individuals with Chronic Pain

59        Malingering

# THE COMMISSION

The Commission members recognized that before the Commission could begin its discussions it would be necessary to establish an order of priority for achieving its goals and a universally understood and accepted medical and legal vocabulary.

Because the Social Security Administration uses very specific definitions to describe disability eligibility and entitlement factors, the Commission agreed to accept the Social Security terminology as used in Part One (also see Appendix A) for purposes of discussion and in the final report. At the same time, the Commission determined that it was necessary to clearly define pain, and particularly chronic pain, before any meaningful discussions could be held on the evaluation of pain in determining disability.

Finally, the Commission agreed that it could not carry out its legislative charge in the time allotted without the aid of the National Academy of Sciences (NAS). Thus, the members determined the ways in which the consultative support of the NAS could be used to best advantage.

This section contains a summary of the six meetings held by the Commission and presents the definitions of pain and chronic pain as used in this report and understood and agreed to by the members of the Commission. The section also describes the role of the NAS in the work of the Commission and certain decisions which the Commission made preliminary to its principle discussions.

# MEETINGS

The Commission was appointed on April 1, 1985, and met as a body six times, in May, June, August, September, and October of 1985, and in January 1986. All meetings took place in Washington, D.C., and, with the exception of the May meeting which was administrative in nature, notices were placed in the *Federal Register* to alert all interested parties to the date, time, place, and purpose of each meeting. Copies of transcripts of all proceedings along with records of correspondence between Commission members may be purchased upon request. All requests should be addressed to Social Security Administration, Office of Disability, Room 508 Altmeyer Building, 6401 Security Boulevard, Baltimore, MD 21235.

## May 1, 1985

This first one day meeting was administrative in nature covering the details of the structure, schedule, and charge of the Commission. The Commission members were sworn in and received formal acknowledgment of their charge from Charles D. Baker, then Undersecretary of the Department of Health and Human Services. During this meeting Patricia M. Owens, Associate Commissioner, Office of Disability, Social Security Administration, gave a summary presentation of the Social Security disability programs, the existing policy and procedures for evaluating pain within the disability program structure, and the issues which led directly to the formation of the Commission.

Fredric Solomon, M.D., Director, Division of Mental Health and Behavioral Medicine,

Charles Miller, Executive Officer, Institute of Medicine, and Marian Osterweis, Ph.D., Senior Professional Associate, Institute of Medicine, of the National Academy of Sciences then addressed the possible ways in which the Academy could best work with the Commission.

## June 13–14, 1985

This was the first business meeting of the Commission. On June 13 the Commission heard expert testimony and research data presentations from public advocacy groups, administrators, congressional staff, insurance executives, medical associations, and researchers. On the evening of June 13 the Commission split into three subgroups to discuss in more depth the issue of pain and disability from the private insurance, legal, and medical aspects. On June 14 the Commission heard additional expert testimony. The day concluded with a final discussion of agenda, priorities, and work assignments.

## Summary of Presentations

*Lyle Lieberman*, then President of the National Organization of Social Security Claimants' Representatives, gave the Commission a view of how the adjudicative process works from the claimant's representative's viewpoint.

*David W. Florence, M.D.*, spoke as a member and representative of the American Academy of Orthopaedic Surgeons on pain evaluation.

41

that may be psychological or biophysiological.

*Bruce Smoller, M.D.*, psychiatrist in private practice and member of the clinical faculty at The George Washington Medical School, spoke on the psychological characteristics of pain patients within the context of disability. He expressed the view that psychogenic pain exists only in three instances: depression with somatization; in rare cases of psychosis with delusions; and conversion reaction.

*Deborah S. Swansburg*, a consultant for the Institute of Medicine of the National Academy of Sciences, presented the literature survey she prepared on the relationship between pain, disability compensation, and vocational rehabilitation.

**October 24–25, 1985**

This two-day meeting was directed to discussion, review and, subsequently, agreement on those findings and recommendations which could be accepted by the Commission on the basis of its work to date. At this meeting the Commission also, mindful of the commitment to the Secretary, focused on the format and direction of its final report.

**January 30–31, 1986**

During this sixth and last meeting the Commission members reviewed the text of the draft report to ensure that it complied with their charge and that it reflected the discussions, findings, and recommendations of the Commission. Discrepancies or omissions in content were discussed and recommendations for changes in text and format noted for incorporation in the final report.

# CONSULTATION WITH THE NATIONAL ACADEMY OF SCIENCES

The Commission realized that it could not, in the time allotted, satisfactorily address all of the issues without the use of the services which could be provided by the National Academy of Sciences (NAS). Therefore, the Commission took full advantage of the legislative charge to work in consultation with the NAS and availed itself of the opportunity to utilize the NAS services.

As the Institute of Medicine (IOM) of the NAS had recently conducted an analysis to assess the status of basic research on pain and pain management, the Commission requested the IOM to conduct a review of the published literature on pain and disability which the IOM contracted to an independent consultant. Although the Commission requested that the review be limited to published research in the United States, the body of work reviewed is extensive and the IOM consultant provided a valuable and needed service in documenting this area.

As previously indicated, the report was presented to the Commission during the September meeting.

At the request of the Commission the IOM assumed responsibility for assembling a panel of experts to testify on the possible impact the payment of disability benefits, particularly disability on the basis of pain, would have on chronic pain behavior and on the rehabilitation of the claimant. The panel presentation was made at the September meeting and is discussed in Part Three of this report.

Finally, at the recommendation of the Commission, the Social Security Administration contracted with the IOM to conduct a major study on the relationship of chronic pain, chronic illness behavior, and disability. (See Appendix B.)

The results of the IOM study should serve as a valuable supplement to the Commission's recommendations, as the Congress no doubt intended when it directed that the Commission work in consultation with the NAS. The Commission is particularly interested in the IOM suggestions as to promising areas of research in the field of chronic pain and its assessment and advocates funding of the most promising of these research projects.

# DATA ON PAIN AND SOCIAL SECURITY CLAIMANTS

The Commission noted that the Social Security Administration (SSA) has little clinical or economic data specifically directed to pain and pain behavior as it relates to disability claimants and the extent to which pain plays a pivotal role in establishing disability. Thus, at the time this Commission was convened, SSA was unable to advise the Commission, with any great degree of reliability, as to the percentage of claims in which pain was involved, or the number of claims where pain, and specifically chronic pain, was a critical factor in the decisionmaking or might have been the basis for the decision at any level of adjudication.

Aware of the lack of reliable data on claims involving allegations of pain, SSA had initiated several projects to define the extent of the caseload involving allegations of severe pain or other symptoms. One such project was the Office of Disability's (OD) National Study of the Chronic Pain Syndrome, which was an attempt to obtain information about the prevalence of chronic pain syndrome (CPS), as defined by OD for purposes of this study, in the claimant population and to delineate the characteristics of such cases. (See Appendix C for a full description of this study.)

Although there were significant limitations to the study, and these limitations dramatically affected the Commission's faith in the reliability of any conclusions which could be drawn from the study data, there were certain interesting findings which may be indicative of characteristics of the disability applicant population as a whole and are, therefore, worthy of note here. In this study, about 60 percent of all cases involved allegations of pain and about 10 percent were identified as "CPS cases" using the study definition of CPS (see Appendix C). Further, about 25 percent of those cases classified as CPS in the study were awarded benefits. There was no conclusion, however, as to whether the presence of pain was a significant factor in the decision.

While the study findings confirmed SSA's experience that as many as 60 percent of initial claims involve allegations of pain, of special interest to SSA and this Commission both was the indication that just under 10 percent of the claimants were classified by OD physicians (using as criteria six factors thought to indicate CPS) as CPS cases. This percentage of cases identified by the study as CPS was higher than anticipated, leading to the possibility that more thorough investigation would show that the problem of evaluating pain affects a greater proportion of the disability caseload than expected. For example, if the study findings were applied to 1984 workloads for initial disabled worker claims, more than 90,000 claims would involve CPS. On the other hand, the mere presence of one or more of the study criteria did not necessarily mean a physician would rate the case a CPS case. As the tables in Appendix C show, in 41 percent of the cases OD physicians found an average of 2.3 of the six criteria present in CPS cases, in contrast to an average of only 0.4 of the criteria rated as present in non-CPS cases. In 68 percent of the non-CPS cases none of the six factors were rated as present.

A second SSA project to assess the extent to which pain plays a role in the disability

binding policy, SSA maintains an ongoing review of title II (Social Security) ALJ decisions where disability entitlement is at issue. Commonly referred to as the Bellmon review, this review was instituted following enactment of section 304(g) of Public Law 96-265. The review is conducted at the AC level. The AC has the authority to review all ALJ decisions and dismissal actions at the request of the claimant or on its own motion. Under the Bellmon provision, the AC is currently reviewing a random sample of 15 percent of all ALJ favorable title II disability decisions and 2.5 percent of all unappealed ALJ title II disability affirmations of denial. The AC may remand a case to the ALJ for further development and review, usually because the ALJ decision is not substantially supported by the evidence in file, or may reverse the ALJ decision on its "own motion." In fiscal year 1985, the AC reviewed 5,860 ALJ allowances and 1,487 unappealed ALJ denials under the Bellmon review provisions.

Any policy decision or procedural change must be communicated directly and clearly to the district/branch office staffs, to the decisionmakers in the DDSs and to the Quality Assurance staffs, the ALJs and AC members. SSA is acutely aware of the implications of such changes in terms of the training needs of adjudicators.

In accepting the importance of national program uniformity the Commission is aware that the sheer size of the program, with its thousands of decisionmakers, and the complexity of the problem of defining pain, dictate the need for clear and unambiguous rules. Although it was made clear from the start that the Commission

was not bound to adhere to existing law, the complexity of the problem, the limited time available to complete the work, and the fact that the Commission was dealing with only one part of the disability program, resulted in the Commission's directing its attention to considering the issue in terms of the present program rather than exploring avenues which might require extensive legislative action.

In working within the existing program, the Commission accepted the concept of uniformity to mean that (1) given different claimants with similar medical-vocational profiles, like decisions should be made, (2) the same rules are applied regardless of where a person resides and, (3) different adjudicators, given the same set of facts, should reach a similar conclusion. At the same time, the law provides that claimants can be treated differently if the facts in the case are different.

The Commission holds that pain is a complex experience, embracing physical, mental, social, and behavioral processes, which compromises the quality of life of many Americans. Chronic pain and its consequences are inadequately understood by patients, the health care system, the public generally, and SSA. This general lack of understanding has generated predictable administrative difficulties, including incomplete data gathering and inconsistent decisionmaking, which compound the difficulties of maintaining nationally uniform standards.

50

# DEFINING PAIN

The Commission recognizes two basic categories of pain, acute and chronic. The distinctions between the two are important for proper assessment of disability and are described in detail below. Acute pain is relatively well understood and is dealt with relatively well by current law. The problem is in the evaluation of individuals with chronic pain and, more specifically, the chronic pain syndrome (CPS).

To ensure uniform understanding, the Commission defined and described pain, and chronic pain states in particular, and agreed to a system of classification for individuals with chronic pain. Although the definitions and classifications used by the Commission may not conform precisely to some which have been used by various researchers, the Commission's definitions and classifications formed the basis for its deliberations and discussions in Part Three of this report and are, therefore, presented here as background for the reader.

## Understanding and Defining Pain

The most common conception of the pain process begins with the stimulation of certain specialized nerve endings. The stimulation can be a discrete, localized pin prick or a widespread impact; it may be a "pure pain" event or it may be accompanied by sensations of cold, pressure, etc.; it may occur in the skin or deep within the body.

Whatever the variations of noxious stimulation, the sensation is transmitted from nerve cell to nerve cell via complex and still incompletely understood electrochemical mechanisms, to the spinal cord and ultimately to the brain. The messages carried by the nerve cells may be blocked (such as by narcotics), superseded (such as when a pain message is overwhelmed by a higher priority impulse, like fright) or, occasionally, lost or garbled in transition.

When the signal through the neurons reaches a central point (in some instances this occurs in the brain, but other types of pain are received lower in the spinal cord), it is interpreted as a pain message, and an appropriate physical response is triggered. Where the stimulus is a complex one (e.g., involving both pain and fright), the interpretation will be complex as well and the "pain" component of the stimulus might not be recognized as primary.

This model of the pain process, of pain nociception being the brain's interpretation of a complicated message transmitted to it by the nerves in response to an external stimulus, is the generally accepted one, and it works well enough to explain the process when there is a pain stimulus. However, there are a number of conditions involving body damage where there is no pain

stimulus at all, and there are others where a pain stimulus occurs without the brain perceiving it. Moreover, a pain stimulus does not always indicate a threat to tissue or body damage, as when a set of muscles receives an unusual amount of use and is "sore" the next day. Thus, even without beginning to consider the so-called "psychological" issues, it is clear that the common model of the pain process has many limitations. For purposes of assessing disability, and especially for shaping a response of the legal system to the problem of pain, some refinements are, therefore, necessary.

First, it is important to differentiate "pain" from "suffering." The greater the pain the more it is believed to cause suffering. However, some pain, like that of childbirth, can be extremely severe and yet be considered rewarding. People may tolerate great pain without reporting suffering particularly if they know that it does not have dire meaning, that it can be relieved, or that it will be short-lived. On the other hand, individuals will report suffering with pain that others might consider minor if the pain is believed to signal dire consequences (such as cancer), if the pain is perceived as never-ending, or if no relief seems possible. In all these situations, individuals perceive pain as a threat to their continued existence — not merely to their lives or their bodies, but to their integrity as persons. That this is the relationship of pain to suffering is strongly suggested by the fact that suffering can be relieved *in the face of continued pain*, by making the source of the pain known, changing its meaning, and demonstrating that it can be controlled and that an end is in sight.

Pain and suffering tend to evoke virtually identical behaviors. As a consequence, both

the suffering individual who reports pain and the observer who would evaluate it are faced with trying to differentiate pain behaviors (discussed below) from suffering behaviors. In the case of pain behaviors which are reasonably consistent with significant physical findings, reversal of those behaviors awaits resolution of the underlying medical problem and, very frequently, overcoming the effects of deactivation and overguarding engendered by treatment and the passage of time since onset. In the case of suffering behaviors associated with reports of pain, but in which physical findings are lacking or insufficient to account for the pain alleged, resolution of the problem concerns clarification to the suffering individual that the pain which he or she is experiencing does not inevitably constitute a threat to his or her continued existence. In effect, it is postulated that, in the latter situation, the individual is confounding pain with suffering and does so largely under the mistaken impression that there is no resolution; that their future is threatened indefinitely. "Clarification," however, inevitably involves far more than transmission of information. The long-suffering pain patient has a pervasive repertoire of mental and physical consequences, including the adverse effects of deactivation and overguarding, which, for their reversal, will require systematic and extensive intervention.

This is not to say that suffering is any less intense or less real than pain, merely that it is a broader concept, and that it often confuses the precision of "pain" perception and reporting. Second, the degree of pain

caused by a particular stimulus varies enormously from individual to individual. As elaborated in the discussion on the measurement of pain in Part Three of this report (see page 81), current science offers no objective evidence of the existence or extent of a person's pain. We can observe tissue damage, and under some circumstances we can even measure the nerve impulse arising from stimulation of the pain receptors. We can also observe a person's reactions to the stimuli, but there is no direct external way to interpret that experience as "pain" or to compare objectively one painful experience to the next or one person's pain to another's. What we can objectively observe, and what does serve as the basis for medical and legal inferences, is "pain behaviors."

Pain can also be categorized on the basis of its presumed site of origin and the terms "somatogenic" and "psychogenic" have been used as discussed below.

"Somatogenic" refers to pain generated by tissue damage, prompted by injury or disease. Although most significant physical impairments generate corresponding emotional stress, this category of pain is relatively familiar and straightforward. It can often, however, produce erroneous diagnoses, because the origin of a pain stimulus in a particular part of the body usually, but not always, evidences tissue damage. Professionals and lay persons alike may fail to recognize that "hurt" and "harm" are not the same.

"Psychogenic pain" refers to a specific diagnostic entry in the Psychiatric Diagnostic and Statistical Manual III (DSM III). In general this term is difficult to define with disagreement among experts being common. The Commission questioned several expert witnesses about the "psychogenic pain" diagnosis and concluded that individuals with psychogenic pain by any commonly accepted definition constitute a very small number. Further, such persons come under the existing mental impairment listing for somatoform disorder used by the Social Security Administration. In contrast, the Commission believes that the mental impairment listing for somatoform disorders does not accurately describe individuals with chronic pain discussed in the following subsection. The Commission held that the medical conditions in groups A and B are not solely psychiatric impairments.

Social conditioning, reinforcing or minimizing pain behaviors and coloring their expression, is a powerful influence. Iatrogenic influences, too, can muddy the neat body/mind distinction, as failed treatment regimens (surgery, drugs, prolonged inactivity) generate their own pains in pursuit of a cure for others.

In the case of chronic pain, the issue can be looked at in another way. It may be useful to distinguish between "having" something (e.g., the body "has" an impairment) and "doing" something (e.g., the individual displays or emits pain behaviors). Pain behaviors have often been interpreted to mean the individual "has" an impairment. And that is often, particularly in acute pain, the case. But it is essential to recognize that

those same pain behaviors, however they originated, may now be occurring for other reasons; reasons, for example, reflecting the effects of disuse, the confounding of suffering with pain, or as a consequence of conditioning effects produced by the environment and people around the individual.

The Commission wishes to emphasize the fact that no one can know the pain of another person. Only pain behaviors, not pain itself, are observable to the outsider. Pain behaviors comprise verbal and nonverbal expressions or actions indicating that pain is being experienced. Obvious verbal expressions of pain include moans, gasps, and overt statements or complaints of pain. Facial expressions, guarded movements, limping and the like are also pain behaviors, as is the use of a cane or other assistive device. The alterations in muscle deployment, changes in stance, gait, and body motions are also found when pain is present. Similarly, broader activities, such as frequent reliance upon the health care system (e.g., repeated seeking of medication, surgery or other therapy) or avoidance of erstwhile pleasurable events can be understood, in the appropriate context, as pain behaviors.

The special importance of pain behaviors is twofold. First is the fact that pain behaviors are our only way of assessing a person's pain. Because science has developed no laboratory tests for identifying and measuring pain, the only available substitute is careful observation of a wide range of behaviors.

The second factor is that pain behaviors are subject to influence by a variety of factors in addition to pain stimuli, making the assessment of pain particularly complex. It is noteworthy, in particular, that many pain behaviors are at least partially under the conscious control of the individual. Individuals vary substantially in their utilization of the repertoire of pain behaviors, and evidence also indicates that there are demonstrable social boundaries giving some groups (defined, for example, by ethnicity, gender or age) greater "permission" to express their pain in the overt ways of pain behavior. Pain behaviors are also influenced by the effects of the naturally occurring learning process, which automatically accompanies any experience. This becomes a very important issue in considering chronic pain.

The temporal aspect of pain is another obvious basis for classification and, again, two categories are generally recognized.

"Acute" pain is pain of recent onset, most commonly associated with a discrete injury or other trauma. In the absence of residual structural defect or systemic disease, acute pain should subside as the healing process continues — ordinarily less than six months and usually less than one month. Recurring or episodic acute pain is generally associated with identifiable systemic disease, and intermittent bouts of more intense acute pain are punctuated by periods of remission. However, when pain recurs with sufficient frequency over long periods of time, its effects on the individual may be the same as pain that is constantly present for the same duration.

"Chronic" pain is constant or intermittent pain lasting for long periods of time. Six

months is a commonly employed duration. Such pain may be associated with a residual structural defect that persists long after the acute episode. An example would be the pain produced by the pressure of an intervertebral disk against a nerve root that remains long after the injury that led to the disk protrusion. Or pain may persist beyond the anticipated healing time of an injury, or beyond the active state of a disease, and be difficult to explain. Indeed, there may be no objective medical evidence of a physical or mental abnormality which could reasonably be expected to generate pain of the nature and intensity experienced, yet alterations of stance, gait, or body mechanics may clearly signify that pain is present. Unlike acute pain, which may be conceptualized as a warning that something is wrong and is therefore often a useful symptom, chronic pain may become a problem in its own right — a symptom but not necessarily of an underlying impairment.

The existing "Listing of Impairments" incorporates acute pain as an element in many of the categories. (For example, 1.02—rheumatoid arthritis, 4.00E—chest pain of cardiac origin, 10.10—obesity.) Not all pain, however, is amenable to categorization in this way. Some pains (for example, migraine headaches or "phantom limb" pain) generate little or no objective medical evidence. Moreover, where the pain outlasts the apparent physical abnormality, the current Listings do not establish a distinct category recognizing this condition as a discrete impairment.

One special type of pain that occupied much of the Commission's attention is the condition labeled CPS. CPS is a complex condition which has physical, mental, and social components. Both chronic pain and CPS can be defined in terms of duration and persistence in relation to the extent of demonstrated and observable pathology. Both may or may not have emotional components. However, CPS, as opposed to chronic pain, has the added component of certain recognizable psychological and socio-economic influences. Some individuals with chronic pain may not be disabled and other persons with disability due primarily to pain may not have emotional impairments. While there may be some blurring of the boundaries between chronic pain and CPS, the characteristic psychological and sociological behavior patterns inherent in CPS provide a basis for trained clinicians to distinguish between the two conditions, and to differentiate the CPS from malingering and from serious emotional disorders.

The typical CPS claimant might be a middle-aged man who, having worked in manual labor all his life, suffers a severe back injury in a fall. He is out of work for a recovery period of 4 months, but the pain persists despite apparent tissue healing. Additional conservative treatment is unproductive, and a more invasive therapeutic regimen of analgesics and surgery proceeds. A year after the originating fall he is still out of work, still experiencing no abatement of the pain, and well entrenched in a lifestyle of inactivity, pain, and disability.

This sterotypical CPS claimant is not a

hypochondriac, a malingerer or a hysteric. He is not "making up" the pain, not cynically plotting strategies for unwarranted receipt of disability benefits. Instead, his pain is real and very unpleasant, but also very complicated.

The claimant with CPS is caught in the web of effects which result from the influence of conditioning or experience. "Illness behaviors" are rewarded and the incentives for recovery are inadequate. There are multiple variations of this theme: for some, the continuation of pain is rewarded by increased concern and solicitousness from spouse and family; for others pain provides a "legitimate" rationale for quitting an unpleasant work environment; for still others, the luxury of concerted medical attention is a powerful lure.

In all these instances there is a profound but subconscious feedback process in which suffering or pain behaviors occur in large part because the individual's system has come to anticipate that multifarious "good things" happen when he emits pain behaviors, and that relatively "bad things"

are in prospect when he recovers. The conditioning is automatic if circumstances are favorable, and does not require even the awareness, let alone the intent, of the individual.

Without corrective action, a CPS individual slips ever deeper into a rut over time. The pain never abates, and the status of "pain disabled" provides a certain legitimacy and, sometimes, a steady income. As long as the incentive structure remains unaltered the prospects for spontaneous recovery are remote.

The Commission believes, however, that CPS is treatable and need not be a permanent condition. While a few individuals will improve spontaneously, others need the assistance of the concerted rehabilitation efforts of trained professionals. Such rehabilitation efforts include those of complex behavior modification training.

## Classification of Individuals with Chronic Pain

The Commission specifically addressed itself to the problem of evaluating disability in individuals who allege chronic pain. Such individuals live a life in which pain is always a factor, either because of its continuous nature or because, while the pain may sometimes ease, it always returns. The

Commission believes that persons with chronic pain can be classified into four groups.

### Group A – Chronic Pain, Inability to Cope — Insufficient Documented Impairment (Not Covered by Current Law)

Group A individuals have little in the way of medically documented findings, but their complaints of pain are prominent. They develop changes in behavior and mode of living which are due to the physical, emotional, and social effects of their pain. They frequently misuse drugs. They require what appears to be an inordinate amount of medical care; they have hospitalizations and surgeries in search of relief and are often made worse. They do not uphold their family roles and are no longer socially active. In addition, they may be depressed or have other psychological problems. These alterations in function may be of sufficient severity to reduce the Group A individual's residual functional capacity, thereby affecting his or her ability to work. Such persons are unable to function primarily because of their chronic illness behavior and the attendant loss of competent coping mechanisms rather than because of underlying pathological conditions. These persons have what is known as the chronic pain syndrome (CPS). It should be clearly understood that although emotional or psychological factors are important components of the CPS, these individuals do not have, nor are they disabled by, "psychogenic," unreal, or imaginary pain. The Commission holds that CPS is not a psychiatric diagnosis.

For pain to be considered in the evaluation of disability for Social Security purposes, the law specifies that there must be a medically determinable condition that can reasonably be expected to produce the pain. Persons in Group A (with CPS) are not usually found disabled because the documented pathological condition or impairment is not one which would reasonably be expected to produce the pain alleged.

## Group B — Chronic Pain, Competent Coping — Insufficient Documented Impairment (Not Covered by Current Law)

Group B individuals exhibit some similar characteristics to those in Group A. They too lack medically documented findings to account for their pain, yet they may allege disability due primarily to pain. Despite their pain they continue to function well in emotional and social spheres. They do not have CPS. While they are functional their endurance may be compromised both by their pain and by their poor pacing skills. They can sit or stand, but not for periods sufficiently long to be productive. They can walk, but only for short distances before their pain causes them to stop. They may be able to carry heavy loads or do heavy work, but only briefly. Such persons have usually continued to work for many years despite their pain, but physical alterations in habitus, posture, gait, or work-related motions or effort can be demonstrated. Their pain may ultimately cause them to stop working. Because of the pain standard in the present law, as with individuals in Group A, they do not qualify for disability

benefits under the Social Security or Supplemental Security Income programs.

## Group C — Chronic Pain, Inability to Cope — Documented Impairment Sufficient (Covered by Current Law)

Group C individuals have medically determinable conditions, such as rheumatoid arthritis, which fully account for their pain. However, like Group A individuals, they also have severe difficulties with emotional and social functioning arising from their illness — the ability to cope with the pain and to deal with the problems created by the chronic illness has been lost. It is difficult to know to what degree these difficulties relate to either the underlying impairment or to the pain. They are unable to work both because of the physical consequences of their impairment and because of its social and emotional consequences. Their behavior is similar to individuals with CPS (Group A), except that Group C individuals also have medically determinable impairments which could reasonably be expected to produce the pain alleged. These individuals do not generally present a problem in the assessment of disability under the Social Security Act. For disability assessment

purposes their pain can be considered along with their impairment.

## Group D — Chronic Pain, Competent Coping — Documented Impairment Sufficient (Covered by Current Law)

Group D individuals, like those in Group C, have medically documented impairments that could reasonably be expected to produce pain. Group D individuals, however, have good emotional and social functioning. They cope competently with their pain and the problems created by their impairment and may continue to work. These persons may qualify for Social Security benefits because of their medically documented impairment.

The Commission was particularly concerned with the problems raised by the first two groups: Group A — CPS, chronic pain, inability to cope, little in the way of documented impairment; Group B — chronic pain, competent coping, little in the way of documented impairment.

58

# MALINGERING

In defining chronic pain, and in subsequent discussions concerning the ramifications of establishing a category of impairment for claimants whose impairment is due primarily to pain, the Commission members discussed at some length the concern as to whether malingerers can be distinquished from individuals who are truly impaired due primarily to pain. The medical experts on the Commission held that malingering can be recognized by trained health care professionals who can distinquish malingerers from claimants with credible allegations of pain. The essence of the medical experts' position is reflected in the following description of malingering and in methods for distinquishing malingerers from other claimants.

The Commission holds that malingering is the conscious and deliberate feigning of an illness or disability for gain. The essential feature of malingering is the voluntary production and presentation of false or grossly exaggerated physical or mental symptoms in pursuit of a goal. The goal frequently involves the prospect of financial reward (such as payment of Social Security disability benefits) or avoidance of unpleasant work or duty. Although malingering often has a negative connotation, for example, it is popularly associated with faking illness or injury to avoid military duty, under some circumstances malingering may be adaptive behavior, as when a wartime captive feigns illness to avoid additional harsh treatment from the enemy.

In considering the likelihood of malingering as a factor in allegations of pain which are not substantiated by objective medical signs and findings, the Commission is aware that there are certain advantages to being sick—increased attention, control of others, freedom from responsibilities, etc. Usually, however, these secondary gains are not part of the individual's illness, but arise after the illness is established. Further, the Commission observed that the fact that the individual can achieve certain advantages from the illness does not mean that he or she is malingering.

At the same time, the Commission recognizes that the presence of an obviously recognizable goal, whether financial, emotional, or social, which can be achieved by the individual as a result of the illness behavior may give rise to suspicion that malingering may be a factor in the allegations of pain, particularly when the medical evidence submitted in support of the individual's Social Security disability claim fails to support the allegations of severe, disabling pain and the evidence in file reflects a lack of cooperation with the diagnostic evaluation and prescribed treatment regimen.

The Commission explored the issue of malingering in great depth. The members questioned witnesses closely about malingering and scrutinized their own experiences. A clear consensus developed that malingering is not a significant problem for the Social Security disability system for two reasons: numbers and identifiability. First, the Commission concluded that there are simply not very many malingerers in the

Social Security disability applicant population. Second, the members expressed confidence that trained professionals, medical and other, could identify malingerers using appropriate medical and psychological tests and that careful review of the entire disability file, including the history, objective physical and mental findings, and statements from the claimant, his or her treating sources, and others would provide proper safeguards.

Part Three

# COMMISSION DISCUSSION AREAS

Part Three: Commission Discussion Areas

# TABLE OF CONTENTS

*Page*
65        Introduction

69        Summary of Discussion Subjects

          Subject of Discussion

71        Statutory Pain Standard
75        Lack of Knowledge: Inadequate Tools and Techniques
81        Lack of Reliable Method For Measurement of Pain
89        Facilities to Evaluate Pain
95        Consequences of Granting or Denying Benefits
103       Reactivation/Vocational Rehabilitation Experiment
104          Proposal for Reactivation/Vocational Rehabilitation Experiment(s)
107          Outline of Proposed Experiment(s)
107             I. Purpose
108             II. Design
110             III. Selection Criteria
114             IV. Conditions of Participation
115             V. Followup

# COMMISSION DISCUSSION AREAS

In the course of its study, the Commission has not been blind to the problems facing the Social Security administrators and has paid special attention to the discussions on the current policies and procedures promulgated by the Social Security Administration with respect to the evaluation of pain in adjudicating disability claims. In its meetings the Commission defined major areas of concern and carefully considered each of these areas individually and in relationship to each other. Commission discussions were often lengthy and highly charged, reflecting the sensitive nature of the issues and the personal experiences and opinions of the members.

This section of the report reflects the major areas considered by the Commission. In combination, they reflect the scope of the Commission's discussions, observations, and findings. For ready reference, the specific findings and recommendations resulting from the Commission discussion appear at the end of each subsection.

# SUMMARY OF DISCUSSION SUBJECTS

Subject: Statutory Standard                                    page 71

The Commission was asked to address the adequacy of the statutory
language for evaluation of pain and to recommend to the Secretary of
Health and Human Services whether that standard should be allowed to
"sunset" on December 31, 1986, or should be extended, or extended with
modification.


Subject: Lack of Knowledge: Inadequate Tools and Techniques  page 75

The Commission observed that there is a general lack of knowledge and
understanding of chronic pain and chronic pain behavior which is
reflected in the lack of adequate Social Security Administration tools and
techniques for obtaining information about pain.


Subject: Lack of Reliable Method for Measurement of Pain      page 81

The Commission considered whether a valid and reliable method of
measuring pain for purposes of assessing impairment due primarily to
pain exists.


Subject: Facilities to Evaluate Pain                           page 89

The Commission considered whether specialized pain centers should be
used by the Social Security Administration to provide a comprehensive
assessment of claimants alleging impairment due primarily to pain.
Specifically, the Commission addressed the questions of availability,
reliability, and required specifications for such facilities.

Subject: Consequences of Granting or Denying Benefits          page 95

The Commission weighed the consequences of granting disability benefits versus denying disability benefits in the context of the Social Security Administration's dual and competing responsibilities to protect the interests of claimants and the integrity of the Disability Trust Fund and Federal general revenues.


Subject: Reactivation/Vocational Rehabilitation Experiment     page 103

The Commission discussed the value of a reactivation and rehabilitation program as a necessary step in assessing impairment due primarily to pain.

Subject of Discussion

# STATUTORY PAIN STANDARD

The Commission was asked to comment on the adequacy of the statutory language for evaluation of pain and to recommend to the Secretary of Health and Human Services whether that standard should be allowed to "sunset" on December 31, 1986, or should be extended, or be extended with modification.

"An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability."

October 9, 1984
Public Law 98-460, Section 3(a)(1)

In October 1984, the Congress enacted the above statutory language with the explicit provision that the standard would apply to *all* decisions made prior to January 1, 1987. The new temporary statutory standard codified existing Regulation and policy with respect to the evaluation of pain in determining disability.

To comment on the adequacy of the statutory standard the Commission reviewed the history of the provision and the events summarized below leading to its enactment.

During the Congressional deliberations on Public Law (P.L.) 98-460 several Members noted the influence the federal courts were exercising in defining various pain standards in the disability program. In addition, the decisions regarding pain varied considerably from Circuit to Circuit, and primarily addressed how a claimant's allegation of pain was to be assessed and evaluated in deciding whether a claimant was under a disability. Some Members were concerned that the court opinions had gone beyond what the Congress had intended by giving too much weight to allegations, thereby redefining the concept of disability. They believed that the court pain standards were improper and beyond the intent of Congress. Other Members were concerned that the Social Security Administration (SSA) was too restrictive in its interpretation of how to evaluate pain, thereby wrongly denying benefits.

Further compounding the diversity of court rulings for adjudicating allegations of pain was the requirement by some courts that the Secretary reopen many hundreds of previously decided claims for the purpose of applying a court defined pain standard. This created administrative burdens for SSA, but provided the opportunity for benefits to be awarded to claimants whom the courts adjudged to have been wrongly denied at the administrative levels. A related but broader issue was the sensitive matter of whether the Secretary was required to adopt diverse court standards at the administrative level, thereby having different standards in different geographic areas in contradiction to the Congressional dictates for a uniformly administered national disability program.

In enacting the statutory standard, the Congress made clear that it intended that uniform standards be applied in adjudication of disability claims involving allegations of pain during the interim period in which this Commission studied the question of the evaluation of pain and disability and assessed the adequacy of the Social Security standard expressed in the statute in light of the Commission findings. At the same time, the Congress intended to eliminate further detailed judicial pronouncements on the issue of an appropriate pain standard. Although court opinions were generally consistent with SSA policies regarding pain, the courts perceived that certain aspects of the administrative record did not clearly show adherence to those policies. In a few decisions, court opinions could be read to conflict with existing Social Security policies. Since enactment of P.L. 98-460, however, it is significant to note that the courts have deferred to the new statutory language and, in some cases, gone so far as to find prior court rulings to be superseded by the statutory definition of pain.

## REPORT OF DISCUSSION

The Commission does not perceive its role as that of interpreter of court opinions on pain. It recognizes that each opinion may, in fact, be subject to various interpretations. (See Appendix F for a compilation of significant court opinions on the issue of pain.)

However, the Commission was specifically asked to consider the appropriateness of the statutory standard enacted in 1984, and to comment on whether the standard should be allowed to "sunset" on the December 31, 1986, expiration date or be extended. This question came up for discussion several times and was the subject of considerable debate.

In general, the Commission understands and finds no fault with the administrative need for a statutory standard to ensure a uniform

policy, nor does the Commission question the statutory requirement that pain be considered in evaluating Social Security disability claims. However, the members differ in their stance on the adequacy of the statutory language in defining pain. In particular, there is concern that the statute does not provide for consideration of impairment due primarily to pain where there is insufficient objective medical signs and findings to establish a medically determinable physical or mental impairment which could reasonably be related to the alleged pain and its corresponding functional restrictions.

The importance of the question of the adequacy of the statutory standard cannot be overlooked. At present some 55,000 Social Security cases are pending before the federal courts. Of these, more than 95 percent involve claims for disability. There are no precise statistics with respect to how many also include pain allegations, but from preliminary data (see Appendix C), it is reasonable to assume that it may be an issue in as many as half of them.

The Commission, therefore, appointed a subgroup to examine the existing statute and develop recommendations regarding the advisability and nature of any change to be made. As a result, several proposals for amending the existing statute were brought before the Commission. The principal thrust of the changes being recommended was to define the consideration to be given to pain

in evaluating disability and, particularly, to more clearly recognize chronic pain syndrome (CPS).

The Commission believes that there is inadequate data to ensure that any change in the statute at this time would properly and clearly define pain and, in particular, pain not clearly attributable to objectively determinable physical or mental causes, and that the necessary data will not be available prior to January 1, 1987.

The expectation of the Congress was that this Commission would be able to:

(1) complete its mandated study of the issues;

(2) evaluate the appropriateness of the standard; and

(3) recommend extension, modification, or termination of the statutory language

in time for the Congress to act prior to January 1, 1987. However, in view of the complexity of the issues, the Commission observes that this expectation may have been too optimistic. Therefore, it was the considered opinion of the Commission that, provided the statutory language did not specifically bar conducting a proposed experiment, the current statutory language adequately and appropriately calls attention to the necessity of considering pain in adjudicating disability claims and that there is no need for clarification or modification of the statutory language at this time.

Although the Commission believes that it may be necessary in the future to modify the

existing statutory language to clearly define impairment due primarily to pain, and particularly CPS, and to outline the consideration to be given to allegations of pain in the adjudicative process, any proposed modification would be premature in light of the need for additional data.

At the same time, the Commission is recommending an experiment or experiments (described more fully on pages 107-115 of this report) to examine whether there should be a disability category for impairment due primarily to pain and to study the feasibility, efficacy, and cost effectiveness of rehabilitation where impairment is due primarily to pain. The results of this experiment(s) in conjunction with the findings of the study being conducted by the Institute of Medicine of the National Academy of Sciences (see page 45 and Appendix B) on pain, chronic illness behavior, and disability will permit a more informed recommendation for any needed change.

## FINDING

The introduction of a statutory requirement has promoted uniformity of adjudication at all levels within Social Security and has generally caused the courts to defer to the statutory language. Thus, to the extent that uniformity and national program administration are desirable objectives for the disability program, the presence of a statutory standard has been effective.

## RECOMMENDATION

The current statutory standard for the evaluation of pain should be extended without modification for the duration of the experiment(s) being recommended by this Commission and for one year thereafter. Any modification in the statutory language should only be made after additional data is acquired as a result of the study being conducted by the Institute of Medicine of the National Academy of Sciences and through the experimental process.

Subject of Discussion

# LACK OF KNOWLEDGE: INADEQUATE TOOLS AND TECHNIQUES

The Commission observed that the general lack of knowledge and understanding of chronic pain and chronic pain behavior is reflected in the lack of adequate Social Security Administration (SSA) tools and techniques for obtaining information about pain.

In drawing this conclusion the Commission carefully reviewed the methods and forms which are used to obtain information from claimants, treating sources, and others about pain and pain behavior and reviewed copies of the standard application forms used by the district offices (DOs) and medical request forms used by the State disability determination services (DDSs), as well as a representative number of the special questionnaires currently used by DDSs to obtain specific information in claims where pain is alleged. (See Appendix E.) What follows is a review of those methods and the Commission findings and recommendations for improvement.

## REPORT OF DISCUSSION

Information about a claimant's pain may be obtained in a variety of ways and from a number of sources. One of the first indicators that pain may be involved in a disability case often comes during the DO interview.

Then, either as a part of the description of why he or she is disabled, or in response to the interviewer's questions, the claimant may allege pain. Alternatively, an alert interviewer may notice the claimant's behavior during the interview and direct certain questions to the claimant which will elicit information about the pain and the effect the pain has on the claimant's capacity for certain basic functions, such as sitting, standing, walking, etc. The information obtained by the DO interviewer is part of the file forwarded to the DDS.

In the course of its development the DDS may obtain information from a number of sources, including the claimant's treating or consulting physicians, consultative examinations, hospital records, interviews with third parties who have knowledge of the claimant, etc. Any of these sources may indicate the presence of pain and report specific information which will corroborate the claimant's allegations.

Usually, when objective medical findings are present which corroborate the allegations, the issue of evaluating the degree to which the pain affects the claimant's functional capacity is not as difficult as when objective medical findings are absent. However, when

the objective evidence does not corroborate the extent of the alleged pain in terms of severity, duration, or frequency of occurrence, the reviewer must consider all of the available information regarding the claimant's alleged pain. This would include the evidence which has been received from the claimant during the initial and any followup interview, the claimant's treating or consulting sources, or other medical sources who may have examined the claimant, and also information which may be in file or readily available from family, friends, neighbors, coworkers, or others who know the claimant and would be able to provide information on the claimant's daily activities, behavior patterns, activities, prior to and since the alleged onset of the pain, etc. The final determination must take all of this information into account.

At present, much of the above information is obtained through the use of standardized forms. Thus, SSA uses a standard disability application which records information about the nature of the claimant's impairment, the onset of the illness or injury, the date the claimant last worked, the nature of the claimant's work prior to the alleged onset, etc. The claimant is also asked whether he or she has difficulty performing a range of activities, such as sitting, standing, walking, bending, seeing, hearing, etc. At the same time, the interviewer is expected to observe and note any difficulties the claimant exhibits in any of these areas during the course of the interview. All of this

information is forwarded to the DDS for consideration and evaluation in conjunction with the DDS development of the medical evidence.

DDSs have developed standardized forms which they regularly use to request evidence. While the basic form is generally designed to be usable in obtaining information about a wide variety of medical conditions, many DDSs have designed modified forms to request specific details about the claimant. Thus, there are a large number of special forms which have been developed for use when requesting information from a cardiologist, orthopedist, ophthalmologist, etc. In these modified forms, the DDS questions are tailored to encourage the reporting source to provide as complete information on the claimant as possible.

Over the past several years, increasing attention has been paid to allegations of pain from the claimant, his or her treating sources, or others. In a number of States, this has resulted in the development of a number of special "pain" questionnaires aimed at providing a clear and complete picture of the claimant's pain. In some cases, the questionnaires are designed for completion by medical sources. This type of questionnaire may be a substitute for the standard form or a supplement to the standard medical report form. Whether the request is a modified standard form or a special form designed to obtain information about pain, the intent is the same. The reporting source's attention is specifically focused on the question of the pain and the report, if complete, should provide a

description of the longitudinal history, nature, extent, duration, and severity of the claimant's pain.

In other instances, the DDS has developed pain questionnaires which are designed to obtain more information from the claimant. These forms ask the claimant to provide detailed descriptions of the pain, its effects on activities of daily living, relationships with others, ability to work or perform a variety of work-related activities, etc. Some of these "pain" questionnaires are completed by the claimant and mailed to the DDS, others may be completed through a telephone interview conducted by either a DO or DDS interviewer. In some cases, the DDS will also interview one or more relatives, friends, or others regarding the claimant's condition.

Again, all of this information should be considered by the DDS in arriving at a disability decision. Once the decision is made, a decision rationale is prepared which should reflect the degree to which pain was weighed into the actual decision.

At the hearing level, the administrative law judge (ALJ) can request additional information from the claimant, his or her family, friends, former employers, coworkers, etc. In addition, the ALJ can request the DDS to obtain additional medical information from treating or consultative sources as to the claimant's impairment(s), including the nature, extent, and effect of any alleged pain.

In reviewing the existing forms and evaluating the effectiveness of the information gathering system currently used by DOs and DDSs alike, the Commission realizes that the problem that faces SSA goes back to the lack of knowledge and understanding of pain and pain behavior — by the claimant, his or her treating source, and the adjudicative teams — and precludes effective data collection at all levels.

The Commission spent considerable time in discussing the manner in which it could best aid SSA to improve its information gathering tools. Along this line, several members of the Commission explored possible formats for appropriate questionnaires for claimants, treating sources, and others. These prototype documents were brought before the whole Commission for discussion and comment during the October 1985 meeting and again during the January 1986 meeting.

In reviewing these prototypes, several members voiced concerns that were supported by the Commission as a whole. One of the principal concerns was that the limited tenure of the Commission did not allow the type of indepth work that should properly go into the design of an

appropriate and reliable data gathering instrument.

Another consideration was that, although the members had considerable expertise in the area of pain and pain behavior, design of questionnaires today involves high technology and a specific type of expertise that went beyond that available within the Commission.

However, even assuming the members had the time and expertise to design appropriate instruments, the development of such instruments would require an improved profile of SSA's claimants and caseload involving pain allegations to ensure a statistically sound product. There was doubt as to whether the information currently available was adequate to develop a form or questionnaire which would meet the strict criteria the Commission set for itself.

Notwithstanding the above reservations, the Commission believes the prototype questions developed during the course of its meetings reflect the type of information needed by SSA to properly evaluate pain and pain behavior. (See Appendix E for examples of questions which should be incorporated in questionnaires to be developed by SSA with the help of experts in the technical development of such instruments.)

In a related discussion, the Commission recommended that for uniformity of administration, when pain is alleged for the first time at the ALJ level, unless a favorable determination can be made on the basis of other information in file, the case should be automatically remanded to the DDS for development of the new allegations and reconsideration of the earlier DDS decision. In doing so, the Commission recognized that this would entail delays for some claimants. The Commission noted the inefficiency of providing for the possibility of two ALJ hearings — one to determine if a favorable decision could be made at the initial hearing without supplementing the record of pain, and a second if the case were remanded for development of pain, again denied by the DDS, and the claimant then filed for a hearing on the issue of pain.

However, a majority of the Commission held, after considerable discussion and a formal vote, that the recommendation of a mandatory remand is appropriate. In making this recommendation the Commission has no intention to delay decisions and believes that institution of the procedure will in the long run promote more efficient information gathering and development of pain-related disability cases at the earlier stages of adjudication. Commission members have reason to believe that there is a percentage of cases in which information is intentionally withheld at the earlier levels of adjudication in order to bring the case before the ALJ for a face-to-face hearing. The Commission expects that once claimants and claimant's representatives are aware of the automatic remand provision, they will be encouraged to provide more complete information at the earliest possible date.

78

Finally, the Commission notes that, although SSA has a training program designed to familiarize all adjudicators with the law and regulations for the evaluation of pain, no amount of training can ensure a complete understanding and determination of the claimant's situation because neither the trainers nor the trainees fully understand the nature of the problem facing them. This can be compounded because the claimant, who is also in most cases unaware of the forces contributing to the pain experience, may be unconsciously amplifying the problems. This situation is true at all levels of adjudication and crosses all social and economic groups.

## FINDINGS

It is essential that the initial DO interview process be able to identify pain cases as early as possible. Improved interviewing techniques will enable pain cases to be placed on a separate track with routinely required early face-to-face interviews at the DDS level. This will provide a more complete description of the claimant's pain and the effects of such pain on his or her ability to function early in the claims process, thereby eliminating the need for repeated requests for additional development. It should also reduce, to some extent, the number of pain cases which are denied at the initial, and even the reconsideration, level because of incomplete evidence and/or understanding of the effects of the individual's symptomatology.

The Commission cannot ignore the possibility that an allegation or report of severe pain will not surface until the case is before the ALJ. In such situations, the needs of both the claimant and of SSA may best be served by remand of the case to the DDS for the necessary development and re-evaluation of the evidence rather than incurring added expense and potential delay by holding the case at the hearing level. However, the Commission recognizes that there are factors other than pain which are considered in the adjudicative process and, although the Commission is interested in the pain aspects of the case, it does not recommend delaying a favorable decision for the purely academic development of the alleged pain.

# RECOMMENDATIONS

The Commission recommends that the early stages of the disability claims procedure should be redesigned to adduce more adequate information about pain and pain behavior. Several specific steps should be pursued toward this objective. These include:

1. Additional training focused on issues of pain to be provided to State DDS employees, to ALJs, and to others within the Social Security disability system, in order to instruct government personnel about issues raised by pain complaints;

2. Redesign of SSA application forms to alert interviewers and/or adjudicators to cases where pain is a substantial element in the claim and development of questionnaires to collect more information about pain at the earliest opportunity. The initial application form should provide the claimant a clear occasion to detail the pain, when present. Questionnaires and forms sent to treating and consulting physicians and, where appropriate, to the applicant, his or her family, friends, and other potential sources, should also have additional provision for eliciting detailed descriptions of pain behaviors, when applicable. Further, the Commission recommends that SSA, wherever possible, use experts for the design and testing of such questionnaires and other data gathering instruments.

3. Personal interviews or face-to-face examinations at the DDS level should be required earlier in the decisionmaking process in pain cases to enable first hand personal evaluation to supplement paper reviews and telephone interviews.

4. Regulations should require decisionmakers at each stage and at all levels of adjudication of a disability case to specifically address the issue of pain whenever it is raised by the claimant or the record, and to state explicitly all findings and the basis for such findings regarding the nature, extent, and severity of pain.

In any case where disabling pain is alleged for the first time at the ALJ stage, and the ALJ is unable to otherwise dispose of the case (e.g., by awarding benefits on medical or medical-vocational grounds or denying benefits based on the claimant's failure to satisfy the nonmedical eligibility requirements), the ALJ should be required to remand the case back to the State DDS for further development of the record regarding pain.

Subject of Discussion

# LACK OF RELIABLE METHOD FOR MEASUREMENT OF PAIN

The Commission was asked whether a valid and reliable method of measuring pain for purposes of assessing impairment due primarily to pain exists.

The disability regulations require, without exception, that disability must be established on the basis of verifiable and objective medical evidence, as demonstrated by medically acceptable clinical and laboratory diagnostic techniques, with emphasis placed on the repeatability and reliability of such techniques. Further, the law requires that there must be medical signs or other findings which establish that there is a medically determinable condition which

could reasonably be expected to produce a claimant's pain. Therefore, the Commission considered whether a valid and reliable method of assessing impairment due primarily to pain is available.

In conjunction with this, the Commission reviewed a wide spectrum of medical and nonmedical methods of assessing pain and heard testimony from experts in the field of pain measurement, and from Commission members and others experienced in the clinical management of pain patients.

## REPORT OF DISCUSSION

Early studies in clinical pain measurement were restricted to the development of pain measurement scales used to report clinical and experimental pain. Since 1960, numerous investigators have suggested the much more complex nature of pain and have developed a wide variety of assessment tools.

These investigators sensitized the research and rehabilitation communities to the existence of more than just the somatic or sensory components of the pain experience. The result has been the development of combination treatments for pain patients and the beginnings of more appropriate

evaluative tools combined with the development of a multidisciplinary team approach to the treatment of chronic pain.

Because of the crucial nature of the question of just what is possible in the area of pain measurement, the Commission decided that although it had considerable expertise in pain treatment, and the evaluation of pain for rehabilitation and insurance purposes, it would pursue any available additional knowledge of pain measurement through a literature review on the intersection of pain

and disability with the help of consultant services contracted by the Institute of Medicine (IOM) of the National Academy of Sciences, and by hearing testimony from experts in the area of pain measurement.

Just what is possible in the area of pain measurement is a key point in the evaluation of pain for disability purposes. Although a direct measurement of the level of pain would be useful, a measure of the person's functional capacity to perform work would be a necessary and more reasonable index of disability to assure uniform treatment for all claimants.

The expert testimony confirmed the Commission's understanding that although current clinical pain measurement research being conducted by the National Institutes of Health and other research centers holds some promise, it is not in a stage that can be expected to produce useful administrative tools in the near future. Clinical pain assessment scales can produce only relative results. Although they can be used to demonstrate something like the effectiveness of a drug, they have very little validity as absolute measures of pain. For example, a visual analog scale can be used with validity to compare an individual's rating of pain before and after the administration of a drug and to measure the relative change in the rating. But any attempt to compare the findings for different individuals would have

very little face validity because each individual's rating scale is subjective.

Another major issue is just how useful experimental pain studies are in assessing the magnitude of suffering caused by chronic pain. Acute stimuli not only produce a limited-duration "pure" pain entity, they also ignore the importance of psychological stresses and other nonsomatic, nonsensory, contributors to the pain experience. All of this is not to say, however, that an assessment battery cannot be developed to provide better ways to make decisions about disability and impairment.

The experts testified that pain can really best be defined as a description of an individual's experience encompassing physical, mental, social and behavioral processes, and all dimensions involved in the pain experience need to be evaluated to make a useful determination of whether or not an individual is incapacitated by the pain. Pain behavior, including verbal reports of pain, thus becomes the means to make as objective an assessment as possible of an essentially subjective area.

The following discussion presents the problems of measuring pain in terms of impact on disability evaluation for claims involving chronic pain as opposed to acute pain. (See Part Two, page 54 for a discussion of acute vs. chronic pain.)

An individual with a pain experience of a magnitude that approaches disability will almost always demonstrate a preoccupation

82

with the pain as evidenced by constant reference to the condition and the fact that all activities are considered in relation to the pain. As a corollary manifestation, this preoccupation with pain leads to an overutilization of the health care system. Back pain claimants, for instance, routinely have a history of multiple operations with the result that it is difficult to determine if the surgeries are the cause or the result of the pain.

Another pain-associated behavior is the inappropriate use of analgesic and/or depressant drugs. Physicians who work with patients in centers set up specifically to deal with pain report reduced levels of drug use when patients are treated appropriately.

Other pain behaviors include reduced levels of activity and avoidance of responsibilities. This might, for instance, be the voluntary restriction of all forms of movement or the foregoing of normally pleasurable activities or hobbies. An individual who was fond of walking or of chatting with neighbors reinforces the verbal complaint of pain by giving up these normally pleasurable activities because of the pain. The avoidance of work or other responsibilities by someone who has always responded well to normal societal demands that certain things be done, not because he or she necessarily wants to do them but because they should be done, is an indication that the individual feels that the pain is now an overriding factor.

A final, and perhaps most obvious, group of pain behaviors are those pain behaviors which involve motor activity. These include things like rubbing the painful area and facial expressions like grimacing. Controlled movement (guarding) is also prevalent as is the practice of sitting, lying, or standing in other than normal positions (bracing). Taken as a group these pain behaviors give a picture of an individual who is exhibiting how much pain affects his or her life.

The instruments for indirect measurement of pain encompass both behavioral and verbal aspects. Both are important aspects for evaluating the problems. The distinction between behavioral and verbal is important even though both in the ultimate sense are behavioral. People vary in their ability to express in words experiences they are having, placing a constraint on reliance solely on words. Conversely, actions and words often are influenced in quite different ways by the consequences they meet; i.e., by learning and conditioning effects. The often great divergence between what people say and what they do is perhaps the most obvious illustration. The implication of this in the measurement of pain is that reliance should not be placed solely on either overt actions or verbal statements. Instead, behavioral indicators can be used to check verbal reports and any discrepancies pursued to further delineate the problem. While neither should be considered the definitive criterion, actions are generally a more reliable reflection of an individual's

functioning than are his or her words. This issue is discussed further below.

Pain behavior testing can be broken into four categories: 1) measures of the presence or absence of suffering; 2) measures of the reported magnitude of pain; 3) measures of personality, motor or body movement performance; 4) measures of family responses to pain behavior.

Measures of the magnitude of pain entail a variety of behavioral and verbal tests, including preoccupation with pain, abuse of medication, and motor behaviors like guarding and bracing. These are perhaps the most central to pain measurement, but it is important to remember that magnitudes for both verbal and other behaviors will be strongly influenced, if not dictated, by the personality and environmental factors measured by the personality, motor and body movement tests. This category of tests attempts to measure personality and environment to filter out what psychologists call "behavioral style." The extremes of behavioral style for pain measurement purposes might be called, in layman's terms, "pain minimizers" and "pain maximizers." But there are as many variations as there are differences in daily activities, family interactions and work histories.

During its evaluation of the various available measures of pain behavior, the Commission reviewed many of the principal measures used today, with specific attention to the McGill Pain Questionnaire (MPQ) and the Minnesota Multiphasic Personality Inventory (MMPI). The MPQ is widely used and provides the responder with sets of words from which to choose in describing aspects of his or her pain. It addresses sensory, cognitive, and emotional or motivational aspects. While the MPQ is a psychological test to assess the sensory and affective aspects of pain, it has not been used to assess disability due primarily to pain.

Perhaps the most widely used and studied instrument is the MMPI. This is a true/false type personality test which contains numerous scales. It can be scored objectively and computer-based interpretations have been developed (and are continuing to evolve with increasing validity). Many studies have been carried out with the MMPI in regard to pain and many other kinds of human problems. However, the MMPI also has not yet demonstrated the kind of predictive validity essential to precise measurements about pain, nor has it yet yielded precise predictors of success in treatment or rehabilitation programs. Like the MPQ, it clearly deserves more study, but has not as yet progressed to where it can serve as an acceptable measure for the assessment of clinical pain as it relates to disability.

Despite drawbacks in relying on individual tests, a number of tests are now available which, when used together, would cover the gamut of physical, mental, social and behavioral processes. Mood and personality tests are important because they affect how an individual will respond to pain. Any pain questionnaire used by the Social Security Administration (SSA) should, far from being

a straight directory of physical pain, encompass information about social contingencies, environmental pressures, rewards, and the family and social system under which the individual is functioning.

The experts believe that any assessment battery adopted by SSA should be followed by an interview with someone specifically trained in pain assessment. Further, such an assessment battery would require expert interpretation.

In conjunction with the exploration of possible techniques which could provide SSA with reliable and repeatable methods to measure the effects of pain on function, the Commission reviewed the potential use of ergonomics in claims development.

Ergonomics is the study of conditions of the workplace. It applies mathematics to calculate what a person can do, how much weight he or she can lift, move, carry, etc., and is a way of measuring the safeness of the workplace by examining the strength requirements of the job (standing, walking, sitting, pushing/pulling, lifting, carrying) and then evaluating mathematically whether the individual can meet those requirements.

Employers apply ergonomics to ensure safety in the workplace by predetermining whether an individual can meet the strength demands for required job tasks. While certain norms have been established, the measure of whether a given individual can

perform a job is specific to that individual and each individual's capability must be independently calculated. In assessing pain behaviors the methods of ergonomics are necessarily limited to the extent to which the individual engages in the requisite activity. Failure of the individual to perform on the basis of alleged or reported pain does not permit one to infer the extent of nociception arising from tissue or structural defect; only that the individual engages in the specific behavior of refusing to perform or of performing less than adequately.

Given a complete description of the strength requirements of a job, a professional trained in ergonomics can predict whether or not an individual demonstrates ability to perform that job. Conversely, ergonomics can be used to mathematically predict an individual's limits of strength. This information can then be applied by a trained professional, such as a vocational counselor, to identify jobs the individual should be able to perform.

Ergonomics can, therefore, provide SSA with an objective, mathematical assessment of a given job's requirements. Thus, where information for a given job, employer, or industry, is available to the State disability determination services (DDS), it may be useful in combination with other information in file, including the medical assessment of residual functional capacity, in evaluating the claimant's ability to perform job tasks under Steps 4 and 5 of the sequential evaluation. (See Part One, pages 15-17 of this report.) Similarly, where an individual

has undergone an ergonomic assessment, the predictive values for the individual may be obtained by the DDS and considered in conjunction with all other information in file. A drawback to SSA's adoption of consultative ergonomic assessments is cost, estimated at approximately $1500, and the limited availability of trained professionals and equipment in many geographic areas.

Finally, the Commission determined from its collective knowledge, the literature review contracted by the Institute of Medicine, and expert testimony, that "state of the art" medical technology is not currently able to assess disability due primarily to pain. Any immediate serious approach to the problem of pain measurement must, therefore, begin with a recognition of the need to assess pain behavior in a multidimensional way.

The Commission agrees with the expert testimony that a set of assessment procedures is needed that is both specific to pain patients and psychometrically appropriate. To be psychometrically appropriate any set of assessment procedures must be (1) internally consistent and reliable as a group, (2) a valid measure of what they are meant to measure, (3) utilitarian, cost effective, more easily administered with instructions that can be readily understood by the test-taker, or have better face validity then current tests, and (4) sensitive to change to reflect the results of such test measures as treatment, drugs, etc.

## FINDING

Numerous attempts have been made to try to develop methodologies for measuring pain objectively. This is, as yet, not possible because pain is inherently a subjective personal experience and we are necessarily limited to observations of pain behavior, including the person's reports. With acute pain, attempts at measurement have been somewhat more successful, at least in experimental settings and in a limited

number of clinical settings where patients have been taught to describe the quality and intensity of pain and their degree of relief, using measurement tools that have established validity. Chronic pain, however, is a more complex entity, with additional social and psychological factors requiring a multidimensional approach to evaluate the person's report of pain.

## RECOMMENDATIONS

The Commission recommends that a multidimensional assessment battery be developed for use in the proposed experiment described on pages 107-115 of

this report, and its value as predictive of the rehabilitation potential of disability claimants tested as part of the experiment.

86

The Commission further recommends that if this battery proves successful, SSA give consideration to its eventual adaptation for inclusion as a regular step in the disability evaluation process.

Because of the importance of this area to the development of a valid and reliable method of evaluating pain for Social Security disability program purposes, the area of pain measurement has been referred to the Institute of Medicine (IOM) of the National Academy of Sciences for further study. (See Appendix B for more detail on the IOM study.)

Subject of Discussion

# FACILITIES TO EVALUATE PAIN

In conjunction with discussions about the availability of methods to evaluate impairment due primarily to pain, the Commission investigated the availability and reliability of facilities devoted specifically to the evaluation, treatment and/or rehabilitation of pain patients. While these facilities are in a state of growth and evolution, the following is a summary of what the Commission found to be the current status of such facilities and the specifications that would be required for a pain center to be able to provide the Social Security Administration (SSA) with a comprehensive assessment of a claimant alleging impairment due primarily to pain. For purposes of this report the term "pain center" is used as a generic for the type of facilities described below.

Historically, pain centers evolved in the United States and in Europe within the biomedical model, as multidisciplinary groups of physicians to review difficult diagnostic and therapeutic pain problems, or both. Most early pain centers were actually equated with "nerve block clinics" when nerve blocks represented the only nonsurgical treatment modality besides drugs for pain control.

In the last 20 years advances in research in the behavioral sciences added new dimensions to the study of pain which promoted new promising treatment strategies of behavioral medicine.

The evolutionary process is still in full progress and can easily be traced in the variety of pain control facilities around the world, ranging from unimodal pain clinics to highly sophisticated multimodal pain control centers. In 1977 an initial *Directory of Pain Clinics* was published by the American Society of Anesthesiologists (ASA). While the directory, as published, was faulted by the fact that it included only unverified data submitted by the respondents to the questionnaire and many clinics were not identified, it was an initial attempt to identify resources available to chronic pain sufferers.

A further revision of the directory was published in 1979 and listed by the ASA as an *International Directory of Pain Centers/Clinics*. The survey listed 273 United States clinics, of which 42 percent were of the multiple discipline type, 35 percent modality-oriented (primarily nerve block clinics), and the remaining 23 percent were syndrome-oriented (back pain, orofacial pain, headache, etc.). Of the 273 pain clinics listed in the United States, 41 percent were directed by anesthesiologists, 10 percent by orthopedists and physiatrists, 9 percent by psychologists, 9 percent by neurosurgeons, 8 percent by dentists, 7 percent by neurologists, and 6 percent by nonmedical personnel. Of the United States clinics listed, 40 percent were of the outpatient variety, 21 percent inpatient, and 13 percent both in- and outpatient. The remainder failed to list the location of the service rendered.

89

In the 1979 directory the Committee on Pain Therapy of the ASA proposed several definitions which will be useful for any discussion on the value of pain centers as a tool to be considered by SSA. Those definitions are as follows:

Major comprehensive pain centers — A major comprehensive pain center is an organized facility with both space and personnel committed to the evaluation of the interaction of the physical, emotional and sociological aspects of chronic pain problems, possessing the capability of developing a multidisciplinary approach to pain management, conducting research, and training of pain specialists among varied health care personnel.

Comprehensive pain centers — A comprehensive pain center is an organized facility with individuals or groups managing a great variety of chronic pain problems but unable to fulfill the academic prerequisites for a major comprehensive pain center. The center should have the personnel and facilities for evaluation of the psychosocial as well as the physical aspects of chronic pain behavior and for administration of therapy appropriate to the problem found.

Syndrome-oriented pain center — A syndrome-oriented pain center is an organized facility which provides an indepth study of all aspects of a particular pain problem and offers an acceptable treatment program for that problem. Examples of syndrome-oriented pain centers may be: low back pain centers, headache or facial pain centers, cancer pain centers, spinal cord injury centers, etc.

Modality-oriented pain centers — The modality-oriented pain center is a facility which offers the chronic pain patient the appropriate therapy as defined by the specialty of the center. Other therapies may be used as adjuncts on a referral basis. Such a center may or may not provide extensive evaluative processes or interdisciplinary treatment. Examples of modality-oriented pain centers include nerve block clinics, transcutaneous electrical nerve stimulation (TENS) clinics, acupuncture clinics, biofeedback clinics, mental health centers, etc.

All reports from the various pain control centers emphasize the important role played by the pain team for successful outcome of treatment. To form an effective team all members should share a common language and a common philosophy, agree on the same therapeutic goals for each patient, and have easy interdisciplinary communication and access to patients' records. This team consists of physicians, psychologists, physiotherapists, occupational therapists, nurses, social workers, and experts in vocational counseling.

There have been no new directories of pain centers since 1979, nor is there any other registry by which such facilities can be identified. It is variously estimated that in

the United States there are presently some 1,000–1,500 clinics, but there is as yet no certification program for training of pain therapy personnel except as part of training programs in other disciplines, of which most are anesthesiology fellowships. There are also few accepted protocols for treatment of any chronic pain problem other than cancer pain.

There are a number of organizations with an interest in the evaluation and treatment of pain and impairment due primarily to pain which were mentioned in the course of the Commission's discussion of this topic. While the Commission believes it is necessary for the reader to understand the role that these organizations have played in conjunction with the growth of pain centers and, therefore, provides a brief description of three such groups, at this point the Commission in no way endorses these organizations or recommends them or any particular pain center to SSA.

The *American Academy of Algology* was formed in 1983 as a nonprofit association of licensed physicians and surgeons with an M.D. degree within the 50 United States. Membership is limited to those in the field who are presently spending a majority of their time in clinical practice in the treatment of patients with chronic pain or patients with pain due to terminal cancer. Also accepted for membership are physicians who have, over the years,

demonstrated through past clinical work or pain research, an outstanding knowledge of and contribution to the field of pain treatment. At present there are 156 members.

The Academy aims to (1) support the formation of a specialty of algology with the long range aim of applying for recognition as an American Board of Algology through the appropriate channels, and (2) strive to ascertain and educate its membership concerning the various aspects in the social economic field related to the delivery of health care to patients with chronic pain or pain due to cancer.

The *American Pain Society* (APS) was founded in 1977 to (1) promote the control, management, and understanding of pain through scientific meetings, research activities, and clinical services, (2) inform the public of advancement in the area of pain, and (3) develop standards for training and ethical management of pain patients. The membership includes physicians, dentists, psychologists, nurses, and other health professionals interested in pain. In 1985 there were 1,000 members.

The APS conducts postgraduate continuing education programs and professional training scientific conferences, and compiles statistics. The Society meets annually and publishes an annual *Membership Directory*.

The *Commission on Accreditation of Rehabilitation Facilities* (CARF) was founded in 1966 and in 1985 listed 350 Survey

Consultants. CARF aims to encourage development and improvement of uniformly high standards of performance for all facilities serving individuals with physical and developmental disabilities.

CARF surveys and accredits rehabilitation facilities, including those involved in chronic pain management, and conducts research and educational activities related to standards for facilities offering programs in hospital-based rehabilitation, spinal cord injury, chronic pain management, outpatient medical rehabilitation, infant and early childhood development, vocational evaluation, work adjustment, occupational skill training, job placement, work services, residential services, independent living, and psychosocial areas. The Accreditation Program is administered by a 16-member appointed board of trustees.

# REPORT OF DISCUSSION

The American Pain Society (APS), in its concern over the rapid proliferation of self-styled pain specialists and pain clinics, appointed a committee to recommend standards for both inpatient and outpatient facilities. The standards accepted by the Society were essentially those contained in the ASA Directory of 1979 for major comprehensive clinics and later adopted by a national Advisory Committee of the Commission on Accreditation of Rehabilitation Facilities (CARF). Subsequently, CARF assumed the responsibility for accreditation of pain facilities. While CARF has now accredited some 45 facilities, it neither evaluates the quality of, nor endorses the agendum of, these facilities.

Thus, there are currently no criteria by which the programmatic competency of pain facilities may be identified, although many excellent programs provide both comprehensive physical and psychological evaluation and utilize multimodal rehabilitative therapy.

Comprehensive evaluation utilizes prescreening, record review, medical and psychological examinations and testing, and other diagnostic procedures. Treatment programs are developed individually for each patient and include medical, psychological, and functional (musculoskeletal) interventions. Although outpatient programs may be less expensive, the cost of inpatient programs may be justified in the context of a substitute for reimbursement for disability. However, the results of followup studies would not favor one program over the other.

## FINDING

It is possible to establish protocols of evaluation of individuals complaining of chronic pain to establish an acceptable diagnosis. Treatment and rehabilitation programs must be multimodal and time-restricted to be cost effective. Minimal standards for pain centers should include: (1) interdisciplinary (team) evaluation to include medical, psychological, musculo-skeletal (functional), sociological and vocational assessment; (2) quantitative measurements of dysfunction and therapy-related improvement; (3) rehabilitation goals, including detoxification from addictive medication, improvement of function, endurance, range of motion, lifting capacity and tolerance, patient training in self-control of autonomic function, muscle tension, self-care, stress management, assertiveness training, and psychological counseling; (4) specification of treatment objectives in a format ensuring informed consent; (5) measures of compliance with the rehabilitation program by periodic reevaluation of medical, psychological, and functional progress; and (6) vocational and avocational counseling with a view to placement in productive activity on completion of the period of rehabilitation.

## RECOMMENDATION

Whenever necessary, prior to allowing or denying Social Security disability benefits, SSA should use pain specialists and pain centers as consultative sources for evaluation and treatment in accordance with the specifications set forth above. For this purpose, the Commission defines a pain specialist as any health professional who has taken special training in the study of pain in their discipline.

Subject of Discussion

# CONSEQUENCES OF GRANTING OR DENYING BENEFITS

The Commission weighed the consequences of granting disability benefits versus denying disability benefits in the context of the Social Security Administration's (SSA's) dual and competing responsibilities to protect the interests of claimants and the integrity of the Disability Trust Fund and Federal general revenues.

The economic and social importance of the title II (Social Security) disability program is reflected by the fact that in December 1985 alone 2.7 million disabled workers and 1.2 million of their dependents were paid $1.5 billion for a projected annual program cost to the Disability Trust Fund of nearly $19.8 billion.

The title XVI (Supplemental Security Income) disability program is of equal social importance and also significant economic importance to the population it serves. In December 1985, the latest month for which figures are available, $.7 billion of general revenue funds were distributed in payments to 2.6 million blind and disabled persons under this program with an annual cost in Federal expenditures of $7.9 billion.

In reviewing the economic importance of these two programs, it is easy to see that any change which would lead to an increase or decrease in the number of beneficiaries on the rolls would have a significant effect on claimants, the Disability Trust Fund, and Federal general revenues.

For example, SSA presently awards benefits to 48 percent of all those who apply each year. This includes awards at the initial level and those made at the various administrative appeal levels. A change in the definition of disability could significantly change the rate of disability awards. Social Security actuaries project that a decrease in the allowance rate by 1 percent would *reduce* the benefit rolls by roughly 8,000 individuals annually at a savings of about $60 million in the first year and a cumulative savings of $900 million for the first 5 years.

On the other hand, any change which would result in an increase in the allowance rate by 1 percent would result in roughly 8,000 more individuals added to the rolls each year at a cost of about $60 million in the first year and a cumulative cost of $900 million for the first 5 years. Put in perspective, the potential benefit liability to the system in the case of a 30-year-old applicant is approximately $200,000, assuming an $800 monthly benefit for 35 years, discounted at 7 percent, and adjusted for a 4 percent cost of living each year. Thus, from a strictly benefit point of view, the cost of change is considerable and was noted by the Commission.

Appendix D contains a table prepared by SSA, Office of the Actuary, showing the present value of various benefits paid for various periods discounted at different rates

and an explanation of the basis for the calculations.

In reviewing this issue the Commission also took note of the experience of the insurance industry. Both group and individual disability underwriters are very conscious of the fact that the ratio of the disability benefit level to the claimant's earnings is a major factor in both the frequency of disability and the length of disability.

Industry statistics indicate that the higher the ratio of benefits to previous earnings, the greater the chance of disability and the longer that disability.* Consequently, private disability programs rarely insure more than two-thirds of an individual's gross earnings or more than 80 percent of an individual's post tax earnings.

## REPORT OF DISCUSSION

Early in its deliberations, the Commission addressed the question of whether claimants who allege disability primarily due to pain should be entitled to disability benefits. Such claimants are typically those with some physical findings which are not in and of themselves disabling, yet these claimants allege that their restrictions because of pain render them disabled. Growing out of that discussion was a point of view, held by several of the medical experts on the Commission, that paying disability benefits to such claimants may foster certain behaviors that actually exacerbate the impairment and prevent rehabilitation. This concern was present throughout the deliberations as the members sought information on this phenomenon. This report of the Commission's discussion of this subject must be prefaced by three caveats: (1) there is a lack of information in this area, (2) the behavioral consequences of granting benefits is legally irrelevant, and (3) the consequences of granting benefits vary by individual.

Although several Commission members held the view that the granting of disability benefits was not in the long-term interests of the claimant because of the reinforcement of chronic pain behavior, others wanted evidence of this as demonstrated by research. As reported in Part Two, at the request of the Commission, the Institute of Medicine (IOM) of the National Academy of Sciences contracted with an independent consultant who conducted a survey of the literature on pain and disability and presented her findings during the September 1985 meeting. This review highlighted the lack of reliable scientific studies on the subject. While some studies have attempted to compare certain rehabilitation indicators (e.g., recovery rates, duration of disability, return to work) of those who receive benefits with those who do not, all have been flawed in some fundamental way. Basic scientific methodologies, such as the establishment of

*Disability Income Insurance: The Unique Risk

control groups and precautions against observer biases, have not been rigorously observed. Compounding the problem is that different definitions of disability exist in the several studies that have been conducted, thereby resulting in different definitions of success measures. Not surprisingly, the findings from these studies make it difficult to draw valid conclusions. The consultant found that the studies, on the whole, were unreliable and unpersuasive. The Commission accepts that judgment and cautions against substituting intuition and anecdote for hard data on a subject of major consequence.

It should also be noted that the Commission made another attempt to get more information on the consequences question by asking the IOM to assemble a panel of experts to address the Commission. The IOM asked the panel members to discuss the consequences of granting versus denying benefits. It is interesting to observe that the panel members were unable to address this question and discussed other disability related issues. This is perhaps further evidence of the lack of a common body of knowledge on the subject.

The Commission recognizes that the issue in granting disability benefits is simply whether or not the claimant meets the definition of disability. There is no requirement that benefits be granted only in those cases where it is in the long run "best" interests of the claimant. The Commission noted that such an inherently paternalistic judgment is not a requirement of other major disability programs, including private insurance, and that it is the insured

event, i.e., disability, that requires the insurer to award benefits. This principle is as appropriate to the Social Security disability system as it is to any other disability system.

As the Social Security Act requires personalized adjudication of claims, the consequences of the disability decision vary by individual. Thus, the Commission cautions that any future empirical studies documenting aggregate behavior should not be used to warrant a denial of benefits at the individual level. Generalized findings from research and studies do serve a useful purpose for policy planners in designing a fair and efficient disability system, but such findings should not substitute for personalized medical assessment and adjudication of the legal entitlement of a given individual.

Notwithstanding the above caveats, some Commission members believe that the granting of disability benefits may have unintended consequences resulting in reinforcement of chronic illness behavior. More specifically, some of the medical professionals who treat patients with significant pain complaints observed that the problems of individuals with chronic pain (see Part Two, page 51-56 for a description of chronic pain and chronic pain behavior) may be exacerbated by the compensation system, thereby impeding chances of successful rehabilitation and return to full function.

As noted in Part One of this report, the disability program, by law, requires that an individual's impairment must be

substantiated by medical signs, findings, and symptoms. Further, symptoms alone can never be the basis of a finding of disability without the requisite medical signs and findings. The claimant must, therefore, "prove" his or her disability in order to get benefits. The act of "proving" disability serves as a safeguard to the trust fund in that entitlements are based on quantifiable evidence, not mere allegations. But, at the same time, this requirement may serve as an incentive for the claimant to emphasize allegations and ultimately, through the subtleties of self-perception, to view him or herself as more seriously disabled than is the case. This perception of serious disability may, of itself, serve as a bar to rehabilitation efforts.

Similarly, section 221(i) of the Social Security Act requires that continuing entitlement to benefits be reviewed periodically (every 3 to 7 years depending on the nature of the impairment) to insure that only those who continue to meet the eligibility requirements receive benefits. Section 2 of Public Law 98-460 further provides that individuals whose impairments improve to the point where substantial gainful activity is again possible be removed from the rolls.

The Congress has viewed the continuing disability review process as an important safeguard for the disability program. Yet, from the beneficiary's perspective, this periodic review of eligibility may be seen as fostering a continuing need to "reprove" disability and demonstrate convincingly that no medical improvement has occurred. The

threatened loss of disability benefits, upon which the beneficiary and his or her family have come to depend, with the attendant loss of Medicare/Medicaid protection, may be a disincentive against medical improvement. It may well be that the work incentive provisions which are designed to encourage disabled beneficiaries to return to work (see Part One, pages 19-21 of this report) cannot override the powerful messages in having to "prove" and "reprove" disability. The receipt of disability benefits can be seen as legitimizing the individual's role in a society where people are generally expected to work unless they are physically or mentally unable to do so. All of these factors — the need to "prove" and "reprove" eligibility; the need to have an acceptable reason for not working; the financial dependence on benefits and corollary health care protection — may interact in such a way as to continually reinforce chronic illness behavior and defeat efforts at rehabilitation.

The development of chronic illness behavior can also be looked at as a demonstration of operant conditioning which would suggest that the rewards for pain behavior tend to reinforce the continuance and persistence of that behavior. In the case of the disability claimant with pain complaints, although the primary reward may appear to be financial, there are clearly other important benefits. The legitimacy conferred by the official

designation of *disabled* may be of inestimable worth if it carries with it physical and emotional support from family, friends, and the society at large. Although one would not choose to be disabled, the legitimacy conferred by that designation may be the only socially acceptable way for some individuals to work within the system to adapt to the competition of daily living.

The other side of the question, the consequences of denying benefits, is of equal importance to this Commission. Some of the consequences are readily apparent: financial instability for the claimant and his or her family; ineligibility for Medicare and/or Medicaid protection which are tied to disability entitlement; and emotional and social distress associated with loss of status as a productive member of society. The lack of financial support and health benefits can compound the individual's impairment if he or she has to exist on an inadequate diet, has no access to health care, or lives in substandard housing. Further, if the claimant has contributed to the support of the family unit, the inability to work and the resulting loss of income may cause a loss of self-esteem and, sometimes, dissolution of the family unit.

Just as the granting of benefits conveys a certain legitimacy and social acceptance to not working, the denying of benefits may jeopardize an individual's place in society. For example, the individual who has had a long attachment to the workforce and who is later incapacitated by illness or accident has his or her role as a contributing member of the workplace and as a provider of financial support to the family suddenly disrupted. As that individual confronts the disability system, he or she must "prove" disability through an often lengthy entitlement process. If, at the end of this process, the individual is denied disability benefits, his or her whole identity is called into question.

Although there are several provisions in the Social Security law (see Part One, pages 19-21) which are intended to encourage rehabilitation of beneficiaries, the Commission was generally critical of the rehabilitation aspects of the disability programs and viewed these provisions as inadequate to overcome the inherent financial and social advantages to continued entitlement to benefits.

Some Commission members stressed that, although consideration for referral to a State vocational rehabilitation agency is a normal part of the claims process, the truth is the State agencies have not succeeded in getting significant numbers of Social Security claimants into rehabilitation programs. In this regard, some Commission members questioned whether the provision restricting reimbursement of vocational rehabilitation agencies to only those cases where the individual successfully returns to work has the effect of limiting rehabilitation efforts to only the most promising candidates.

However, in considering the degree to which the existing program acts as a disincentive

to rehabilitation efforts, the Commission is unable, on the basis of available information, to predict how well the Social Security disability population, with its profile of advanced age (47 percent of those allowed in 1983 were 55 or over), severe disability, and blue collar work histories, would respond to rehabilitation intervention. The fact that people usually enter the Social Security system some months after the onset of disability (and under the title II program must wait 5 months after onset before benefits are paid) may frustrate rehabilitation efforts which are generally thought to be more successful when they are offered close to the time of the disabling event. Thus, the Commission believes the issue of rehabilitation for the Social Security population should be explored in a more ordered way so that the important questions that have been raised during its deliberations may be answered.

The Commission recognizes that there may be some systemic features of the disability program that affect both sides of the issue of whether to grant or deny benefits. Thus, some basic assumptions that the Commission has accepted are: (1) whenever possible, rehabilitation is better than long-term receipt of disability benefits; (2) both the economy and the Social Security trust fund are advantaged when successful rehabilitation restores beneficiaries to employment; and (3) there are impediments to rehabilitation in the present disability system.

The Commission must conclude that there is simply too little data upon which to make recommendations for changes in the basic program structure. At this point, the Commission is uncertain as to whether claimants with significant complaints of disability due primarily to pain are being denied benefits.

## FINDINGS

In some instances the availability of public or private disability and medical benefits are disincentives to rehabilitation and may influence the persistence and continuation of pain behavior. In other instances, however, income from these sources is the major factor insulating the recipient (and his or her family) from economic deprivation and attendant potential health jeopardizing stresses.

Further, the granting of disability benefits often is used as a substitute compensation for unemployment resulting from occupational disability. As such it creates a "sick" person out of one who could be at least partially productive. As medical disability is far more expensive than occupational disability, requiring continued

health care overutilization to continue to prove disability, alternative programs for support of the occupationally disabled should be explored.

The present evaluation process risks promoting iatrogenically induced complications or even disability through overdependence on objective medical evidence of impairment. Thus, under the current system, claimants with chronic pain who fail to produce sufficient objective medical evidence risk denial. The number of these claimants is unknown.

## RECOMMENDATIONS

The Commission recommends that there be an experiment or experiments to assess the magnitude of the problem and to evaluate whether there should be a listing category for "impairment due primarily to pain."

The Commission recommends that the experiment(s) include a study of the feasibility, efficacy, and cost effectiveness of reactivation and rehabilitation where the alleged impairment is due primarily to pain.

Subject of Discussion

# REACTIVATION/ VOCATIONAL REHABILITATION EXPERIMENT

The Commission discussed the value of a reactivation and rehabilitation program as a necessary step in assessing impairment due primarily to pain.

## REPORT OF DISCUSSION

It is in the interests of the claimant and society as a whole to make every effort to rehabilitate Social Security disability claimants to their full potential. Successful return to the workplace not only improves the quality of life for the worker, but also can significantly decrease the disability costs of the Social Security system.

The Commission believes with some support from expert testimony and the experience of members, that the closer to the disabling event the rehabilitation effort begins, the more likely it is to be effective. It realizes that one of the problems in the existing system is that the Social Security disability applicant often may not apply for benefits until considerable time has elapsed after the date of injury or illness.

On the basis of their own experience, the literature, and expert statements on the subject, the Commission members know that rehabilitation specialists emphasize that early intervention with a disabled person, in order to lay the proper groundwork for a rehabilitation program, is essential to optimize results.

At the same time, the members realize that one very basic difficulty with the Social Security disability insurance program is that entitlement to benefits does not begin until after the individual has been disabled for 5 full calendar months, and then only if the disabling impairment(s) is expected to last at least 12 months. Thus, although many, in fact most, claims are filed in the first 5 months after the initial injury or illness, many potential claimants put off filing an application for a longer period of time. This built-in delay in filing effectively precludes immediate or early intervention for rehabilitation. In comparison, under private insurance programs, as testified to by expert members on the Commission, rehabilitation efforts begin in the very early weeks of disability, even though it may take many months for the rehabilitation program to be successfully completed.

The contrasts between the existing Social Security program provisions for rehabilitation and those that prevail in the private sector did not go unnoticed by the Commission members. The members realized that any proposal for early intervention would require the development of some method which would alert Social Security adjudicators to potential claimants who were also candidates for rehabilitation. But the Commission did not want to recommend any system which would create

unmanageable workloads for the Social Security Administration (SSA) or would disadvantage potential disability claimants. Nonetheless, the Commission believes that early identification of potential rehabilitation candidates should be an integral part of a demonstration project or projects. With these restrictions in mind, the Commission concluded that a way to identify the potential disability claimant population should be developed, but determined that development of the methodology was beyond the scope of the Commission's responsibility.

## PROPOSAL FOR REACTIVATION/ VOCATIONAL REHABILITATION EXPERIMENT

The Commission realized quite early in its deliberations that there was insufficient data to determine (1) the number of claims in which pain plays a critical role in the decisionmaking process, (2) the ratio of allowances to denials where pain is the turning point for the decision, and (3) the long-term consequences of allowing or denying benefits to claimants who allege disability due primarily to pain.

Despite these drawbacks, the Commission clearly recognized that SSA does have a problem in evaluating disability claims where disability is alleged due primarily to pain, that this problem is related to the lack of any objective tool to measure an individual's pain, and that, although this problem was the reason for the Commission's existence, it was highly unlikely the Commission would be able to satisfactorily resolve all of these questions. Therefore, the Commission determined that the issues in question could best be answered through an experiment or experiments as described in more detail in the following pages.

The Commission does not intend that the proposed experiment(s) be limited to an assessment of the caseload for "pain" cases or a determination of whether the current Social Security procedures for evaluating disability, and specifically the medical evaluation criteria (the Listings), are adequate to properly evaluate impairment due primarily to pain. Rather, the Commission is seriously concerned with the potential adverse consequences of awarding disability benefits to claimants whose impairment is primarily due to pain and strongly advocates that any experiment(s) include a reactivation/vocational rehabilitation program for these claimants to test the results of such a program in terms of its effectiveness in assisting individuals to return to work.

The members agree that the evidence indicates the possibility that there is a group of Social Security disability claimants who are disabled due primarily to pain, but who

104

do not meet or equal the medical evaluation criteria and, under current policies, cannot be found disabled on the basis of medical-vocational considerations. Further, the Commission realizes that the Social Security medical evaluation criteria require that an individual have a "medically determinable physical or mental impairment" but that, under the existing policies, pain cannot be considered an impairment in and of itself.

Thus, the Commission recognized that in considering establishing criteria for determining impairment due primarily to pain, they were exploring new territory in which a symptom – pain – would be elevated to consideration as an impairment. This was a core issue underlying many of the Commission's deliberations leading up to this final report and was weighed against the financial and institutional burdens that would be imposed upon the Social Security disability programs if a recommendation to elevate pain to impairment level was made prematurely.

The members agreed that while the collective expertise of the Commission could and did (See Part Two, pages 54-56) readily identify and describe chronic pain patients and differentiate chronic pain from chronic pain syndrome (CPS) and malingering, the Commission could not determine at this time whether an individual with chronic pain or CPS is disabled within the meaning of the Social Security Act. Further, as members with clinical experience in multidisciplinary pain centers indicated that a proportion of individuals with chronic pain can be reactivated and vocationally

rehabilitated through appropriate treatment programs, the Commission was reluctant to determine an individual disabled if chronic pain, in a given instance, however much its severity, is a condition potentially reversible in something less than 12 months. Finally, because of the issue of potential reversibility, the Commission could not decide whether an individual with chronic pain or CPS should be determined disabled in the sense of having a condition which would not be subject to reversal within a period of a few weeks or months given appropriate treatment. Nonetheless, the Commission believed that the first step in determining whether an impairment category for individuals with chronic pain was appropriate would be the development and evaluation of a set of criteria to identify the chronic pain individual.

With this in mind, a subgroup was formed to study the proposal and to consider the possibility of identifying those criteria which could be applied to evaluate impairment due primarily to pain. This subgroup met several times over the life of the Commission and presented a proposal for criteria for evaluation of impairment due primarily to pain before the full Commission during the October 1985 meeting.

During that meeting the Commission agreed that the proposed criteria were likely to identify individuals with chronic pain. However, several members seriously

questioned whether the criteria would be able to accurately or best identify whether the individual with chronic pain was or was not disabled within the intent of the Social Security Act and in the sense of having an irreversible condition. These members, therefore, suggested that the criteria be tested before the Commission made any recommendation to SSA that the criteria be incorporated into the Listings of Impairment. Other members took an even more cautious approach and felt that a necessary first step was to test the criteria to see if, in fact, there was a group of individuals who would be able to meet the proposed criteria and were disabled and still other members held that no valid assessment of impairment due primarily to pain could be made without first determining whether an individual could be reactivated and vocationally rehabilitated. Thus, the majority of the members felt that the lack of past experience and proven methodology for the evaluation of impairment due primarily to pain mandated that the criteria be tested and that a related reactivation/vocational rehabilitation experiment be conducted.

It is important to note that considerable debate took place with respect to the proposal that the criteria for evaluation of impairment due primarily to pain (which appear later in this section as the selection criteria for the proposed experiment(s)) be adopted on an experimental basis only. Some members felt that the agreement that the criteria could identify individuals with chronic pain and, more specifically, CPS, mandated a Commission recommendation

that the criteria be nationally implemented by SSA as soon as possible. These members argued that failure to implement the criteria nationally would be a disservice to those individuals who would meet the criteria but were currently being denied disability under the existing Social Security policies and procedures.

Despite the persistence of this argument, the majority of Commission members felt that, although the criteria represented the full Commission's best effort at the development of a guide to evaluation of impairment due primarily to pain, no more could be reliably said about the criteria without testing and held firm in their recommendation that implementation of the criteria be limited to an experimental population.

In commenting on the criteria, the Commission cautions that these criteria have not been tested by the Commission, nor anywhere else to its knowledge. The Commission recognizes that the criteria do parallel existing evaluation criteria for certain mental impairments, but would point out that while similarities exist, this in no way is meant to imply that impairment due primarily to pain should be considered a mental impairment and would caution the reader against drawing that conclusion.

The Commission realizes that the criteria do describe an individual who would meet the

definition of CPS as described in Part Two of this report. However, the Commission again cautions the reader against drawing the conclusion that a diagnosis of CPS defines disability for Social Security purposes. At this time, the Commission is unable to draw any definite conclusions about the juncture of CPS and disability.

Perhaps one further point should be made here. As a corollary to the discussions on extension of the statutory pain standard, some Commission members expressed concern that the proposed criteria for determining impairment due primarily to pain included behavioral evidence which could be interpreted as not meeting the statutory requirement that there must be an underlying medically determinable impairment to which the alleged pain could reasonably be related and that this would preclude the inclusion of the criteria in the experiment.

During this discussion some members argued that even though behavioral evidence was more subjective in nature than most other kinds of evidence accepted by Social Security as medically determinable, a broad reading of the term "medically

determinable" would encompass behavioral evidence. This group argued if "medically determinable" was construed to include behavioral evidence, no change in statute would be needed to ensure the feasibility of the experiment. On the other side of the issue were those Commission members who held that it was doubtful the Congress intended or even considered behavioral evidence to be accepted as medically determinable. These members felt that the Congress would wish to enact specific enabling legislation to authorize the recommended experiment(s).

Following is a description of the Commission's purpose in proposing the experiment(s) and the broad outline of the experimental design. The Commission does not feel that it is necessary or even appropriate that they include details and expects that the final design will be completed by SSA working in cooperation with experts in the field of experimental design and validity testing.

# Outline of Proposed Experiment(s)

## I. PURPOSE

(a) To assess the true size and composition of the Social Security claimant population where the primary

impairment is pain not reasonably consistent with objective medical findings.

(b) To determine if individuals whose impairment is primarily due to pain (as defined in the selection criteria on page 110 of this report) and not presently entitled to title II (Social Security) benefits should be determined to be disabled within the meaning of the Social Security law.

(c) To determine what proportion of individuals determined to meet the selection criteria for impairment due primarily to pain can be reactivated and vocationally rehabilitated through intensive treatment in appropriate treatment centers and/or vocational rehabilitation centers and the treatment modalities which achieve maximum success with these individuals.

(d) To analyze the results of the reactivation/vocational rehabilitation experiment to obtain a profile of the Social Security claimant population identified in (c) in terms of education, work history, age, and sex, and to determine the cost effectiveness of reactivation/vocational rehabilitation in this population.

(e) To evaluate the cost effectiveness of incorporating a reactivation/vocational rehabilitation program as an integral part of case evaluation in disability claims where impairment is due primarily to pain.

(f) On completion of the experiment, to review the selection criteria for impairment due primarily to pain and evaluate the desirability of incorporating the criteria into the Listing of Impairments.

## II. DESIGN

The Commission suggests that the proposed experiment(s) be conducted in two phases. Phase I is a preliminary paper study to determine the size and demographics of the claimant population whose impairment is due primarily to pain. The Commission believes that this phase can be accomplished by SSA and will provide sufficient data on the claimant population to assure the necessity and accurate design of Phase II, which is intended as a "hands on" study of the reactivation/vocational rehabilitation treatment program as measured by the rate of successful return to the workplace. To ensure the validity and reliability of the experimental design, the Commission recommends that SSA contract with outside experts in the field of experimental design and statistics.

108

## A. PHASE I – Preliminary Paper Study

In Phase I, SSA would institute a postadjudicative review of current disability claims. The review would be designed to determine for test purposes only what proportion of claimants meet the proposed selection criteria for impairment due primarily to pain but, under current policy guidelines, are denied disability benefits because medical evidence fails to substantiate a medically determinable impairment which could reasonably cause the alleged pain. To obtain this information, SSA would conduct a paper review of a stratified random sample of title II (Social Security) worker claims or concurrent title II-title XVI (claims involving both Social Security and Supplemental Security Income applications) allowances and denials as determined under existing policy guidelines. Under Phase I, complete demographic information would be obtained on this group.

The Commission expects that Phase I will allow a determination as to whether there is an identifiable claimant population whose impairment is due primarily to pain but who is denied disability benefits under existing policy guidelines (see I. (b) above). The Commission views this as important because of suggestions that, despite the absence of specific listing level medical evaluation criteria for impairment due primarily to pain, existing policy guidelines allow favorable determinations under a variety of medical and medical-vocational alternatives, sometimes described as "getting in the back door." Phase I should, therefore, produce statistical data for two potential groups of claimants who meet the selection criteria: (1) those *allowed* disability benefits under existing policy guidelines, and (2) those *denied* disability benefits under existing policy guidelines.

B. PHASE II – Reactivation/Vocational Rehabilitation Experiment

Phase II of the study assumes that there is a substantial number of claimants that meet the selection criteria for impairment due primarily to pain. As indicated above, the data obtained in Phase I should identify this population and provide demographics for development of the Phase II study which is intended to predict whether the identified claimant population would benefit from a program of reactivation and vocational rehabilitation (see I. (c) above).

## III. SELECTION CRITERIA

Essentially, the Phase II study population will concentrate on disability claimants who (1) meet the selection criteria below, and (2) have been denied disability under existing SSA policy guidelines. The Commission expects that the final design of the experiment will provide the appropriate control groups to ensure that any conclusions drawn from the reactivation/vocational rehabilitation phase will be applicable to the needs of SSA in determining the accuracy of the criteria and the appropriateness of developing a listing level category for impairment due primarily to pain.

A finding that an individual meets the selection criteria means that for purposes of the experiment the individual states that he/she could not reasonably be expected to engage in gainful work activity because of an impairment or impairments due primarily to pain. The selection criteria will be applied only when there is a prior finding that the individual is not disabled under either the existing medical evaluation criteria, i.e., does not meet or equal the Listings, or after a medical-vocational evaluation of the individual's residual functional capacity in conjunction with the vocational factors of age, education, and work experience.

The criterion which appears in Part A of the selection criteria requires that signs and findings be present which support the claimant's allegations of severe pain. This can be established by applying the criteria in either Part A.1. or Part A.2. Part A.1. applies to cases where the evidence for the existence of pain corresponds to the identification of physical tissue damage. Part A.2. deals with cases where the existence of pain is established through a variety of behavioral

modifications. Part A.2.b. lists a number of behavioral manifestations and requires that the evidence in file confirm the presence of at least three of the five categories in this subsection.

Part B of the selection criteria relates to the degree of impairment caused by the pain. It requires that the file clearly document the existence of *all* of the listed items. As it is possible for an individual's functioning to vary over time, the level of functioning at any point in time may not give an adequate picture of the actual overall level of function. Therefore, to establish the severity of the individual's impairment, it is important that evidence from all relevant sources over a sufficiently long period of time prior to the date of review be obtained. To properly evaluate the degree to which reported pain affects an individual's functional abilities, consideration must be given to all of the available evidence, and any variations in the level of functioning must be taken into account before arriving at a determination of impairment severity over time.

Part B of the selection criteria requires consideration of whether the individual has any functional loss due to pain in four areas considered essential to work. The four areas are (1) activities of daily living (B.1.), (2) social functioning (B.2.), (3) ability to complete tasks (B.3.), and (4) functional capacity to perform basic work activities (B.4.). The degree of functional loss for each of these areas will then be rated in accord with the methods which will be prescribed in the final experiment protocol.

For purposes of these selection criteria, "activities of daily living" includes activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using telephones and directories, using a post office, etc. To properly evaluate the extent to which reported pain affects the individual's ability to engage in activities of daily living, it is necessary to define the extent to which the individual is capable of performing and participating in these activities. In the context of the criteria, "marked" does not refer to the number of activities which are restricted, but to the overall degree of restriction or combination of restrictions which is present.

For example, a person who is able to dress and feed him or herself, eat at the dinner table, read the evening paper, etc., might still have marked restrictions of daily activities if he or she is unable to sit at the table for extended periods of time, cannot easily move from one position to another or from one room of the house to another, regularly carry items from one area of the home to another, or frequently sit comfortably when using private or public transportation, without some pain.

"Social functioning" refers to an individual's capacity to interact appropriately and communicate effectively with other individuals. This includes the ability to get along with others, e.g., family members,

friends, neighbors, store clerks, landlords, bus drivers, etc. Impaired social functioning may be demonstrated by a history of altercations, evictions, firings, fear of strangers, avoidance, social isolation, etc. Strength in social functioning may be documented by the individual's ability to initiate social contacts with others, communicate clearly with others, interact and actively participate in group activities, etc. "Marked" difficulties in social functioning is not measured by the number of areas in which the individual's social functioning is impaired, but the overall degree of interference in a particular area or combination of areas of functioning. For example, an individual who refrains from initiating social contacts with others, ceases to participate in sustained group activities, or often declines social invitations, because of pain, may have marked limits on his or her social functioning.

Subsection B.3., "failure to complete tasks in a timely manner," refers to the work-related functions of concentration, persistence, or pace. Some individuals may report that pain interferes with their ability to concentrate or sustain attention sufficiently long to permit the timely completion of tasks such as those commonly required in work settings. In activities of daily living, concentration may be reflected in terms of ability to complete tasks in everyday household routines. Strengths and weaknesses in concentration may be evidenced through observations of the frequency with which errors are made, the time it takes to complete tasks, and the extent to which assistance may be required to complete tasks.

While assessment of an individual's ability to complete tasks may best be observed in work and work-like settings, information which is obtained through direct interview and/or psychological testing by a psychiatrist or psychologist experienced in working with pain, and reports from relatives, friends, coworkers, and others, must also be considered important in evaluating the degree to which the individual is able to function in this area.

In terms of the selection criteria, "marked difficulty in performing basic work activities" refers to the individual's ability to deal with the normal activities of work, i.e., sitting, standing, walking, pushing, pulling, carrying, lifting, repeated on a daily and continuing basis, as well as to nonexertional aspects of work such as difficulty in concentration, or remembering and following simple instructions, getting along with supervisors and/or coworkers, etc., on a sustained and regular basis.

The distinction between what the individual says and what he or she does is often critical in assessing clinical pain. Therefore, where the individual reports that he or she is unable, with some frequency, to perform some or all of the normal demands of work due to pain, every effort must be made to obtain documentation from all available sources as to the extent and the duration of

112

the reported restriction(s). Where objective medical evidence to support the reported limitation(s) is available, this type of evidence should always be obtained. However, information from family, friends, neighbors, coworkers, etc., may also be important in evaluating the reported limitation(s) and should also be obtained whenever available.

To meet the selection criteria the individual must meet BOTH A and B:

A. Pain, as evidenced by:

1. Measurable impairment of function with physical tissue damage in body parts specifically related to the complaints of pain; OR

2. a. Pain complaints apparently disproportionate and/or inappropriate in location, in intensity or duration to the physical damage and/or its normally expected healing time;

   AND

   b. Behavioral manifestations of pain which must include THREE of the following:

   1) Preoccupation with pain as evidenced by persistent and repeated complaints, or willingness to undergo repeated painful diagnostic or therapeutic procedures in search of a cure;

   2) Overutilization of health care system as evidenced by frequency of physician visits, or surgical procedures, or frequent changes of health care professionals;

   3) Persistent excessive use of analgesic and/or sedative drugs;

   4) Consistent audible and body language displays such as grimacing, bracing, guarding movements, or disturbances of station or gait as observed by physicians, interviewers, associates, family, and other observers;

   5) Other accepted, objectifiable pain-related behaviors such as sleep disturbances, eating disorders, or sexual dysfunction.

B. Frequent and/or persistent episodes of ALL of the following due to pain:

1. Marked restriction of activities of daily living; AND

2. Marked difficulties in maintaining social functioning; AND

3. Failure to complete tasks in a timely manner; AND

4. Marked restriction in objectifiable functional capacity to perform basic work activities.

113

The Commission recommends that, in addition to the above selection criteria, the experiment (1) be limited to individuals age 50 or under (Statistics and studies indicate that individuals who are under age 50 have the greatest opportunity for rehabilitation and also represent the greatest potential expense to the Disability Trust Fund if they remain in benefit status.); (2) be structured to focus on individuals with pain complaints related to the back and neck (This group represents the largest percentage of disability claims in the targetted age group.); (3) last for a sufficient period of time to ensure proper statistical results and followup; (4) be designed to include use of appropriate data gathering instruments to ensure a reliable geographic and demographic profile of the Phase II population to allow valid subsequent determinations as to demographic or geographic differences; (5) require design and utilization of an appropriate multidimensional instrument for assessment of the rehabilitation potential of the study population; and (6) use the criteria for acceptable rehabilitation centers and facilities as outlined on page 93 of this report as one element to qualify such centers and facilities for purposes of design and implementation of Phase II.

## IV. CONDITIONS OF PARTICIPATION

On the basis of the testimony it has heard and the experience of those members who are associated with multidisciplinary pain treatment facilities, the Commission believes that reactivation/vocational rehabilitation programs need not be very long. Some programs may be as short as three months or less, although others are longer. The Commission recognizes that claimant participation in Phase II must be voluntary, but believes that claimants can be encouraged to enter the experiment through an incentive program. Thus, the Commission recommends that claimants selected for the study be granted a time-limited monthly stipend, to begin with the month in which the individual agrees to enter a reactivation/vocational rehabilitation program and to continue during the time the individual takes part in the program and for a limited time thereafter so long as the individual fully participates in the program. The stipend will be calculated to equal the monthly title II benefit the individual would have received had disability been awarded.

Further, the Commission recommends that as a condition of participation, all individuals entered in the Phase II experiment agree to a suspension of their appeal rights during the period in which they are enrolled in the experiment. At the conclusion of the experiment (or the

termination of the individual's participation) all appeal rights will be restored.

During the course of Phase II, the progress of all participants should be monitored and appropriate data collection instruments utilized to record information on rehabilitation activities to include, but not necessarily be limited to, information about self-rehabilitation and both successful and unsuccessful work attempts.

At the conclusion of the individual's specified period of participation in Phase II, or at such time as the individual ceases to fully participate:

> The monthly stipend will cease;

> The individual's appeal rights will be restored;

> The data compiled during the course of the experiment will be reviewed, analyzed and become a permanent part of the disability claims file.

## V. FOLLOWUP

The Commission anticipates that it will take no less than 1 year after the conclusion of the experiment to analyse the data collected during Phase II and prepare a final report.

# RECOMMENDATION

The Commission recommends that Congress and the Department of Health and Human Services appoint a new Commission as soon as feasible after the conclusion of the experiment(s) to assess the validity of the criteria for determining impairment due primarily to pain and of the effectiveness of the rehabilitation program. This new Commission should also be charged with responsibility to review the findings of the study being conducted by the Institute of Medicine (IOM) of the National Academy of Sciences, to survey the interim progress in evaluating pain, and to reaffirm the national focus upon the issue of pain. It should include one or more members with expertise in the deliberations, findings, and recommendations of this Commission and with the findings and results of the study being conducted by the IOM on the intersection of pain and disability.

The new Commission would be expected to provide answers to the questions which this

115

Commission is unable to respond to at this time to include recommendations as to:

(1) the appropriateness of the current statutory standard for the evaluation of pain in the disability decisionmaking process;

(2) whether there should be a specific set of listing level criteria for the evaluation of impairment due primarily to pain; and

(3) whether a special rehabilitation program for selected claimants should be instituted as part of the disability evaluation process for individuals determined to have a high potential for successful return to the workplace.

MINORITY OPINION

# MINORITY OPINION

We respectfully dissent from a critical Commission Recommendation. Our sincere appreciation for the seriousness of the Commission's deliberations, as well as our profound sense that it is, on this matter, going in absolutely the wrong direction, require us to present our views in some detail.

The issue that divides us from the majority is a fundamental one. The Commission has identified a problem—of inexact but substantial proportions—concerning the inadequate response of the present disability law in cases where credible complaints of dysfunctional pain are unaccompanied by objective clinical or laboratory diagnostic evidence of a physical or mental abnormality that could reasonably be expected to cause suffering of the nature, duration, or severity experienced. The current Social Security Administration regulations effectively deny benefits in such cases, preventing individuals who are disabled by pain from obtaining the same types of relief regularly afforded to individuals who are disabled by other equally mysterious, but somehow more respectable, ailments.

The Commission has recommended addressing this inequity in two related, but severable, experiments. The first is the attempt to draw "criteria" which would satisfactorily define this chronic pain group, attempting to include those who truly cannot at present engage in substantial gainful activity due to their pain, while excluding (a) those whose pain is, in fact, associated with a demonstrable physical or mental anomaly, which provides a suitable basis under current law for evaluating ability to work and (b) malingerers and shirkers.

(The ability to identify, with quite high confidence, the few insincere fakers who attempt to bilk the system is a key Commission finding, as elaborated elsewhere in the Report.)

The Commission's second recommended experiment would be to graft onto the current disability benefits program a modest pilot project in rehabilitation, targeted at selected members of the group of pain victims defined by the new proposed "criteria." This program would explore, in a number of local pilot projects, the cost effectiveness of government-sponsored multidisciplinary therapy designed to restore functional capacity to pain patients, remove them from the disability rolls, and return them to work.

This separate opinion does not address this second experiment, the proposed rehabilitation program. It is the limited scope of the first experiment, however, that seems to us to be unnecessarily modest and that provokes this dissent. Instead of being content merely with drafting "criteria" for the selection of participants in a scattered set of local rehabilitation programs, we would retitle the definition "criteria" as a new "listing" for "Impairment Due Primarily to Pain" (see page 125) and recommend its immediate adoption, on a nationwide basis, as an addition to the other well-established listings already in the Social Security regulations. (For a description of the legal significance of the Listings, see page 14 of the Commission's Report.) The Commission's second recommended experiment (the rehabilitation program)

would then be a local project designed to restore to productivity (and thus remove from disability status) as many as possible.

There are three basic reasons for preferring immediate adoption of the pain listing, instead of awaiting the conclusion of the Commission's two experiments.

First, there is a significant need to provide prompt assistance to pain victims now, and elemental fairness dictates that we not delay by a further 3 years or so the process of addressing a problem we already appreciate.

The Commission Report evidences the significance of the problem of pain, as well as the inadequacy of the current regulations. Victims of dysfunctional pain, as established by the Commission's unanimous definition, are unable to work. They do meet the statutory criteria of "inability to perform substantial gainful activity" and, even more than many other disabled persons, they can generally do nothing about it. It hardly seems appropriate, then, to impose upon them a further penalty for having had the doubly bad fortune not only to suffer disability, but to be victimized by a particularly insidious, invisible, and socially disfavored form of impairment.

In short, we see no adequate reason—nor have the Commission's prolonged deliberations adduced any—why victims of disabling pain should be singled out for particularly harsh denials of the benefits that are routinely paid to victims of other disabling conditions such as heart disease, diabetes, alcoholism, obesity, or paranoid schizophrenia. What is it about pain alone that provokes such discrimination and the denial of a statutory entitlement?

On all meaningful bases, pain victims are on a par with claimants who meet other listings. In both cases, financial eligibility must be established—the individuals we have in mind have either fully contributed to the Disability Trust Fund through substantial, recent payroll deductions, or else they fully satisfy the stringent income and resource tests for Supplemental Security Income. Like those who meet other listings, pain victims are not currently engaged in substantial work activity. Like others, they too, must show the presence of a "severe" impairment, and one lasting greater than 12 months duration. Ultimately, pain victims seeking to meet a listing would need to carry the burden of proof to demonstrate inability to perform gainful activity—again, exactly the same standard routinely applied to dozens of other impairments. And, while objective medical indicators of dysfunctional pain are elusive and inaccessible to the untrained, this category of impairment is no more subjective, and certainly no more prone to abuse, then others already incorporated into existing listings, including most dramatically the revolutionary new guidelines for mental impairments.

Since pain victims meet the statutory criteria now, it seems to us that simple fairness and respect for the existing law require that they should not have to wait a further 3 years to have the chance to be compensated in the same way others already are.

Second, our concern for the due process requirement of treating all disability victims similarly is exacerbated by our skepticism

about the Commission's proposed experiment as a definitive solution.

The Commission reviewed (personally or through a literature survey summarized on our behalf by the National Academy of Sciences) a vast array of studies and experiments conducted to date on the issues of pain and disability. The Commission found many of them to be interesting and informative, but found none of them to be dispositive or unequivocal.

Even if this ambiguity is not an inherent feature in social science research, we are far from confident that the Commission's experiment will—or could—resolve the issue to everyone's satisfaction. Instead, we foresee a future Pain Commission, convened 3-5 years hence, reviewing and critiquing the design and the results of this proposed experiment (much as the present Commission has expressed skepticism over the efforts of predecessor researchers) and concluding that the evidence was still, in some respects, incomplete. Unless they are more assertive than the present Commission, and more willing to take bold steps, still more time will be lost in futile search for a scientific exactitude that is unnecessary and unsought regarding all other categories of impairment.

Moreover, the criteria prepared by the Commission as the screening mechanism for participation in the rehabilitation experiment are drafted in quite restrictive terms. There is some reason to be concerned, in fact, that they may be so restrictive that an insufficient number of claimants will be designated for the pilot project to have a useful data base.

We agree that it is suitable to start with a restrictive definition, and relax it later as

appropriate (if it appears, for example, that almost everyone who could satisfy our proposed listing should already be entitled to disability benefits under current law by meeting an existing listing, through the grids, or via a nonexertional impairment). But this restrictiveness enhances our apprehension that immediate, nationwide implementation is necessary and feasible: the numbers of claimants involved at this stage are likely to be small, and those who *do* meet these criteria are likely to be among the most severely disabled—the most egregious omissions from the present disability rolls.

Our third reason for urging prompt action, rather than just more studies, arises from the sense that the political environment may be particularly ripe just now for taking constructive steps in the area of pain.

The establishment of the Commission itself, for example, is a reflection of Congress' uncertainty over the proper evaluation of pain, as well as an expression of a Congressional hope that experts more familiar with the phenomenon of pain could suggest some constructive approaches. The Commission's hesitancy—in the face of this indication of a legislative interest in bold measures—seems particularly disappointing and ill-timed.

Similarly, there are indications that the courts are dissatisfied with the current nettlesome confusion over the state of the law concerning pain, and anxious for some sort of definitive clarification. In addition, the support and assistance the Commission has received from the Social Security Administration suggests that more far-reaching Commission conclusions are

urgently sought. Last but not least, the public temperament, too, desires a clear resolution, not the further frustration of an additional delay in effective remedies.

In short, there is no good reason to wait for another study, another 3 years, another Pain Commission, to do our work. Our knowledge is admittedly incomplete, but the Commission does know enough to identify the problem, to realize its scope and significance, and to prompt more vigorous actions. For that reason, we must dissent from the Commission recommendation that would essentially do nothing for most pain victims for at least the next 3 years.

* * * * * * * * * * * * * *

We cannot close this statement without at least a brief word of appreciation and praise for the Commission's deliberations on this important question.

The Commission approached this matter with seriousness and attention. The Commission devoted a great deal of time to it, and examined it from a variety of perspectives. We were allowed an ample opportunity to present these views, and we believe they were afforded a sincere and thoughtful—as well as candid—evaluation. In sum, we believe that our position received more than a fair hearing.

Our respect for the Commission and for its product makes this dissent difficult. We do not in any way wish to jeopardize the stature of the Report, or to minimize the significance of the many useful findings and recommendations it contains. After considerable thought, however, we concluded that a public expression of our opinion would serve the Commission better than would our silence, just as we have concluded that the problem of pain is too significant merely to study.

> Richard Black, M.D.
> Harold Carron, M.D.
> Marc Hertzman, M.D.
> David A. Koplow

# PROPOSED NEW LISTING

## 14.00 Category of Impairments, Impairment Due Primarily to Pain

A finding that an individual meets the listing *Impairment Due Primarily to Pain* means that the individual could not reasonably be expected to engage in gainful work activity because of an impairment or impairments primarily due to pain. Before applying this listing the existence of a severe medically determinable physical or mental impairment must first be established in accordance with Reg. 404.1520(c).

Part A of the listing requires that signs and findings be present which support the claimant's allegations of severe pain. This can be established in either of two ways. Part A.1. applies to cases where the evidence for the existence of pain corresponds to the identification of physical tissue damage. Part A.2. deals with cases where the existence of pain is established through a variety of behavioral modifications. Part A.2.b. lists a number of behavioral manifestations and requires that the evidence in file confirm the presence of at least three of the five categories in this subsection.

Part B relates to the degree of impairment caused by the pain. It requires that the file clearly document the existence of *all* of the listed items. As it is possible for an individual's functioning to vary over time, the level of functioning at any point in time may not give an adequate picture of the actual overall level of function. Therefore, to establish the severity of the individual's impairment, it is important that evidence from all relevant sources over a sufficiently long period of time prior to the date of review be obtained. To properly evaluate the degree to which reported pain affects an individual's functional abilities, consideration must be given to all of the available evidence, and any variations in the level of functioning must be taken into account before arriving at a determination of impairment severity over time.

Part B of the listing requires consideration of whether the individual has any functional loss due to pain in four areas considered essential to work. The four areas are (1) activities of daily living (B.1.), (2) social functioning (B.2.), (3) ability to complete tasks (B.3.), and (4) functional capacity to perform basic work activities (B.4.).

For purposes of this listing, "activities of daily living" includes activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using telephones and directories, using a post office, etc. To properly evaluate the extent to which reported pain affects the individual's ability to engage in activities of daily living, it is necessary to define the extent to which the individual is capable of performing and participating in these activities. In the context of the criteria, "marked" does not refer to the number of activities which are restricted, but to the overall degree of restriction or combination of restrictions which is present.

For example, a person who is able to dress and feed him or herself, eat at the dinner table, read the evening paper, etc., might still

125

have marked restrictions of daily activities if he or she is unable to sit at the table for extended periods of time, cannot easily move from one position to another or from one room of the house to another, regularly carry items from one area of the home to another, or frequently sit comfortably when using private or public transportation, without some pain.

"Social functioning" refers to an individual's capacity to interact appropriately and communicate effectively with other individuals. This includes the ability to get along with others, e.g., family members, friends, neighbors, store clerks, landlords, bus drivers, etc. Impaired social functioning may be demonstrated by a history of altercations, evictions, firings, fear of strangers, avoidance, social isolation, etc. Strength in social functioning may be documented by the individual's ability to initiate social contacts with others, communicate clearly with others, interact and actively participate in group activities, etc. "Marked" difficulties in social functioning is not measured by the number of areas in which the individual's social functioning is impaired, but the overall degree of interference in a particular area or combination of areas of functioning. For example, an individual who refrains from initiating social contacts with others, ceases to participate in sustained group activities, or often declines social invitations, because of pain, may have marked limits on his or her social functioning.

Subsection B.3., "failure to complete tasks in a timely manner," refers to the work-related functions of concentration, persistence, or pace. Some individuals may report that pain interferes with their ability to concentrate or sustain attention sufficiently long to permit the timely completion of tasks such as those commonly required in work settings. In activities of daily living, concentration may be reflected in terms of ability to complete tasks in everyday household routines. Strengths and weaknesses in concentration may be evidenced through observations of the frequency with which errors are made, the time it takes to complete tasks, and the extent to which assistance may be required to complete tasks. While assessment of an individual's ability to complete tasks may best be observed in work and work-like settings, information which is obtained through direct psychiatric examination and/or psychological testing by a psychiatrist or psychologist experienced in working with pain, and reports from relatives, friends, coworkers on a sustained and regular basis, etc., must also be considered important in evaluating the degree to which the individual is able to function in this area.

In the listing, "marked difficulty in performing basic work activities" refers to the individual's ability to deal with the normal activities of work, i.e., sitting, standing, walking, pushing, pulling, carrying, lifting, repeated on a daily and continuing basis, as well as to nonexertional aspects of work such as difficulty in concentration, or remembering and following simple instructions, getting along with supervisors and/or coworkers, etc., on a sustained and regular basis. The distinction between what the individual says and what he or she does

is often critical in assessing clinical pain. Therefore, where the individual reports that he or she is unable, with some frequency, to perform some or all of the normal demands of work due to pain every effort must be made to obtain documentation from all available sources as to the extent and the duration of the reported restriction(s). Where objective medical evidence to support the reported limitation(s) is available, this type of evidence should always be obtained and included in file. However, information from family, friends, neighbors, coworkers, etc., may also be important in evaluating the reported limitations and should also be obtained whenever available.

Impairment due primarily to pain. With BOTH A and B:

A. Pain, as evidenced by:

1. Measurable impairment of function with physical tissue damage in body parts specifically related to the complaints of pain; OR

2. a. Pain complaints apparently disproportionate and/or inappropriate in location, intensity or duration to the physical damage and/or its normally expected healing time;

    AND

   b. Behavioral manifestations of pain which must include THREE of the following:

   1) Preoccupation with pain as evidenced by persistent and repeated complaints, or willingness to undergo repeated painful diagnostic or therapeutic procedures in search of a cure;

   2) Overutilization of health care system as evidenced by frequency of physician visits, or surgical procedures, or frequent changes of health care professionals;

   3) Persistent excessive use of analgesic and/or sedative drugs;

   4) Consistent audible and body language displays such as grimacing, bracing, guarding movements, or disturbances of station or gait as observed by physicians, interviewers, associates, family, and other observers;

   5) Other accepted, objectifiable pain-related behaviors such as sleep disturbances, eating disorders, or sexual dysfunction.

B. Frequent and/or persistent episodes of ALL of the following due to pain:

1. Marked restriction of activities of daily living; AND

2. Marked difficulties in maintaining social functioning; AND

3. Failure to complete tasks in a timely manner; AND

4. Marked restriction in objectifiable functional capacity to perform basic work activities.

127

APPENDICES

Appendices

# TABLE OF CONTENTS

*Page*

    Appendix A Glossary

135    Medical Terms

139    Disability Program Terms

149    Appendix B Outline of Study Being Conducted by the Institute of Medicine

153    Appendix C Summary of National Study of Chronic Pain Syndrome

165    Appendix D Present Value of Selected Benefit Amounts

    Appendix E Sample Pain Questions

169    Sample Pain Questions for Physicians

170    Sample Pain Questions for Patients

172    Sample Pain Questions for Claimant's Relatives or Friends

173    Example of DDS Pain Questionnaire in Use

183    Appendix F Court Decisions: Evaluation of Pain

Appendix A

# GLOSSARY

# MEDICAL TERMS

## ACUTE PAIN

Pain of recent (usually less than 10 days) onset, or with intermittent and recurring pain; an episode of recent onset. The biologic or tissue damage component is usually dominant. There is local tissue damage or somatic systemic and autonomic indicators, and emotional arousal is likely. In the absence of residual structural defect or systemic disease, acute pain should subside in less than 6 months—usually in less than 30 days.

## ACUTE RECURRENT PAIN

A noxious sensation that results from tissue damage. Acute recurrent pain varies in intensity with time and is amenable to medical or surgical intervention and relief.

## AFFECT

Emotion, feeling or mood as a factor of behavior.

## ALGOLOGY

The study of pain. From the Greek "Algos," pain and "logos," study of, discipline.

## ALGOLOGIST

A specialist in human pain; one who is particularly expert in human pain.

## CHRONIC PAIN

Pain lasting for long periods of time. More than 6 months is a commonly employed duration. Such pain may be associated with a residual structural defect that persists long after the acute episode or pain associated with the persistence of the disease process, as in arthritis. Chronic pain may also be pain persisting past healing time without objective physical findings of residual structural defect or, in the case of systemic disease, pain persisting past the active state of the disease process. Pain that recurs regularly and frequently over long periods of time is also considered to be chronic pain.

135

## CHRONIC PAIN SYNDROME (CPS)

The inability to maintain normal physical, social or emotional functioning due to pain when no medically determinable condition can be found sufficient to account for the complaints of pain.

## DISINCENTIVE PROCESS

Factors, such as socio-economic, whose loss would not be offset by returning to productive employment or activity.

## IATROGENIC

Resulting from the activity of physicians. A term applied to any condition in a patient occurring as the result of treatment by a physician or surgeon.

## IMPAIRMENT DUE PRIMARILY TO PAIN

Inability to participate in significant gainful activity attributed by the individual to pain, its anticipation or effects, rather than to other physical or mental cause.

## NOCICEPTION

The detection or "reception" of noxious or aversive (painful) stimuli by sensory receptors (free nerve endings) scattered throughout the body. The process by which the brain learns there is a noxious stimulus.

## NOXIOUS

Unpleasant. Specifically used when referring to an unpleasant stimulus.

## OPERANT

Action or behavior which involves voluntary (striated) muscles. Operant action or behavior contrasts with RESPONDENT action or behavior. The special importance of OPERANT behavior is that it is sensitive to or influenced by consequences, whether immediately present in the environment or anticipated by the person.

## OPERANT CONDITIONING

Refers to a method for producing learning or behavior change by the systematic use of consequences or reinforcers as distinguished from PAVLOVIAN (or classical) conditioning. Operant conditioning can be very durable. Most behavior of each person has been formed on the basis of operant conditioning principles, whether by intent or in the natural occurrence of events.

136

## PAIN

A response. A report of "pain" necessarily involves both the perception of the stimulus in the brain and the "meaning" accorded to it which, in turn, dictates the response.

## PAIN BEHAVIOR

Verbal or nonverbal actions understood by observers to indicate the person may be experiencing pain. These actions may include moans, gasping, or other audible behaviors; complaints or statements about pain/suffering; facial expressions; guarded movement; limping; use of a cane or other assistance device; avoidance of activities; and such health care seeking behaviors as taking medications or requesting medical assistance.

## PAIN CLINICS

Specialized facilities for evaluation and treatment of complex pain problems.

## PAIN SPECIALISTS

Physicians, psychologists, dentists, and other health professionals who evaluate and treat complex chronic pain problems and patients with chronic pain syndromes.

## PAVLOVIAN CONDITIONING

Classical conditioning which relies on the pairing of stimuli, as opposed to programming consequences. In contrast to OPERANT CONDITIONING. The effects of Pavlovian conditioning rarely persist.

## PSYCHOGENIC PAIN

As defined in the Diagnostic and Statistical Manual of Mental Disorders III (DSM III), psychogenic pain disorder presents a clinical picture in which the predominant feature is the complaint of pain in the absence of adequate physical findings and in association with evidence of the etiological role of psychological factors. The disturbance is not due to any other mental disorder.

The pain symptom either is inconsistent with the anatomic distribution of the nervous system or, if it mimics a known disease entity (as in angina or sciatica), cannot be adequately accounted for by organic pathology after extensive diagnostic evaluation. Similarly, no pathophysiological mechanism accounts for the pain, as in tension headaches caused by muscle spasm.

## REACTIVATION

Restoration of a person to a higher or greater activity level. Most chronic pain patients move little or guardedly, i.e., they are deactivated. Reactivation seeks to restore a more normal or vigorous movement and activity.

## REHABILITATION

Restoration of a person to more normal function, including participation in social and vocational activities. This usually involves a multidisciplinary treatment process.

## RESPONDANT

Action or behavior which involves involuntary (smooth) muscle or glandular action, e.g., digestion. A term used in behavioral psychology.

## SOMATIC

Body tissues or parts aside from brain tissue. A pain problem which is "somatic" is one which exists because of some body defect or damage.

## SOMATOGENIC

Refers to a problem arising from body (somatic) tissues.

## WADDELL'S TESTS

A standardized set of five tests for low back pain. The Waddell's tests use nonorganic physical signs independent of and distinquishable from the standard clinical signs of physical pathology and correlate with other psychological data. Waddell's tests are used to help separate the physical from the nonorganic aspects of low back pain and may serve as a simple clinical screen to help identify the need for more detailed psychological assessment of a given patient.

# DISABILITY PROGRAM TERMS

## ADMINISTRATIVE LAW JUDGE (ALJ)

One who conducts hearings and decides matters of fact and law in accordance with the Social Security Act, the Social Security Regulations, and Rulings for claimants appealing unfavorable title II and title XVI determinations.

## BASIC WORK ACTIVITIES

The abilities and aptitudes necessary to do most jobs. Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting.

## CENTRAL OFFICE

Social Security Administration headquarters in Baltimore.

## CONSULTATIVE EXAMINATION

A physical or mental examination or test purchased at Government expense from the attending physician, other sources of record, or an independent source (1) to obtain more detailed medical findings about an individual's impairment, (2) to obtain technical or specialized medical information, or (3) resolve conflicts or differences in medical findings or assessments in the evidence already in file.

## CONTINUING DISABILITY REVIEW

The process by which all claimants receiving disability benefits are reevaluated to determine if they continue to be disabled within the meaning of the law.

## DISABILITY

For both Social Security and Supplemental Security Income program purposes, disability is an administrative conclusion that an individual is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.

## DISABILITY DETERMINATION SERVICES

That agency of the State which has been designated by the State to carry out the disability determination function. The Disability Determination Services (DDS) has responsibility for Social Security and Supplemental Security Income disability determinations using policies and guidelines set forth by the Social Security Administration. Frequently referred to as the State agency. With some technical exceptions, nearly all initial and reconsideration disability determinations are made by a DDS in the State in which the claimant resides.

## DISABILITY INSURANCE BENEFITS

Monthly payments provided for under the provisions of title II of the Social Security Act. Entitlement to disability insurance benefits (DIB) requires that an individual meet both medical and legal requirements as defined by law.

## DISABLED WIDOW/WIDOWER BENEFITS

Monthly payments provided for under the provisions of title II of the Social Security Act. Entitlement to disabled widows' or widowers' benefits (DWB) requires that (in addition to certain age and relationship criteria) the claimant's impairment meet or equal the level of severity of an impairment in the Listing of Impairments. Payment rate is based on the earnings of the deceased spouse.

## ELIGIBILITY

An individual is eligible for a benefit if he or she would meet all requirements for entitlement but has not filed an application.

## ENTITLEMENT

An administrative term meaning that an individual meets certain conditions which confer upon him or her the right to benefits. Under the title II program, there are four specific factors which must be met. The individual must (1) be "insured" on his own earnings record or be dependent on someone who is "insured," (2) file an application, (3) serve a 5-month waiting period, (4) be under a disability as defined by law.

## EXERTIONAL ACTIVITY

One of the primary strength activities (sitting, standing, walking, lifting, carrying, pushing, and pulling) defining a level of work. The Social Security definition is the same as that used by the Department of Labor to classify occupations by strength levels. Any job requirement which is not exertional (as defined above by the primary strength activities) is considered nonexertional.

## EXERTIONAL CAPABILITY

A capability required to perform one of the primary strength activities.

## EXERTIONAL LIMITATION

An impairment-caused limitation which affects capability to perform an exertional (primary strength) activity.

## FUNCTIONAL CAPACITY

For Social Security disability program purposes functional capacity represents the measure of ability to perform particular work-related physical and mental activities.

## IMPAIRMENT

A medical determination. Adverse alteration of physical or mental health status resulting from anatomic, physiologic, chemical, or psychologic abnormalities which restrict an individual's capacity to perform basic work-related functions. For Social Security program purposes, the impairment must be the primary cause of inability to engage in substantial gainful activity.

## INSURED STATUS

Applies to title II claims. A term used to describe the minimum number of quarters of coverage required for an individual to qualify for disability benefits. For DIB, the individual must have worked at a job or self-employment long enough and recently enough to meet the insured status requirements. In DWB, the deceased spouse must have had insured status.

## LABORATORY FINDINGS

Anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests.

## LISTING OF IMPAIRMENTS (the Listings)

A compilation of over 100 medical impairments classified into 13 body systems and described in terms of symptoms, signs, and laboratory findings is contained in 20 CFR 404. Subpart P, Appendix 1. The Listing establishes a level of severity assumed to ordinarily prevent an individual from engaging in substantial gainful activity. Where an individual's medical record contains evidence of signs, symptoms, and laboratory findings which are the same as those for a listed impairment, the individual is said to "meet" the listing and, in the absence of work, is deemed disabled on the basis of medical evidence alone.

## MEDICAID

A medical assistance program under title XIX of the Social Security Act funded by Federal and State revenues to pay medical expenses for certain eligible needy and low-income people. Medicaid programs are State administered and vary from State to State. In most States individuals who qualify for Supplemental Security Income (SSI) payments also qualify for Medicaid.

## MEDICARE

A medical insurance program under title XVIII of the Social Security Act funded from trust funds, general revenues, and participant premiums to pay medical expenses for covered individuals. Medicare is a Federal program administered by the Health Care Financing Administration (HCFA) with uniform standards throughout the United States. All Social Security disability beneficiaries are eligible for Medicare protection beginning with the 25th month of entitlement to monthly benefits.

## NONEXERTIONAL IMPAIRMENT

One which is medically determinable and causes a nonexertional limitation of function or an environmental restriction. Nonexertional impairments can affect the ability to reach, to seize, hold, grasp, or turn an object (handle); to bend the legs alone (kneel); to bend the spine alone (stoop); or bend both the spine and legs (crouch). Fine movements of small objects, such as done in much sedentary work and in certain types of more demanding work (e.g., surgery), require the use of the fingers to pick, pinch, etc. In addition, impairments of vision, speech, and hearing are considered nonexertional impairments.

## NOT SEVERE IMPAIRMENT

A slight abnormality or combination of slight abnormalities which has not more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities.

## ONSET

The first day on which the individual is determined to be under a disability. The individual must meet all factors of entitlement at onset.

## QUARTER OF COVERAGE

Based on dividing the calendar year into four equal quarters and crediting earnings from employment and self-employment to quarters on the basis of the amount of earnings and the period of employment in accordance with a formula established by law.

## REGIONAL OFFICE

SSA's administrative field office. There are 10 regional offices located in Boston, New York, Philadelphia, Atlanta, Kansas City, Chicago, Dallas, Denver, San Francisco, and Seattle.

## RESIDUAL FUNCTIONAL CAPACITY

Residual functional capacity (RFC) is the remaining capacity to perform work-related physical and mental activities despite certain functional limitations resulting from medically determinable impairments. For Social Security disability program purposes the assessment of RFC is a medical determination.

## SEQUENTIAL EVALUATION

An orderly 5-step process established by law under which initial disability claims are reviewed to determine whether an individual is "disabled" as defined by the Social Security Act. In widow/widower claims, only the first three steps in the sequential evaluation apply.

## SERVICES

For purposes of the trial work period the term "services" means activity in employment or self-employment, whether in a sheltered workshop environment or regular work, which is performed for remuneration or gain or is of a type normally performed for remuneration or gain. Work in employment constitutes services if the monthly earnings amount to more than $75 either in cash or kind. Work in self-employment constitutes services if net earnings exceed $75 a month or work activity of more than 15 hours a month is performed.

143

## SEVERE IMPAIRMENT

A finding that the medical signs, symptoms, and laboratory findings establish an impairment(s) which has more than a minimal effect on the individual's ability to perform basic work activities.

## SIGNS

Anatomical, physiological, or psychological abnormalities which can be observed apart from the individual's statements (symptoms). Must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena which indicate specific abnormalities of behavior, affect, thought, memory, orientation, and contact with reality which must also be shown by observable facts that can be medically described and evaluated.

## SOCIAL SECURITY DISABILITY INSURANCE PROGRAM

A program under title II of the Social Security Act to provide monthly benefits for those workers (and their dependents) who have worked in employment or self-employment "covered" by the Federal Insurance Contributions Act (FICA) tax on their earnings and meet the legal definition of disability. Benefits under this program are frequently referred to as title II disability benefits.

## STATE AGENCY

That agency of the State which has been designated by the State to carry out the disability determination function. The State agency has responsibility for Social Security and Supplemental Security Income disability determinations using policies and guidelines set forth by the Social Security Administration. Also known as Disability Determination Services (DDS). With some technical exceptions, nearly all initial and reconsideration disability determinations are made by an agency in the State in which the claimant resides.

## SUBSTANTIAL GAINFUL ACTIVITY

The performance over time of significant physical or mental work activities in employment or self-employment for pay or profit or work of a type generally performed for pay or profit.

## SUPPLEMENTAL SECURITY INCOME

A program under title XVI of the Social Security Act. The Supplemental Security Income (SSI) program went into effect on January 1, 1974, to replace separate State programs for needy aged, blind, and disabled persons. The SSI program is financed by Federal general revenues and is administered by the Social Security Administration. This program uses the same definition of disability and has the same medical requirements to establish disability as the Social Security (title II) disability program. Unlike the title II program, under title XVI there is no qualifying work requirement. However, to qualify an individual must meet certain income and resource levels specified in the law.

## SYMPTOMS

A medical definition. The individual's own perception and description of his or her physical or mental impairment(s).

## TRIAL WORK PERIOD

The trial work period (TWP) is a period of 9, not necessarily consecutive, calendar months during which a disability beneficiary can test his or her ability to work on a regular and sustained basis without loss of monthly disability benefits. At the end of the 9 months of trial work, the work and earnings are evaluated to determine if the individual has demonstrated the ability to engage in substantial gainful work.

## UNSUCCESSFUL WORK ATTEMPT

An unsuccessful work attempt (UWA) represents an effort by a beneficiary to work at employment or self-employment which is discontinued or markedly reduced to below the substantial gainful activity level for reasons related to the individual's ability to work.

## WAGE EARNER (NUMBER HOLDER; WORKER; INSURED INDIVIDUAL)

A person who has worked at employment or self-employment "covered" by the Federal Insurance Contributions Act (FICA).

## WAITING PERIOD

In title II (Social Security) disability claims, a period of 5 full calendar months following onset of disability during which benefits are not payable. Not applicable in title XVI (Supplemental Security Income (SSI)) disability claims.

145

Appendix B

# OUTLINE OF STUDY BEING CONDUCTED BY THE INSTITUTE OF MEDICINE

Appendix B

# OUTLINE OF STUDY BEING CONDUCTED
# BY THE INSTITUTE OF MEDICINE

On September 30, 1985, the Institute of Medicine (IOM) of the National Academy of Sciences was contracted to perform a study on the intersection of chronic pain, chronic illness behavior, and disability and to report to the Social Security Administration (SSA) in December 1986. This study being conducted by the IOM under contract with SSA will explore fully:

1. The intersection of medical illness and the symptom that is pain;

2. The distinction between chronic and acute pain;

3. How chronic pain develops;

4. The development of chronic illness behavior as a result of chronic pain;

5. Specific interactions of chronic pain, disability, and the determination of disability;

6. How various disability benefit programs compensate for pain;

7. A look at avenues of research that might lead to a usable form of pain measurement;

8. What rehabilitation strategies are suggested for dealing with individuals with chronic pain and chronic illness behavior.

The final study report will build on the review on pain recently completed by the IOM, explore the specific areas identified above by the Commission, and provide additional information as indicated below:

1. Further recommendations regarding possible changes in the way SSA deals with pain in the context of disability determination;

2. Discussion and possibly recommendations in the area of disability management, especially as it applies to the effect that the benefit structure and administrative processes might have on disability;

3. Suggestions about promising areas of research that would further the understanding of pain and pain behavior;

4. Identification of possible pain measurement mechanisms that might more precisely measure functional losses caused by pain;

5. Discussion and possible recommendations of the role that rehabilitation should play in the current Social Security program in relation to claimants with chronic pain behavior.

149

Appendix C

# SUMMARY OF NATIONAL STUDY OF CHRONIC PAIN SYNDROME

Appendix C

# SUMMARY OF NATIONAL STUDY OF CHRONIC PAIN SYNDROME

In 1984 the Social Security Administration, Office of Disability (OD) initiated a special study to better assess the caseload involving allegations of pain, the body location of the alleged pain, and the extent to which the pain allegation was critical to the determination.

In this study, a stratified random sample of claims for Social Security Disability Insurance benefits was used, with disproportionate sampling across strata to ensure sufficient chronic pain syndrome (CPS) cases in the study. In all, the OD study considered 52,000 cases based on State disability determination services decisions made during the last 6 months of 1983.

For purposes of this study OD defined the six factors shown below as indicative of CPS.

The six factors in the OD study were:

1. Intractable pain of 6 months or more duration;

2. Marked alteration of behavior with depression or anxiety;

3. Marked restriction in daily activities;

4. Excessive use of medication and frequent use of medical services;

5. No clear relationship to organic disorder;

6. History of multiple nonproductive tests, treatments, and surgeries.

Initial screening for this OD national study was performed in the Office of Disability Operations (ODO), where cases were divided into "CPS probable" and "CPS not likely" on the basis of the primary diagnosis shown on the actual disability determination form in file. In classifying cases, ODO personnel were instructed to classify a case as CPS probable if certain diagnoses, considered more likely to be associated with significant allegations of pain, were shown on the disability determination form. All cases were then routed to the OD, Office of Medical Evaluation (OME) where they were reviewed and further divided into "CPS cases," "other pain cases," and "no pain cases."

OME staff physicians then reviewed the cases to determine which of the six factors the OD believed associated with CPS were present and were asked on the basis of their experience and medical judgment to answer the

question, "In summary, does the evidence indicate that the individual has CPS even though some of the criteria below are lacking?" For study purposes a "yes" answer meant that the individual OME physician believed CPS was present. OME physicians were not provided with a set of guidelines directing that any specific set or minimum number of factors had to be present for a "yes" answer. Thus, the OME response to this important question represented a global rating, with each OME physician answering the question on the basis of his or her own experience and medical judgment.

Tables 1-5 summarize the study data of particular interest to the Commission.

Table 1   Pattern of association between individual CPS criteria and summary judgment of OME physician

Table 2   Number of individual chronic pain syndrome criteria associated with summary judgment of central office reviewing physician by pain status

Table 3   Estimated number and percent initial determinations for disabled worker benefits by pain status, calendar 1984

Table 4   Percent distribution of initial disability determinations by principal body system affected and pain status

Table 5   Percent of chronic pain syndrome and of other pain cases by nature and type of pain

**TABLE 1.—Pattern of association between individual CPS criteria and summary judgment of OME physician**

| Individual criteria | Summary of central office physician judgment[1] | | |
| | Percent of cases | | |
| | All pain cases | CPS cases | Other pain cases |
|---|---|---|---|
| Intractable pain of 6 months or more duration | 100.0 | 100.0 | 100.0 |
| YES | 13.5 | 57.7 | 5.1 |
| NO | 86.5 | 42.3 | 94.9 |
| Marked alteration of behavior with depression or anxiety | 100.0 | 100.0 | 100.0 |
| YES | 6.5 | 21.7 | 3.7 |
| NO | 93.5 | 78.3 | 96.4 |
| Marked restriction in daily activities | 100.0 | 100.0 | 100.0 |
| YES | 18.8 | 48.1 | 13.3 |
| NO | 81.2 | 51.9 | 86.7 |
| Excessive use of medication and frequent treatment | 100.0 | 100.0 | 100.0 |
| YES | 5.6 | 24.5 | 2.1 |
| NO | 94.4 | 75.5 | 97.9 |
| No clear relationship to organic disorder | 100.0 | 100.0 | 100.0 |
| YES | 19.7 | 48.0 | 14.3 |
| NO | 80.3 | 52.0 | 85.7 |
| History of multiple nonproductive tests, treatments and surgeries | 100.0 | 100.0 | 100.0 |
| YES | 5.6 | 24.5 | 2.0 |
| NO | 94.4 | 75.5 | 98.0 |

[1]Based on answer by central office reviewing physician to question, "In summary, does the evidence indicate that the individual has CPS even though some of the criteria above are lacking?" Answer of "yes" represented classification as CPS case for purpose of analysis.

**TABLE 2.—Number of individual chronic pain syndrome criteria associated with summary judgment of central office reviewing physician by pain status**

| Number of individual criteria | Summary of central office physician judgment[1] | | |
| --- | --- | --- | --- |
| | Percent of cases | | |
| | All pain cases | CPS cases | Other pain cases |
| TOTAL | 100.0 | 100.0 | 100.0 |
| 0 | 59.4 | 12.6 | 68.3 |
| 1 | 25.2 | 19.7 | 26.2 |
| 2 | 7.3 | 27.1 | 3.6 |
| 3 | 4.5 | 22.8 | 1.0 |
| 4 | 1.9 | 9.2 | 0.5 |
| 5 | 1.4 | 6.8 | 0.4 |
| 6 | 0.3 | 1.9 | 0.0 |
| Mean number | 0.7 | 2.3 | 0.4 |

[1]Cf. footnote 1, table 1.

156

**TABLE 3.—Estimated number and percent initial determinations for disabled worker benefits by pain status, calendar 1984**

| Pain status | Initial determinations[1] | |
| --- | --- | --- |
| | Number of cases (in 000's) | Percent of cases |
| Total number of initial determinations[2] | 96.1 | 100.0 |
| Number of determinations where pain alleged | 57.9 | 60.2 |
| Number of determinations involving CPS | 9.2 | 9.6 |
| Number of determinations not involving pain | 38.2 | 39.8 |

[1]Excludes reconsideration and hearing cases.
[2]For disabled workers only.

**TABLE 4.—Percent distribution of initial disability determinations by principal body system affected and pain status**

| Medical characteristic | Percent of cases | | | | CPS cases as percent of all initial determinations |
|---|---|---|---|---|---|
| | All initial determinations | No pain involved | Chronic pain syndrome | Other pain cases | |
| ALL CASES | 100.0 | 100.0 | 100.0 | 100.0 | 9.6 |
| Principal body system affected | | | | | |
| Musculoskeletal | 29.5 | 11.4 | 56.7 | 38.5 | 18.4 |
| Special sense and speech | 6.0 | 11.6 | 2.2 | 2.4 | 3.5 |
| Respiratory system | 5.5 | 6.7 | 0.6 | 5.5 | 1.0 |
| Cardiovascular system | 17.5 | 10.6 | 16.6 | 23.0 | 9.1 |
| Digestive system | 2.6 | 3.9 | 2.0 | 1.6 | 7.4 |
| Genito-Urinary system | 1.9 | 2.8 | 0.0 | 1.5 | 0.0 |
| Hemic and lymphatic system | 0.2 | 0.4 | 0.0 | 0.0 | 0.0 |
| Skin | 1.0 | 0.1 | 0.0 | 1.9 | 0.0 |
| Endocrine system | 2.5 | 2.5 | 1.5 | 2.6 | 5.8 |
| Multiple body systems | 1.6 | 0.4 | 0.3 | 2.9 | 1.5 |
| Neurological | 7.7 | 14.1 | 0.6 | 4.0 | 0.8 |
| Mental disorders | 14.4 | 26.3 | 4.1 | 7.0 | 2.7 |
| Neoplastic disease | 8.4 | 7.7 | 13.6 | 7.8 | 15.6 |
| Unknown | 1.4 | 1.5 | 1.9 | 1.2 | 13.3 |

**TABLE 5.—Percent of chronic pain syndrome and of other pain cases by nature and type of pain**

| Pain characteristic | CPS cases | | | Other pain cases | | |
|---|---|---|---|---|---|---|
| | Total | Allow | Deny | Total | Allow | Deny |
| TOTAL PERCENT | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Location of pain[1] | | | | | | |
| Back | 65.9 | 65.5 | 66.0 | 29.0 | 18.7 | 34.0 |
| Neck | 17.7 | 9.9 | 20.4 | 10.3 | 9.9 | 10.6 |
| Head | 16.3 | 18.1 | 15.8 | 6.0 | 5.6 | 6.1 |
| Chest | 21.2 | 29.8 | 18.3 | 27.2 | 41.5 | 20.2 |
| Abdomen | 3.6 | 2.7 | 3.9 | 6.2 | 6.7 | 6.0 |
| Eyes | 0.0 | 0.0 | 0.0 | 1.1 | 1.9 | 0.7 |
| Leg | 30.8 | 38.8 | 28.2 | 15.3 | 16.0 | 14.9 |
| Knee | 12.2 | 22.9 | 8.7 | 14.6 | 12.7 | 15.5 |
| Ankle | 8.0 | 15.1 | 5.7 | 4.4 | 5.5 | 3.8 |
| Foot | 4.0 | 4.0 | 4.0 | 6.0 | 3.2 | 7.4 |
| Hip | 16.9 | 43.7 | 8.0 | 8.4 | 8.7 | 8.2 |
| Side | 1.6 | 0.5 | 1.9 | 1.0 | 0.0 | 1.4 |
| Shoulder | 14.5 | 17.4 | 13.6 | 9.2 | 6.7 | 10.4 |
| Elbow | 3.7 | 1.0 | 4.6 | 4.7 | 6.2 | 3.9 |
| Wrist | 4.0 | 4.4 | 3.8 | 5.7 | 7.0 | 5.0 |
| Hand | 5.8 | 4.9 | 6.2 | 10.7 | 11.5 | 10.4 |
| Other | 5.3 | 4.8 | 5.5 | 9.5 | 14.4 | 7.2 |
| Diffuse | 0.5 | 2.2 | 0.0 | 3.3 | 3.9 | 2.9 |

Continued on next page

159

**TABLE 5.—Percent of chronic pain syndrome and of other pain cases by nature and type of pain**—continued

| Pain characteristic | CPS cases | | | Other pain cases | | |
|---|---|---|---|---|---|---|
| | Total | Allow | Deny | Total | Allow | Deny |
| **Duration of pain estimated from last medical evidence** | | | | | | |
| 1–6 months | 12.2 | 34.6 | 4.8 | 15.4 | 18.2 | 14.0 |
| 7–12 months | 14.1 | 5.9 | 16.9 | 7.5 | 6.0 | 8.2 |
| 1–2 years | 10.1 | 7.7 | 10.9 | 6.6 | 5.1 | 7.4 |
| More than 2 years | 26.3 | 12.8 | 30.7 | 11.8 | 13.2 | 11.2 |
| Unknown | 37.3 | 38.9 | 36.8 | 58.7 | 57.5 | 59.2 |
| **Appropriateness of pain relative to physical disorder** | | | | | | |
| Inappropriate | | | | | | |
| No physical or organic disorder | 15.0 | 6.0 | 17.9 | 13.5 | 4.2 | 18.0 |
| Not commensurate with severity | 35.0 | 7.0 | 44.3 | 11.5 | 6.2 | 14.1 |
| Appropriate | 44.5 | 85.7 | 41.0 | 50.8 | 68.0 | 42.4 |
| Uncertain | 5.5 | 1.4 | 6.9 | 24.2 | 21.6 | 25.5 |
| **Type of pain[1]** | | | | | | |
| Continuous, intractable | 35.0 | 25.4 | 38.2 | 9.6 | 12.3 | 8.2 |
| Intermittent, rhythmic | 39.6 | 39.7 | 39.6 | 26.1 | 26.3 | 26.0 |
| Brief, transient | 8.4 | 17.2 | 5.6 | 21.7 | 25.4 | 19.8 |
| Unknown | 22.0 | 24.1 | 21.3 | 42.7 | 33.1 | 47.5 |

[1]Multiple response permitted.

Appendix D

# PRESENT VALUE OF SELECTED BENEFIT AMOUNTS

Appendix D

# PRESENT VALUE OF SELECTED BENEFIT AMOUNTS

| Monthly Benefit | | Discounted at | | |
|---|---|---|---|---|
| Amount* | Years | 5% | 6% | 7% |
| 500 | 15 | $ 82,000 | $ 77,000 | $ 72,000 |
| 500 | 25 | 131,000 | 117,000 | 106,000 |
| 500 | 35 | 175,000 | 151,000 | 131,000 |
| 800 | 15 | 132,000 | 123,000 | 115,000 |
| 800 | 25 | 210,000 | 188,000 | 169,000 |
| 800 | 35 | 281,000 | 241,000 | 209,000 |
| 1200 | 15 | 198,000 | 185,000 | 173,000 |
| 1200 | 25 | 315,000 | 282,000 | 253,000 |
| 1200 | 35 | 421,000 | 362,000 | 314,000 |

Each of the numbers in the table represents the present value of a series of monthly amounts. For example, $82,386 is the amount which, in an account drawing 5 percent interest, is exactly sufficient to allow the following series of monthly withdrawals, beginning immediately: $500 for the first year, $520 (up 4 percent) for the second year, $540.80 (up 4 percent) for the third year, ..., for 15 years. Each present value is rounded to the nearest dollar and does not take account of any rounding of the monthly amounts which may be necessary after successive 4 percent increases.

*The monthly benefit amounts are assumed to increase by 4 percent at the end of each year.

Appendix E

# SAMPLE PAIN QUESTIONS

# SAMPLE PAIN QUESTIONS FOR PHYSICIANS

1. Is pain the patient's primary complaint?

2. Does the patient come into your office frequently with a primary complaint of pain?

3. Is there a definitive cause or etiology of the patient's complaints? If so, state the diagnosis and evidence supporting that diagnosis.

4. Are your patient's subjective complaints of pain greater than would be expected for the recognized level of pathology?

5. Does the patient's pain respond favorably to accepted treatment modalities exclusive of pain medication?

6. Are greater than normal amounts of pain medication required to control the patient's pain?

7. Does depressive behavior appear to be a part of the patient's pain pattern?

8. Do you feel that psychological, social or economic factors are significant in the patient's pain problem? If so, which ones?

9. Has the patient's pain pattern changed over the last 12 months? How?

10. Do you anticipate that the patient's pain will improve over the next 12 months with current treatment?

11. Do you feel that a rehabilitation or chronic pain treatment program would be of value for the patient either in the restoration of activities of daily living or employment? If so, which?

## SAMPLE PAIN QUESTIONS FOR PATIENTS

1. Do you have a lot of pain with your impairment?

2. Do you feel that your pain is due to some undiagnosed problem with your body?

3. Do you feel that *any* of your pain is due to mental stress or emotional problems?

4. Do you feel that *all* of your pain is due to mental stress or emotional problems?

5. Do you feel that your pain problem is curable, either totally or partially?

6. Do you feel that your pain problem is hopeless?

7. Do you feel helpless with your pain?

8. Is your doctor doing all that he/she can to help your pain problem?

9. Has any treatment by your doctor helped your pain problem? Which?

10. Are you being given enough pain medication by your doctor?

11. Do you feel depressed frequently?

12. Do you feel that your pain is aggravated by family problems? Work problems?

13. Does your spouse or significant other understand your pain problem?

14. Does your spouse or significant other do all that he/she can to help you with your pain problem?

15. Do you feel that money problems aggravate your pain?

16. Do you get any form of compensation (e.g., workers' compensation, Social Security/Supplemental Security Income disability, private insurance, union or workplace disability benefits, etc.) for your pain? If so, please state which.

17. Has your pain changed over the last 12 months? How?

18. Do you think that your pain is going to change in the next 12 months? How?

19. Did you enjoy working at your last job?

20. Did you consider your pay at your last job adequate for what you did?

21. Are you able to take care of yourself as far as day to day needs are concerned?

22. Would you accept chronic pain treatment?

23. Do you feel that any type of rehabilitation would help your pain?

24. Do you want to ultimately work on a part-time basis?

25. Do you ultimately want to work on a full-time basis?

26. Would you accept rehabilitation with the goal of returning to work, either part-time or full-time?

## SAMPLE PAIN QUESTIONS FOR CLAIMANT'S RELATIVES OR FRIENDS

1. Have you ever observed (enter name) when (he/she) is suffering from pain?

2. What specific things does (he/she) do or say that make you believe the pain is significant?

3. Does medication seem to help relieve (his/her) pain?

4. Have you observed whether (enter name)'s pain is affected by variations in weather, time of day, or (his/her) activities?

5. Please describe any specific activities that (enter name) used to be able to do around the house that (he/she) can no longer do because of the pain.

6. Please describe any other activities (other than those around the house) that (enter name) used to do that (he/she) can no longer do because of the pain.

7. In what ways have you observed (enter name)'s pain affecting (his/her) ability to stand, lift, walk, sit, or do other physical activities?

8. In what ways have you observed (enter name)'s pain affect (his/her) ability to concentrate, exercise judgment, interact with family, friends, coworkers, etc.?

## EXAMPLE OF DDS PAIN QUESTIONNAIRE CURRENTLY IN USE

The Commission also sees merit in some of the forms developed by the various State disability determination services (DDS). The following is an example of a form in current use.

### Questions Sent to CE Sources

In the history, please comment on the type, dose and frequency of analgesic use. What is the frequency and duration of exacerbations? Which joints have been involved in the past and which are involved currently? Describe any permanent deformities. Physical findings should include description of joint pain, swelling, heat, redness, tenderness. Give gait description if involved. Give grip strength, if the hands are involved. If there is atrophy, give circumferential measurements of the involved area and measure the opposite extremity for comparison. Range of motion of all affected joints must be reported in degrees.

Please describe the claimant's stance and gait without and with ambulation aid, if one is used. Describe the aid used. If walking cannot be sustained without aid, please specify the medical necessity for its use. Include a description of the degrees of muscle weakness, and the extent of joint instability, pain, muscle atrophy, neurological disorganization causing stumbling, lurching, or falling. Describe the ability to squat and recover, heel/toe walk, and getting on and off the examining table.

Chest Pain — Extremely important

If the claimant complains of current chest discomfort, the following information MUST be provided so that subsequent reviewers may independently determine the nature and origin of the symptoms. Please question the claimant carefully and report on each of the following factors:

a. Location and radiation.

b. Character.

c. Frequency (including whether there has been a change in the pattern of the symptoms).

d.  Duration.

e.  Precipitating factors (describe in detail the activity; also note whether the pain also occurs at rest or awakens the claimant from sleep and whether it is related to ingestion of food or movement of the upper extremities).

f.  Mode of relief (include time required to obtain relief on rest or after taking specific drugs such as nitroglycerin).

g.  Specific cardiac drugs (list the names and dosage of drugs used by the claimant currently and in the recent past and the response of the claimant's symptoms to these drugs).

h.  Cardiac rehabilitation program (note participation).

i.  Impact on daily activities (describe in detail the impact of the chest pain on ability to perform daily activities).

Report any associated phenomena such as diaphoresis, dyspnea, nausea, fear of death. Give results of pertinent tests. Discuss which origin of pain the evidence best establishes (cardiac, hiatal hernia, esophagitis, etc.).

## Questions Sent to Treating Sources

Please identify joints or spinal area involved and describe residual range of motion IN DEGREES and related pain. (If precise ROM information is not available, your approximations will be helpful in evaluating the severity of the impairment.)

JOINT or SPINAL AREA

RANGE of MOTION in DEGREES

PAIN (location, radiation)

174

Report any nerve root abnormalities including radicular distribution, severity.

Sensory

Motor

Reflex

Comment on onset and persistence of these findings:

Please report dates and results of any nerve root irritation tests (seated and supine straight leg raising, electromyography, etc.):

Date and report of x-ray findings of involved areas. (Please include radiologist's report, if available.)

If ambulation cannot be sustained without aid, please specify why aid is required, such as: muscle weakness, joint instability, pain, muscle atrophy, neurological disorganization causing stumbling, lurching, or falling. Please describe aid used.

Please report location and describe severity of any of the following findings (or indicate "Normal" if not present):

Swelling:

Erythema:

Heat:

Deformity:

Atrophy:

Pain:

Tenderness:

Please identify joints or spinal area involved and describe residual range of motion IN DEGREES and related pain. (If precise ROM information is not available, your approximations will be helpful in evaluating the severity of the impairment.)

JOINT or SPINAL AREA

RANGE of MOTION in DEGREES

PAIN (location, radiation)

Is the patient having chest pain of cardiac origin, e.g., that of ischemia? Yes ____
No ____ If the chest pain is of cardiac origin, the following information is vital to the determination so that subsequent reviewers may independently determine the nature and origin of the symptoms.

1.  LOCATION-RADIATION: Substernal, precordial, elsewhere?

    RADIATES WHERE?

2.  CHARACTER: Crushing, squeezing, aching, etc., vs. sharp, sticking, stabbing, etc.

3.  PRECIPITATING FACTORS: exertion (if exertional, type and amount of activity which precipitates pain), excitement, cold, eating, etc.

4.  HOW RELIEVED—HOW QUICKLY: rest and/or nitroglycerin, antacids, etc.; number of minutes before relief occurs with each. Are other medications used?

5.  FREQUENCY OF ATTACKS: Per day, week, etc. Date of last attack. Discuss if infrequency is due to deliberately limited activity level.

Report any associated phenomena such as diaphoresis, dyspnea, nausea, fear of death. Discuss which origin of pain the evidence best establishes (cardiac, hiatal hernia, esophagitis, etc.)

176

If your patient has recurring chest discomfort, the following information is necessary so that its nature and origin will be apparent to subsequent reviewers. Please report on each of the following factors:

LOCATION and RADIATION:

CHARACTER (e.g., crushing, sticking):

PRECIPITATING FACTORS (if exertional, give examples of activities which reproduce pain):

HOW RELIEVED-HOW QUICKLY:

FREQUENCY (if infrequent due to limited activity, discuss on back of page):

REPORT ASSOCIATED SYMPTOMS (e.g., diaphoresis), and NATURE/ORIGIN OF PAIN:

Is the patient functionally limited as a result of obesity? Yes _____ No _____ If yes, please give examples of difficulty in walking, sitting, arising, standing, or attending to personal needs:

If patient has dyspnea or fatigue related to obesity, please describe the level of activity which produces the same:

Describe any joint pain, swelling, heat, redness, or tenderness. Report range of motion in degrees for all affected joints.

PAIN WORKSHEET

ISSUES:

1. Is there a medically documented impairment where the pain exceeds the expected level of severity? If yes, proceed to #2. If no, stop.

2. Is there a severe impairment; OR is it reasonable to assume that multiple not severe impairments could constitute a severe impairment or restriction of basic work-related activities? If yes, continue investigation. If no, stop.

INVESTIGATION:

1. Documentation –

    a. Frequency of pain:

    b. Duration of pain:

    c. Radiation of pain:

    d. Intensity of pain:

    e. Persistence of pain:

    f. Location of pain:

2. Identify –

    a. Precipitating events (what starts the pain?)

    b. Exacerbating factors (what makes pain worse?)

3. What are effects of medication and treatment?

4. Describe limitations in physical functioning caused by the pain.

5. Describe limitations in how the pain affects daily habits, daily activities, interests and relationships.

Appendix F

# COURT DECISIONS: EVALUATION OF PAIN

Appendix F

# COURT DECISIONS: EVALUATION OF PAIN

*FIRST CIRCUIT*

*Winn v. Heckler*, 762 F.2d 180 (1st Cir. 1985)

*Gray v. Heckler*, 760 F.2d 369 (1st Cir. 1985)

*Miranda v. Secretary of Health, Education and Welfare* 514 F.2d 996 (1st Cir. 1975)

*Reyes Robles v. Finch*, 409 F.2d 84 (1st Cir. 1969)

*SECOND CIRCUIT*

*Mimms v. Heckler*, 750 F.2d 180 (2d Cir. 1984)

*Aponte v. Secretary of Health and Human Services*, 728 F.2d 588 (2d Cir. 1984)

*Rivera v. Schweiker*, 717 F.2d 719 (2d Cir. 1983)

*Gallagher v. Heckler*, 697 F.2d 82 (2d Cir. 1983)

*THIRD CIRCUIT*

*Ferguson v. Schweiker*, 765 F.2d 31 (3rd Cir. 1985)

*Szubak v. Secretary of Health and Human Services*, 745 F.2d 831 (3rd Cir. 1984)

*Green v. Schweiker*, 749 F.2d 1066 (3rd Cir. 1984)

*FOURTH CIRCUIT*

*Foster v. Heckler*, 780 F.2d 1125 (4th Cir. 1986)

*Hammond v. Heckler*, 765 F.2d 424 (4th Cir. 1985)

*Meyers v. Califano*, 611 F.2d 980 (4th Cir. 1980)

*FIFTH CIRCUIT*

*Owens v. Heckler*, 770 F.2d 1276 (5th Cir. 1985)

*Lawler v. Heckler*, 761 F.2d 195 (5th Cir. 1985)

*Davis v. Heckler*, 759 F.2d 432 (5th Cir. 1985)

*Scharlow v. Schweiker*, 655 F.2d 645 (5th Cir. 1981)

*SIXTH CIRCUIT*

*Whitten v. Secretary of Health and Human Services*, 774 F.2d 1164 (6th Cir. 1985)

*Robinson v. Secretary of Health and Human Services*, No. 84-3929, slip op. (6th Cir. Oct. 28, 1985)

*Fraley v. Secretary of Health and Human Services* 733 F.2d 437 (6th Cir. 1984)

*SEVENTH CIRCUIT*

*Look v. Heckler*, 775 F.2d 192 (7th Cir. 1985)

*Whitney v. Schweiker*, 695 F.2d 784 (7th Cir. 1982)

*EIGHTH CIRCUIT*

*Benson v. Heckler*, No. 85-1363, slip op. (8th Cir. Dec. 18, 1985)

*Holland v. Heckler*, 768 F.2d 277 (8th Cir. 1985)

*Sebion v. Heckler*, 757 F.2d 960 (8th Cir. 1985)

*Ford v. Heckler*, 754 F.2d 792 (8th Cir. 1985)

*Polaski v. Heckler*, 751 F.2d 943 (8th Cir. 1984)

*Clark v. Heckler*, 733 F.2d 65 (8th Cir. 1984)

*Nelson v. Heckler*, 712 F.2d 346 (8th Cir. 1983)

*NINTH CIRCUIT*

*Howard v. Heckler*, 782 F.2d 1484 (9th Cir. 1986)

*Nyman v. Heckler*, 779 F.2d 528 (9th Cir. 1985)

*Taylor v. Heckler*, 765 F.2d 872 (9th Cir. 1985)

*Murray v. Heckler*, 722 F.2d 499 (9th Cir. 1983)

*TENTH CIRCUIT*

*Teter v. Heckler,* 775 F.2d 1104 (10th Cir. 1985)

*Broadbent v. Harris,* 698 F.2d 407 (10th Cir. 1983)

*ELEVENTH CIRCUIT*

*Landry v. Heckler,* 782 F.2d 1551 (11th Cir. 1986)

*Hand v. Heckler,* 761 F.2d 1545 (11th Cir. 1985)

*Kelley v. Heckler,* 761 F.2d 1538 (11th Cir. 1985)

*Boyd v. Heckler,* 704 F.2d 1207 (11th Cir. 1983)

BIBLIOGRAPHY

# Bibliography

Akabas, Sheila H.: Expanded View for Worksite Counseling. Business and Health, pp 24–28, December 1984

Aronoff, Gerald M., Evans, Wayne O. and Enders, Pamela L.: A Review of Followup Studies of Multidisciplinary Pain Units. Pain Vol 16, pp 1–11, 1983

Bartko, J. J. and Carpenter, W. T.: On the methods and theory of reliability. Journal of Nervous and Mental Disease Vol 153, pp 307–317, 1976

Black, R. G.: Evaluation of the Pain Patient — A Clinical Guide. Department of Anesthesiology and Critical Care Medicine, The Johns Hopkins Medical Institutes, Baltimore, Maryland, pp 1–18, March 1985

Black, R. G.: Establishing Meaningful Statistics on Health Care, pp 1–7, 25 January 1985

Black, Richard G.: The Chronic Pain Syndrome. Surgical Clinics of North America Vol 55, No. 4, pp 999–1011, August 1975

Bonica, J. J.: The Nature of the Problem, in Carron, H. and McLaughlin, R. (ed): Management of Low Back Pain. Littleton, MA, Wright-PSG Publishing Co., 1982

Brena, Steven F. and Chapman, Stanley L.: Acute versus Chronic Pain States: the "Learned Pain Syndrome." Clinics in Anaesthesiology Vol 3, No. 1, pp 41–55, January 1985

Brena, Steven F.: Chronic Pain States: A Model for Classification. Psychiatric Annals Vol 14 No. 11, pp 778–782, November 1984

Brena, Steven F., Chapman, Stanley L., Stegall, Phyllis G. and Chyatte, Samuel B.: Chronic Pain States: Their Relationship to Impairment and Disability. Arch Phys Med Rehabil Vol 60, pp 387–389, September 1979

Brena, Steven F.: Pain Control Facilities: Patterns of Operation and Problems of Organization in the USA. Clinics in Anaesthesiology Vol 3, No. 1, pp 183–195, January 1985

Brena, Steven F. and Chapman, Stanley L.: Chronic Pain States and Compensable Disability: An Algorithmic Approach, in C. Benedetti et al (ed): Advances in Pain Research and Therapy, Vol 7. New York, Raven Press, 1984

Brena, Steven F. and Chapman, Stanley L.: Pain and Litigation, in Wall, Patrick D. and Melzack, Ronald (ed): Testbook of Pain. New York, Churchill Livingstone, 1984

Brena, Steven F., McCall, Wayne and Franco, Amy: Functional Diagnosis: Vocational and Disability Evaluation, in Bonica, J. J. (ed): The Management of Pain in Clinical Practice, Philadelphia, Lea and Febiger (in press)

Carron, Harold: Compensation Aspects of Low Back Claims, in Carron, H. and McLaughlin, R. (eds): Management of Low Back Pain. Littleton, MA, Wright-PSG Publishing Co, 1982

Carron, Harold, DeGood, Douglas E. and Tait, Raymond: A Comparison of Low Back Pain Patients in the United States and New Zealand: Psychological and Economic Factors Affecting Severity of Disability. Pain Vol 21, pp 77–89, 1985

Chapman, Stanley L., Brena, Steven F. and Bradford, L. Allen: Treatment Outcome in a Chronic Pain Rehabilitation Program. Pain Vol 11, pp 255–268, 1981

Chapman, C. R., Casey, K. L., Dubner, R., Foley, K. M., Gracely, R. H. and Reading, A. E.: Pain Measurement: An Overview. Pain Vol 22, pp 1–31, 1985

Chapman, Stanley L.: Behavior Modification from Chronic Pain States. Clinics in Anaesthesiology Vol 3, No. 1, pp 111–142, January 1985

Eckenhoff, Edward A.: Medical Rehabilitation for Disabled Employees. Business and Health, pp 29–31, May 1984

Florence, David W.: Chronic Pain — Fact or Fiction. Minnesota Medicine Vol 63, pp 779–780, November 1980

Florence, David W.: The Chronic Pain Syndrome A Physical and Psychologic Challenge. Postgraduate Medicine Vol 70 No. 5, pp 218–228, November 1981

Florence, David W.: Diary of A Work-Related Disability. Legal Aspects of Medical Practice, August 1979

Florence, David W.: Workers' Compensation Crisis Looms; MD's Partially to Blame. Legal Aspects of Medical Practice, May 1978

Florence, David W. and Miller, Todd C.: Functional Overlay in Work-Related Injury. Postgraduate Medicine Vol 77 No. 8, pp 97–108, June 1985

Fordyce, Wilbert E.: Back Pain, Compensation, and Public Policy, in Rosen, J. (ed) Vermont Conference on Primary Prevention of Psychopathology, 1984

Fordyce, Wilbert E., Brockway, JoAnn, Bergman, James A. and Spengler, Daniel: Acute Back Pain. A Control Group Comparison vs. Traditional Management Methods, Journal of Behavioral Medicine, 1985

Fordyce, Wilbert E.: A Behavioural Perspective on Chronic Pain. British Journal of Clinical Psychology Vol 21, pp 313–320, 1982

Fordyce, Wilbert E., Roberts, Alan H., Sternbach, Richard A.: The Behavioral Management of Chronic Pain: A Response to Critics

Gracely, R. H. and Wolskee, P. J.: Semantic Functional Measurement of Pain: Integrating Perception and Language. Pain Vol 15, pp 389–398, 1983

Gracely, R. H., Dubner, R., Deeter, W. R. and Wolskee, P. J.: Naloxone and Placebo Alter Postsurgical Pain by Separate Mechanisms. Nature Vol 306, pp 264–265, 1983

Gracely, R. H.: Pain Language and Ideal Pain Assessment, in Melzack, R. (ed): Pain Measurement and Assessment. New York, Raven Press, 1983

Gracely, R. H.: Pain Psychophysics, in Manuck, S. (ed): Advances in Behavioral Medicine, New York, JAI Press, 1985

Hammonds, William, Brena, Steven and Unikel, Irving: Compensation for Work-Related Injuries and Rehabilitation of Patients with Chronic Pain. Southern Medical Journal Vol 71, No. 6, pp 664–666, June 1978

Health Insurance Association of America: Source Book of Health Insurance Data, 1985. Washington, D.C.

Huskisson, Edward C.: Measurement of Pain. The Journal of Rheumatology Vol 9 No. 5, pp 768–769, 1982

Institute of Medicine, National Academy of Sciences: Research Briefing on Pain and Pain Management. May 22, 1985

Keefe, Francis J., Wilkins, Robert H. and Cook, Wesley A.: Direct Observation of Pain Behavior in Low Back Pain Patients During Physical Examination. Pain Vol 20, pp 59–68, 1984.

Keefe, Francis J. and Block, Andrew R.: Development of an Observation Method for Assessing Pain Behavior in Chronic Low Back Pain Patients. Behavior Therapy Vol 13, pp 363– 375, 1982

Keefe, Francis J., Wilkins, Robert H., Cook, Wesley, Crisson, James E. and Muhlbaier, Lawrence H.: Depression, Pain and Pain Behavior. Journal of Consulting and Clinical Psychology (in press)

Keefe, Francis J. and Hill, Robert W.: An Objective Approach to Quantifying Pain Behavior and Gait Patterns in Low Back Pain Patients. Pain Vol 21, pp 153–161, 1985

Kerns, R. D., Turk, D. C. and Rudy, T. E.: The West-Haven Yale Multi-dimensional Pain Inventory (WHYMPI). Pain Vol 23, pp 345–356, 1985

Magni, Guido and Bertolini, Claudio de: Chronic Pain as a Depressive Equivalent. Postgraduate Medicine Vol 73 No. 3, pp 79–90 with commentary by Florence, David and Parris, Winston C. V., March 1983

Maher, Walter B.: Controlling Low Back Pain Costs at Chrysler. Business and Health, pp 20–23, May 1985

Roland, Martin and Morris, Richard: A Study of the Natural History of Back Pain Part 1: Development of a Reliable and Sensitive Measure of Disability in Low Back Pain. Spine Vol 8 No. 2, pp 141–144, 1983

Social Security Administration: Disability Evaluation Under Social Security — A Handbook for Physicians. March 1979 with Supplements

Soule, Charles E.: Disability Income Insurance: The Unique Risk: Homewood, IL, Dow Jones-Irwin, 1984

Sparrell, Charles F. and McKeon, William F.: Preventing Low Back Pain in Industry. Business and Health, pp 16–19, May 1985

Strang, J. Peter: The Chronic Disability Syndrome in Aronoff, Gerald M. (ed): Evaluation and Treatment of Chronic Pain. Baltimore, Urban and Schwartzenberg, 1985

Swartz, Gail: Disability Costs: The Impending Crisis. Business and Health, pp 25–28, May 1984

Turk, D. C. and Kerns, R. D.: Conceptual Issues in the Assessment of Clinical Pain. International Journal of Psychiatry in Medicine Vol 13, pp 15–26, 1983

Turk, D. C. and Rudy, T. E.: Assessment of Cognitive Factors in Chronic Pain: A Worthwhile Enterprise? Journal of Consulting and Clinical Psychology (in press)

Turk, D. C., Rudy, T.E. and Salovey, P.: The McGill Pain Questionnaire Revisited: Confirming the Factor Structure and Examining Appropriate Uses. Pain Vol 21, pp 385–397, 1985

Waddell, Gordon, Main, Chris J., Morris, Emyr W., DiPaola, Michael and Gray, Iain C. M.: Chronic Low Back Pain, Psychologic Distress, and Illness Behavior. Spine Vol 9 No. 2 pp 209–215, 1984

192