UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANA JAMES,<br><br>   Plaintiff,<br><br>  v.<br><br>AT&T WEST DISABILITY BENEFITS<br>PROGRAM, et al.,<br><br>   Defendants. | Case No. 12-cv-06318-WHO<br><br>**ORDER ON CROSS MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>Re:  Dkt. Nos. 35, 42, 45 |

**INTRODUCTION**

Plaintiff Diana James and defendant AT&T Umbrella Benefit Plan No. 1 ("the plan") have made cross motions for summary judgment about whether the plan's denial of long-term disability ("LTD") benefits for James was wrongful.  The question I must answer is whether the plan abused its discretion in denying James LTD benefits despite the fact that she suffered from chronic pain and depression.  Because I conclude that the plan wrongly disregarded evidence in James's favor and did not meaningfully identify what evidence she could provide to support her claims, James's motion for summary judgment is GRANTED and the plan's motion for summary judgment is DENIED.

**FACTUAL BACKGROUND**

James was a Service Representative with Pacific Bell Telephone Company from 1997 until she stopped working as a result of the health issues discussed in this Order in 2010.  Her job was to assist customers with orders, billing, and collection-related issues.  Administrative Record ("AR") 410.  She was covered under the AT&T West Disability Benefits Program[1] (the "disability

---

[1] Effective January 1, 2009, the disability plan replaced what was known as the Pacific Telesis Group Comprehensive Disability Benefits Plan.  AR 802, 807.

United States District Court<br>Northern District of California

United States District Court
Northern District of California

1  plan"). Def. Opp'n Adkins Decl. (Dkt. No. 44-2) ¶ 3. The disability plan is a component program

2  of the AT&T Umbrella Benefit Plan No. 1. AR 833.

3  **I.      THE DISABILITY PLAN**

4          Under the disability plan, short-term disability ("STD") benefits of full or partial wage

5  replacement are available to employees for up to 52 weeks. AR 812-14. Eligibility for STD

6  benefits requires that an employee have a "sickness, injury or other medical, psychiatric or

7  psychological condition that prevents [her] from engaging in [her] normal occupation or

8  employment with the Participating Company." AR 812. After receiving 52 weeks of STD

9  benefits, employees may become eligible for LTD benefits. AR 818. Under the disability plan,

10  eligibility for LTD benefits requires that an employee have a "sickness, injury or other medical,

11  psychiatric or psychological condition that prevents [her] from engaging in any occupation or

12  employment for which [she is] qualified or may reasonably become qualified, based on training[,]

13  education or experience." AR 818.

14          The terms of the disability plan provide that "[t]he Plan Administrator (or, in matters

15  delegated to third parties, the third party that has been so delegated) will have sole discretion to

16  interpret [the disability plan], including . . . determination of coverage and eligibility for benefits,

17  and determination of all relevant factual matters." AR 834. The disability plan also states that

18  "[t]he Claims Administrator has been delegated authority by the Plan Administrator to determine

19  whether a particular Eligible Employee who has filed a claim for benefits is entitled to benefits"

20  and that "[t]he Appeals Administrator has been delegated authority by the Plan Administrator to

21  determine whether a claim was properly decided by the Claims Administrator." AR 834.

22          Sedgwick Claims Management Services, Inc. ("Sedgwick") is the third party that has been

23  delegated responsibility for both the entire claims and appeals processes under the disability plan.

24  AR 801, 833, 836; Def. Opp'n Adkins Decl. ¶ 4; Def. Opp'n Hagestad Decl. (Dkt. No. 44-1) ¶¶ 1-

25  2. The group at Sedgwick that handles disability benefits claims is called the AT&T Integrated

26  Disability Service Center ("IDSC"). Def. Opp'n Hagestad Decl. ¶ 3. Appeals of denied disability

27  claims are decided by Sedgwick's Quality Review Unit ("QRU"). Def. Opp'n Hagestad Decl. ¶ 4.

28  The QRU makes its determination based upon the information that was before the IDSC in making

the initial denial decision, the issues and comments submitted by the participant employee, and any other evidence that the QRU may independently discover.  Def. Opp'n Hagestad Decl. ¶ 4. The QRU may seek assistance from independent medical advisors to analyze medical information in submitted in support of claims.  Def. Opp'n Hagestad Decl. ¶ 4; AR 827.

Only the Claims Administrator has discretion to determine whether an employee has a disability qualifying her for STD or LTD benefits.  AR 813, 819.  In determining eligibility, Sedgwick relies upon objective medical findings from the employee's providers concerning the severity of the patient's condition and its impact on the employee's ability to work.  *See* AR 57, 238, 492; Def. Opp'n Hagestad Decl. ¶ 8.  "A medical opinion that is not supported by objective and measurable medical findings is usually insufficient to support a claim for disability benefits . . . . General, vague, or unsupported descriptions of disability alone are not useful in making determinations about an employee's ability to work."  Def. Opp'n Hagestad Decl. ¶ 8.

Sedgwick does not have a role in the Plan's funding and is not a source of funds used to pay disability benefits.  Def. Opp'n Adkins Decl. ¶ 6; Def. Opp'n Hagestad Decl. ¶ 5.  Sedgwick receives a flat fee for its services regardless of whether it approves or denies claims.  Def. Opp'n Adkins Decl. ¶ 6; Def. Opp'n Hagestad Decl. ¶ 5.

## II.     JAMES'S STD BENEFITS

James has been seeing Dr. Natalia Balytsky, a pain management specialist, since 2007 for chronic low back pain and facet syndrome.[2]  AR 77.  Since that time, James has received numerous steroidal injections for her pain, the severity of which has varied over time.  On a scale of one to 10, James has reported feeling pain ranging from two to 9.5.  AR 76.  On March 3, 2009, Dr. Balytsky opined that James's pain was chronic based on her observations of James over two years.  AR 77.

On June 2, 2009, James took leave from work due to depression, arthritis, and sciatica.  AR 1, 59.  On June 10, 2009, Dr. Balytsky diagnosed James with "Facet Syndrome/low back pain/arthritis."  AR 75.  James's symptoms included "[l]ow back pain caused by prolonged

---

[2] Facet syndrome is a condition in which the joints in the back of the spine degenerate and may cause pain as a result.  Def. Mot. 4 n.5.

sitting . . . arthritis in elbows, shoulders and fingers." AR 75.  James was also "unable to sit and type due to her condition." AR 75.  Dr. Balytsky expected James's condition to improve within three months with treatment and prescribed treatment involving radio frequency ablation if a medial branch block was successful—both depended on authorization from her insurance company.  AR 75.  She suggested that James "avoid prolong[ed] sitting, bending, lifting & typing" for three months.  AR 75.

On June 15, 2009, in support of James's claim for STD benefits, Sedgwick received office visit notes and a Mental Health Provider Statement from her psychiatrist, Dr. Robert Swanson.[3] AR 9-10.  James told Dr. Swanson that "she doesn't have the energy and ability to concentrate that is necessary for work, lead[ing] to increased anxiety at work." AR 10.  Dr. Swanson observed symptoms of depression, anxiety, and persistent pain in the neck, hands, and back.  AR 64.  He noted James's inability to concentrate, but stated that she did not require assistance to go about daily life.  AR 65.  Instead of providing her with a return-to-work plan and date, Dr. Swanson "recommend[ed] retirement" because her "pain isn't going to get better."  AR 65; *see also* AR 66.

On July 1, 2009, Sedgwick received June 18, 2009, office notes from Dr. Balytsky.  The notes stated that James has "major depression."  While she did not have suicidal or homicidal thoughts or psychotic symptoms, the medical evidence "provides significant observable evidence of severe cognitive or functional impairment precluding appropriate communication with peers and customers, higher level reasoning, multitasking or obtaining and retaining info. due to comorbid diagnosis of depression and low back pain."  AR 17-18.

On June 23, 2009, a supervisor at Sedgwick noted that medical documentation showed that James had a medical condition and symptoms that would preclude prolonged sitting, talking, typing, and client interaction, and that she has a "secondary mental health component" that was being exacerbated by her current medical condition.  While the supervisor said that giving James some time off was within reason, James would have to be evaluated to see whether conservative

---

[3] James appears to have been seeing Dr. Swanson as early as April 7, 2009, but Sedgwick disregarded his notes from before June 2009 as being outside the claim period.  AR 10; *see also* AR 63.

United States District Court
Northern District of California

treatment and a full-time return-to-work plan was feasible.  AR 14.

On July 8, 2009, Dr. Swanson noted James as being "very anxious" even with medication and was observed as having major depression, anxiety, and chronic back pain.  AR 19-20.  James's "back pain persists" and she "needs surgical intervention," but it was not approved yet.  AR 19.  Her medication was increased that day.  He concluded that "there is no way she can [return to work] anytime soon."  AR 20.  Dr. Swanson recommended that, "at best," James take one month off from work so that he could reevaluate her at that time.  AR 20.

On July 14, 2009, Dr. Balytsky noted, "It is my professional opinion[ ] that [James] is unable to sit and type due to her condition.  Her pain is worsened by prolonged sitting which is required of her job."  AR 98.

James's claim for STD benefits was approved starting on June 9, 2009, and was extended several times through November 1, 2009, after which she returned to work on a part-time basis.  AR 39-40, 42, 44-45, 142, 155.  She received trigger point injections on several occasions during this period.  AR 17, 88, 118.  On August 5, 2009, she received the medial branch block procedure.  AR 105.  After the procedure, Dr. Balytsky stated, "the patient is having a lot of severe back pain, significant sitting intolerance, and I do not see the patient being able to go back to work full time."  AR 117.

On September 29, 2009, Dr. Balytsky wrote to Sedgwick stating that while James was not able to return to work yet, after she undergoes another injection upon receiving approval from her health insurance to do so, she is estimated to be able to return to work by November 1, 2009.  AR 128.  On October 7, 2009, James was approved for the procedure and was scheduled to receive it on October 19, 2009.  AR 137.  Thereafter, James's STD benefits were extended to November 1, 2009.  AR 140-42.

On October 28, 2009, Sedgwick received a report on a follow-up visit held on October 26, 2009, with Dr. Balytsky.  AR 143.  Dr. Balytsky wrote that James's condition improved, so she was being released to work part-time for two weeks.  AR 143.  Sedgwick approved James's request for a modified work schedule from November 2, 2009, to November 15, 2009, and her department provided the accommodation.  AR 39-40, 42, 148, 155.  The accommodation was later

extended to November 22, 2009, based on James's request.  AR 44-45.  On November 23, 2009, James returned to work fulltime.  AR 45-46.

On January 5, 2010, James went on leave again and was approved for STD benefits.  AR 160, 230.  Because she had been on leave within the 13 weeks prior, her STD benefits continued from what remained of her 52-week STD benefits allotment after her last disability claim.  AR 160.

On January 12, 2010, Sedgwick received a statement from Dr. Swanson identifying symptoms of major depression, chronic back pain, and knee and neck pain in James.  AR 242.  He reported that James could not function in a high-stress job when she is severely depressed and recommended that she not return to work and go on permanent disability.  AR 242-43.  She occasionally cried, and the treatment Dr. Swanson was recommending for her was "just for maintenance" but was not "expect[ed] to improve the patient's physical or cognitive functioning."  AR 242.  Sedgwick also received a January 8, 2010, statement from Dr. Balytsky, who indicated that James received trigger point injections on January 7, 2010, and would improve in three to four weeks, although James "is not able to tolerat[e] prolonge[d] sitting or standing."  AR 245.  The plan approved STD benefits for James from January 12, 2010, to January 31, 2010.  AR 249.

On January 26, 2010, Sedgwick received a statement from Dr. Leo Becnel, who diagnosed James with cataracts and recommended surgery.  AR 262-63.  Based on this documentation, James was approved for STD benefits through February 14, 2010.  AR 269-70, 275-76.  Two days later, Dr. Swanson stated in a doctor's certificate that James was "not to work again."  AR 690.

On January 29, 2010, Sedgwick received a "Physical Capacities Evaluation:  Sedentary" form from Dr. Balytsky.  AR 176, 277-78.  Dr. Balytsky reported that James would not be able to stand or sit for more than 10-15 minutes, nor would she be able to lift or bend; the doctor said that although James could maneuver a mouse and view a computer screen for up to four hours a day, she would not be able to work for more than an hour a day.  AR 277.  In particular, James would need a break every 15 minutes for 10 minutes.  AR 277.  Dr. Balytsky stated that James's restrictions were "permanent" and Dr. Balytsky could not provide a return-to-work plan for James; she also noted that a sit/stand work station would not help James.  AR 278.

United States District Court
Northern District of California

1    On February 9, 2010, Sedgwick received a statement from Dr. Geoffrey Tompkins, an

2 orthopedic surgeon.  AR 176, 284.  He stated that James demonstrated a normal gait unsupported;

3 both her knees showed full equal range of motion; both her hips showed "normal exam"; she had

4 tenderness in both knees, but neither demonstrated an effusion or crepitation; both knees had a

5 normal ligamentous exam; "McMurray's test" did not cause any significant pain; and a

6 "neurocirculatory exam" resulted in a normal diagnosis.  AR 287.  However, he noted that James

7 was "on significant narcotic medication for chronic back pain."  AR 287.  Dr. Tompkins also

8 reviewed x-rays from September 4, 2009, and concluded that they showed mild-to-moderate

9 lateral joint spacing narrowing bilaterally, slightly greater on the left.  AR 287.  He gave James

10 injections in both knees and reported that she would improve in three to six months.  AR 284, 287.

11    On February 16, 2010, Sedgwick received a note from Dr. Balytsky stating, "At this time I

12 feel it is in Mrs. James['s] best interest to remain off of work until February 24, 2010."  AR 301.

13 On March 3, 2010, Dr. Balytsky reported back to Sedgwick about her February 24th meeting with

14 James, stating, "It is my professional opinion that Mrs. James needs to apply for permanent

15 disability.  I do not believe that she will be able to return to work under her medical conditions."

16 AR 321.

17    On March 15, 2010, Sedgwick received notes from a March 3, 2010, appointment with Dr.

18 Swanson indicating that James's back pain limited her activities, that she had depression, and that

19 "she can't possibly do her demanding work in her present condition (physically) and it is unlikely

20 to improve."  AR 194, 338-39.

21    On March 18, 2010, a Sedgwick employee reviewed James's claim file and concluded

22 based on the medical information received that James was unable to see a computer screen to

23 perform talking and typing tasks.  AR 195-96.  The employee noted that the documents indicated

24 that her sight could improve if her cataracts were removed.  AR 196.  Sedgwick then approved

25 STD benefits for James through April 18, 2010.  AR 197.

26    On April 13, 2010, Sedgwick received an April 7, 2010, Preoperative Evaluation

27 completed by Dr. Catherine Davis, a primary care physician.  AR 346.  Dr. Davis reported that

28 James's "Hip xrays were unremarkable.  No obvious arthritis."  AR 346.  On April 16, 2010, Dr.

Davis forwarded to Sedgwick a hip x-ray report by Dr. David Schmidt, in which he reported "[n]o acute fracture or focal osseous abnormality" in James and her "[h]ip joints and sacroiliac joints appear unremarkable." AR 353.  He concluded that it was an "[u]nremarkable examination."  AR 353.

On April 16, 2010, Sedgwick received a report from Dr. Jason Bacharach stating that James had cataract surgery for her left eye on April 14, 2010, and surgery for her right eye was scheduled for June 9, 2010.  AR 356.

On May 24, 2010, Dr. Balytsky completed another "Physical Capacities Evaluation: Sedentary" form, stating that James could not stand or walk for more than 15 minutes and that she could not tolerate prolonged sitting.  AR 558-59.  Dr. Balytsky also stated that James could speak and view a computer screen for up to three to four hours and maneuver a mouse for up to one to two hours during the course of an eight-hour workday, but that she could not work for more than an hour overall.  AR 558.  These restrictions, Dr. Balytsky said, were permanent.  AR 559.

On May 26, 2010, Dr. Balytsky informed Sedgwick that James was appealing her insurance company's denial of a facet rhizotomy procedure.  AR 205, 379, 400.  Sedgwick extended James's STD benefits through July 25, 2010.  AR 397.  On July 1, 2010, James's insurance company reconsidered its denial and authorized the facet rhizotomy procedure.  AR 400.  On July 27, 2010, Sedgwick extended Plaintiff's STD benefits to August 17, 2010, on which date James would reach the maximum 52-week period of time for STD benefits available to her under the disability plan.  AR 404-06.

## III.   JAMES'S LTD BENEFITS

On April 21, 2010, Sedgwick sent James a letter as part of a package advising her that her STD benefits would expire on August 17, 2010, and stating that she may be eligible for LTD benefits.  AR 479.  The package contained, among other things, a document entitled "For Objective Data," which explained the need to submit "objective data" to properly evaluate her claim, including "physical findings, laboratory results, imaging studies or other objective data . . . as it impacts functional impairment."  AR 492-93.  This data had to be "objective, not subjective."  AR 492.  The document does not appear to identify any objective data for showing pain or

United States District Court
Northern District of California

8

depression.

On May 7, 2010, an LTD case manager called James to explain the LTD claims process, including what forms to fill out, when to return them, and the benefits James could receive; she also explained that the definition of disability for LTD benefits was different than the definition for STD benefits, namely, the former required an inability to work in any occupation.  AR 417-19. During the conversation, James said that she needed trigger point and facet injections, that "she is better in the sense [she does not] have to stress about the inability to be at work," and that work had become too stressful and hard—"real hard."  AR 420.  James also said that she could dress herself, bathe, do certain household chores, walk the dog, watch the news, read, drive (unless she is too medicated or in too much pain), and cook.  AR 420-21.

On June 2, 2010, Sedgwick received James's application for LTD benefits.  AR 572.  She said that she first became disabled on January 5, 2010.  AR 572.  She also sent a "Training, Education and Experience Statement," which indicated that she had a college degree in Romance Languages, took computer classes in the late 1980's, used the internet, could use the company software at work, and could somewhat use Microsoft Word and Excel.  AR 568-69.

On June 18, 2010, Dr. Balytsky noted that James's "severe low back pain," which renders her "not able to sit or stand for more than 15-20 min.," was a permanent condition.  AR 689.

On June 22, 2010, James sent Sedgwick a copy of a Supplementary Certification that was sent to the California Employment Development Department and completed by Dr. Balytsky on June 16, 2010, indicating that James had "severe low back pain" and that her "condition is permanent."  AR 578-79.  On June 30, 2010, James sent Sedgwick a physician's office visit note dated June 28, 2010, indicating that her pain scale was 9 out of 10, that she was awaiting "RFA authorization," and that she needed trigger point injections "today."  AR 580.  On July 1, 2010, Sedgwick received office notes from Dr. Tompkins indicating that James received injections in both knees on June 30, 2010.  AR 581.

On July 12, 2010, a case manager called and left messages for Drs. Balytsky, Swanson, Bacharach, Tompkins, and Davis, requesting their availability for a doctor-to-doctor call.  AR 428. The next day, only Dr. Swanson called back, and he stated that he was unavailable that week and

1   that he would need to see James first before making before speaking making such a call.  AR 429.

2           On July 13, 2010, James's LTD claim was referred to two Physician Advisors ("PA") to

3   provide opinions on whether James's medical information supported the likelihood that she would

4   be able to return to work within six to 12 months after her STD benefits expired, and whether

5   there was "medical evidence of a current severe medical condition" that would continue to prevent

6   James from performing sedentary work only.[4]  AR 429-30.

7           On July 14, 2010, PA Reginald Givens, a psychiatrist, called Dr. Swanson and left a

8   message asking him to call back by the next day to set up a time to discuss James.  AR 430.  After

9   reviewing James's records, Dr. Givens observed that the most recent documentation was a June

10  30, 2010, note from a physician assistant, Robert Crenshaw, and another June 28, 2010, note.  AR

11  430-31.  Neither note reported any specific mental status examination findings or psychiatric

12  symptoms.  AR 430.  Dr. Givens concluded that there was "insufficient objective evidence of

13  cognitive dysfunction that would prevent Diana James from performing occupational duties" as a

14  result of psychiatric disorder.  AR 431.  In addition, he said that there was "[n]o specific testing of

15  cognitive functioning [ ] documented in the records."  AR 431.  Dr. Givens completed his report

16  on July 16, 2010, without having spoken to Dr. Swanson.  AR 430-31.

17          On July 15, 2010, PA Neal Sherman, an internal medicine physician, called Drs. Tompkins

18  and Davis and left messages.  AR 432-35.  Dr. Skvaril, the physician covering for Dr. Davis at the

19  time and who had treated James on three to four occasions, returned Dr. Sherman's call and stated,

20  among other things, that Dr. Davis last saw James on April 7, 2010, for a preoperative evaluation

21  and in anticipation of cataract surgery, and that Dr. Davis had not seen her since.  AR 432, 613.

22  Dr. Sherman found that "[t]he medical records provided for review d[id] not include

23  documentation of abnormal physical findings documenting the severity of [James's] medical

24  condition."  AR 433.  "In the absence of that documentation, she would be considered to have the

25  capacity to perform a full range of sedentary job duties without restriction or limitation," Dr.

26  Sherman concluded.  AR 433.  For example, he noted that although Dr. Balytsky recommended

27  _____

28  [4] Sedentary jobs involve sitting for most of the time, but may involve walking or standing for brief
    periods of time.  AR 586.

United States District Court
Northern District of California

permanent restrictions for James in her May 18, 2010, evaluation, the recommendation was completed in the absence of supporting physical findings. AR 433-34. While recognizing that James was "receiving long-acting narcotics" for "chronic low back pain" and is "under treatment for hypertension, degenerative joint disease of the hip and knees as well as hyperlipidemia," Dr. Sherman concluded that "[i]n the absence of documentation of abnormal physical findings, it is not possible to independently confirm the restrictions proposed by Dr. Balytsky" and "the employee would be considered fully capable of performing a full range of sedentary work activities as of 7/21/10 forward." AR 434. Dr. Tompkins had not returned Dr. Sherman's call before Dr. Sherman completed his report on July 16, 2010.

On July 19, 2010, based on James's file and the reports from Drs. Givens and Sherman, Sedgwick concluded that, despite her "treatment for chronic depression with anxiety" and the care she is receiving for chronic pain, James's documentation did not support the severity of her medical or mental conditions, and she had the capacity to perform sedentary job duties. AR 435. On July 21, 2010, Sedgwick informed James that because she "may have some work capacity," Sedgwick would conduct a vocational review to determine whether she met the definition of disability for LTD benefits. AR 583.

On July 22, 2010, a Transferable Skill Assessment was completed by Job Accommodation Specialist Srilakshmi Sennerikuppam. AR 585-86. Sennerikuppam reviewed James's file and medical records, and noted that she has "hypertension, hyperlipidemia, and chronic low back pain secondary to facet arthropathy with myofascial pain[,] as well as degenerative joint disease affecting her hips and knees." AR 585. Based on James's education and work history and her job description, Sennerikuppam noted that her job "is rated at the sedentary level of physical demand," which is defined as work involving sitting most of the time, but which may also involve walking or standing for brief periods of time. AR 585-86. Sennerikuppam identified four alternative occupations for James: (i) information clerk; (ii) telephone solicitor; (iii) call center representative; and (iv) customer service representative. AR 586. Under the "Medical Information" section of the analysis, Sennerikuppam noted, "For the purposes of this assessment, I have been asked to utilize the following information as identified by the Case Manager: Ms.

11

1   James can perform sedentary work." AR 585. Sennerikuppam did not mention James's history of

2   depression and anxiety.

3            On July 26, 2010, James faxed Sedgwick a number of medical documents, including a July

4   1, 2010, letter from her insurance company stating that it had approved a rhizotomy procedure for

5   her and another document showing that James had received "bilateral sacroiliac joint steroid

6   injections" on July 16, 2010. AR 587-90.

7            On August 2, 2010, a "roundtable" consisting of a Sedgwick case manager, the case

8   manager's supervisor, and a nurse case manager met to review James's files and claim for LTD

9   benefits. AR 447-48; Def. Opp'n Hagestad Decl. ¶ 13. The roundtable noted that the rhizotomy

10  procedure was scheduled for August 13, 2010, and that James received bilateral trigger point

11  injections to her knees and lumbar spine. AR 448. The roundtable concluded that the rhizotomy

12  procedure would not preclude James from sedentary duties because such a procedure typically

13  produces soreness for one to two days, but a person undergoing the procedure would retain or gain

14  the ability to resume sedentary activities. AR 448. The roundtable determined that James's

15  medical documentation did "not support the inability to function in the workplace . . . due to the

16  lack of assessment and physical findings in the medical record," and noted that alternative

17  sedentary occupations were identified for her. AR 447-48.

18           On August 9, 2010, Sedgwick received office visit notes from Dr. Swanson indicating that

19  James's depression and anxiety were reduced somewhat with medication, but still persisted. AR

20  591. Dr. Swanson also noted that James would need periodic injections for her knee and lumbar

21  pain for the rest of her life. AR 591. He said that "there is no way this woman could return to

22  demanding work—her condition has already deteriorated too much to be employed." AR 591.

23           On August 11, 2010, Sedgwick called James to inform her that her claim for LTD benefits

24  was denied because there were no "objective" findings to indicate her inability to perform a

25  sedentary job. AR 451. James was told that although she provided documents of her diagnoses

26  and pain, there was no testing of any functional impairment provided. AR 451. Sedgwick

27  determined that James "does have [the] capacity to perform all sedentary job duties," but does not

28  explain how it came to that conclusion. AR 450.

12

On August 17, 2010, James contacted Sedgwick to verify what type of medical documentation was needed to extend her benefits; she was merely told that she needed to submit medical documentation "proving functional impairment" and "objective notes and findings."  AR 451-52.  By September 1, 2010, Sedgwick still had not sent James a denial letter.  AR 454.  From August 17th until September 13th, James contacted Sedgwick a number of times to seek information regarding her LTD claim and said that she was attempting to submit additional medical information to support her application.  AR 452-55

On August 23, 2010, James's "HR status" was changed to "TERMINATED."  AR 453.  On September 14, 2010, James informed a union representative, "Due to my extensive health issues, I regret that returning to work will not be an option for me.  Therefore, I decline the necessity of pursuing a grievance for getting my job back after my recent separation from at&t [sic] subsequent to the expiration of my 12 month short term disability."  AR 730.

On September 22, 2010, Sedgwick sent a letter to James informing her that she did not qualify for LTD benefits based on a review of medical documentation spanning from December 2009 to August 2010.  AR 602.  She was told that "[c]linical information did not document a severity of your condition(s) that supports your inability to perform any occupation."  AR 603.  While the documentation noted her chronic back, knee, and neck pains, as well as depression and anxiety caused by those pains, a preoperative evaluation for her left cataract surgery showed lab results that were "normal, hypertension well controlled, metabolic panel normal for March 2010."  AR 603.  In addition, James's x-rays for hip pain were "unremarkable with no obvious arthritis."  AR 603.  Medical documents from Dr. Bacharach showed that she had her left cataract removed on April 14, 2010, and then had right cataract surgery on June 9, 2010.  AR 603.  After Sedgwick's physician advisor, Dr. Sherman, spoke with Drs. Davis and Skvaril, he concluded that while James "may continue to need ongoing care for continuing symptoms[,] there [wa]s no medical information to substantiate [James's] inability to perform [her] sedentary job duties."  AR 603.

Sedgwick concluded that her doctors' notes did "not provide specific objective physical examination findings to indicate functional impairment," and "[t]here [we]re no specific

13

measurements of range of motion." AR 603.  Further, there was no new neurological or motor strength testing, or recent imaging studies or any other type of studies or findings to indicate how James was functionally impaired from her job duties or any other type of job duties.  AR 603. Sedgwick informed James that based on her training, education, and experience, the Transitional Skills Analysis performed on July 22, 2010, identified four alternate occupations that she was qualified to perform.  AR 603.  Sedgwick cited no evidence of its own to controvert the observations and conclusions of James's treating physicians.

The denial letter from Sedgwick included an outline of the appeals procedure, which included a list of medical evidence James must submit in support of her appeal.  AR 605.  The list required:  a clear outline of her level of functionality; a description of how her level of functionality impacts her ability to work and perform her daily activities; a detailed description of her treatment provider's rationale for the employee's level of functionality; and clinical documentation that supports her treatment provider's rationale.  AR 605.  For mental health, she must provide:  findings from formal mental status examination including clinical presentation and interaction; observations made by her treatment provider during office visits and therapy sessions; and dosage of, and response to, medications.  AR 605.  For medical health, she must submit: findings from physical examinations; diagnostic test results (e.g., lab results, x-rays, MRIs, etc.); and dosage of, and response to, medications.  AR 605-06.

## IV.    JAMES'S APPEAL OF DENIAL OF LTD BENEFITS

On February 6, 2011, James appealed the denial of her LTD claim.  AR 611.  Along with her appeal form, James attached a seven-page letter she wrote herself and 44 exhibits detailing the many treatments she received and her treating physicians' observations; she also included application forms submitted for state disability benefits.  AR 612-706.  The materials documented the numerous treatments she received and problems with which she has been diagnosed.[5]  In her

---

[5] In sum, James provided documentation reflecting:  five bilateral facet steroid injections; five sacroiliac joint injections; two trigger point injections to the neck, four hip steroid injections; three trigger point injections to the lower back, one bilateral medical branch block; one bilateral radiofrequency ablation; two knee injections; increases in pain medication; and exams showing her inability to work.  AR 614-18.

letter, James complained that Sedgwick's denial letter spent "a disproportionate amount of time" discussing the issues giving rise to her STD eligibility rather than addressing why she did not qualify for LTD benefits.  AR 613.  Further, while Sedgwick's physician advisor only spoke with James's primary care physicians, James argued that they were not in a position to speak about the medical conditions that were preventing her from being able to work, i.e., her chronic pain, depression, and anxiety.  AR 613.  James also pointed out that the denial letter failed to reference the medications she takes.  AR 614.

James also submitted new information that post-dated the denial letter.  In a report of a December 3, 2010, visit for trigger point and hip injections, Dr. Balytsky noted that although James "ambulates well with no assistance," "[t]he patient is unable to work."  AR 670.  A February 2, 2011, certification signed by Dr. Balytsky states that James "is not able to sit or stand for more than 10-15 min., also is not able to use her [illegible] due to pain/swelling."  AR 691.  Dr. Balytsky concluded that James "will not be able to perform her regular work."  AR 691.

James also submitted for consideration a Social Security "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" filled out by Dr. Balytsky, dated January 4, 2011.  AR 692-97.  The document explained that James could not sit or stand for more than one hour without interruption, and that she could sit no more than three hours and stand no more than two hours in an eight-hour workday.  AR 693.  For the remainder of the eight hours, James "has to have downtime in bed."  AR 693.  The statement detailed the extent of James's hand abilities with regard to "reaching," handling," "fingering," "feeling," and "push/pull," and her feet abilities with regard to operating foot controls, though Dr. Balytsky did not identify the findings supporting her assessment.  AR 694.  The statement listed other restrictions in movement, and Dr. Balytsky observed that James "has chronic low back pain [and] arthritis," which "can be exaggerated by activities [and] stress."  AR 697.  James is unable to "walk a block at a reasonable pace on rough or uneven surfaces."  AR 697.  Further, she "suffers from depression and anxiety which contribute to her inability to work."  AR 697.  These conditions have lasted and will last for 12 consecutive

1    months.[6]  AR 697.

2          On February 15, 2011, an appeals specialist at Sedgwick spoke with James over the phone

3    and discussed the appeal process.  AR 459-60.  The specialist went over the medical

4    documentation received from James, reviewed the list of James's providers and their specialties,

5    confirmed the reason for her being off work, and gave an explanation of the disability criteria for

6    LTD under the disability plan.  AR 460-61.  The specialist said that once James advised Sedgwick

7    that her file was complete, Sedgwick would forward the file to independent physician advisors

8    with the same specializations as James's current providers.  AR 461.  The specialist explained that

9    the advisors would make one attempt to contact her doctors, but if the advisors were unable to

10   speak with her doctors, they would make recommendations based on the medical information in

11   the file only, so it was important to have all medical information in writing in the file.  AR 461.

12   The specialist advised James to follow up with her providers; James said that she understood and

13   did not have any questions.  AR 461.

14         On March 21, 2011, James submitted additional office visit notes from Dr. Balytsky

15   indicating that she received injections in her low back and right hip, and that she had bilateral

16   sacroiliac joint steroid injections on February 17, 2011.  AR 711-14, 716-25.  In those notes, Dr.

17   Balytsky determined that James "is unable to work" and "suffers from stress related to interaction

18   with spouse and family," but "ambulates well with no assistance."  AR 716.  Dr. Balytsky also

19   stated that James's "bilateral extremities are normal in regards to inspection, palpation, range of

20   motion, strength, stability and tone."  AR 720.  James was scheduled for lower back trigger point

21   injections on March 18, 2011.  AR 728.  She also submitted handwritten notes from Dr. Swanson

22   stating that her husband lost his job, her pain was "up," she had depressive days due to pain and

23   finances, she was taking medication, and she was "[n]ot to return to work ever."  AR 715, 733.

24         In submitting these documents, James sought to substantiate her need for medical

25   procedures and the frequency with which she needed them.  AR 712.  In particular, James pointed

26

27   ───────────────────────
     [6] James submitted her own version of the Medical Source Statement with her own comments.  She
28   confirmed Dr. Balytsky's note that she is "bedridden intermittently."  AR 700.  James said that she
     has a tendency to fall over and has a service dog to help her pick up items.  AR 702.

United States District Court
Northern District of California

United States District Court
Northern District of California

to Dr. Balytsky's notes as containing "objective conclusions" about her physical condition.  AR 713.  James noted that, as a 63-year-old woman, it would make little sense for her to stop employment before her retirement age of 65 and lose all the pension, medical, prescription, dental, and vision benefits to which she would be entitled.  AR 713.  She pointed out the fact that she formally declared that she would not file a grievance to regain her job because she simply cannot work.  AR 713.  On March 30, 2011, James notified Sedgwick that her appeal file was complete.  AR 466.

James's file was then forwarded to three independent physician advisors.  AR 466.  One was Dr. Mark Webb, a psychiatrist.  AR 742.  He spoke with Dr. Swanson, who explained that James's "main problem is physical pain," and "with her pain she [wa]s depressed and cannot work from a psychiatric standpoint."  AR 741.  Dr. Swanson stated, however, that James was "not at risk" and he never referred her to an intensive outpatient program or found her to be psychotic, though he said that "she is psychiatrically disabled."  AR 741.  Dr. Webb also reviewed James's medical records.  He noted Dr. Balytsky's finding that James had an eight-year history of low back pain.  AR 741.

Based on the paper files, Dr. Webb noted that Dr. Swanson's reports stated that James "had major depression and chronic pain."  AR 741.  He also observed that Dr. Swanson said that James "had family issues and pain," and "depression due to pain and finances."  AR 741.  James was also "on two antidepressants and an anxiety medication," and "could not possibly work as it would only increase her pain."  AR 741.  He recorded Dr. Swanson's conclusion that James "was not to return to work forever.  The pain leads to an increase in her anxiety and depression and further disability."

Based on the foregoing, Dr. Webb concluded that James "was not psychiatrically disabled from any job/any occupation as of 08/18/10 through the present."  AR 741.  Dr. Webb reasoned that although James was seen monthly by Dr. Swanson, there was "no detailed mental status examination throughout the medical records provided to highlight any significant or severe complaints," that she was not found to be at risk or psychotic, and there was no referral to an outpatient program or psychiatric hospital, which would be typical for a disabling mental illness.

17

1    AR 741-42.  Although James was on medication for her depression and anxiety, Dr. Webb opined

2    that she could return to work.  AR 742.

3           On April 4, 2011, Dr. Jamie Lee Lewis, who specialized in physical medicine and

4    rehabilitation, left a message for Dr. Balytsky requesting that she call back within 24 hours,

5    otherwise Dr. Lewis would complete the report "based on available medical information"; Dr.

6    Balytsky did not call back when the report was completed on April 8, 2011.  AR 743-44.  Dr.

7    Lewis reviewed James's claim file, including progress notes from 2007 and a letter from Dr.

8    Balytsky dated March 3, 2010, which noted that James "required permanent disability."  AR 744.

9    He observed that James "continued to receive pharmacological pain management as well as a

10   variety of injections including epidurals, facet injections, medial branch blocks, sacroiliac

11   injections, and radiofrequency ablation procedures."  AR 744.  Dr. Lewis stated that although

12   James was deemed unable to "sit greater than one hour, stand greater than one hour, or walk

13   greater than 30 minutes" due to her "subjective back pain and stiffness," there was "[n]o reference

14   to any objective findings" to support these conclusions.  AR 744.  He said that one "[p]hysical

15   examination noted trigger points in the right lumbar area, but not adequately described."  AR 744.

16   "Medication list of 1/11/11 is also provided and is noted."  AR 745.

17          Dr. Lewis also looked to James's older medical records.  He noted a February 2007

18   physical examination, which showed that James had a stable gait but no tenderness in the cervical

19   spine, though she did have tenderness along the paraspinals and right sacroiliac joint, and her

20   motion was reportedly decreased but not quantified; her sensation and strength, however, were

21   intact.  AR 744.  Dr. Webb also noted an April 2008 MRI, which showed that James's ligaments

22   appeared normal, and a 2009 visit that showed that James had a normal gait, no significant knee

23   abnormality, and no restricted range of motion or instability.  AR 744.

24          Dr. Lewis concluded that while James routinely reported chronic subjective pain in the low

25   back, " physical examinations have not demonstrated clinically significant abnormalities," and her

26   range of motion "was not quantified to demonstrate" any significant loss of strength or sensation.

27   AR 745.  Also, he observed that no imaging studies were provided to suggest lumbar pathology

28   other than knee joint degenerative changes.  AR 745.  Dr. Lewis acknowledged that James's

1   subjective symptoms had been treated with a myriad of medications and injections and noted that

2   they did not appear to have any clinically significant change.  AR 745.  He said that although "the

3   provided objective findings suggest degenerative changes," they "do not suggest any significant

4   abnormal pathology that would have clinically significant functional limitations particularly in the

5   claimant's ability to fulfill sedentary work activities."  AR 745.  Nor did the medical

6   documentation "indicate that performance of sedentary occupation would lead to exacerbation of

7   an underlying muscular condition or cause undue levels of pain."  AR 745.  Accordingly, Dr.

8   Lewis concluded that James was not disabled "from any occupation during the dates in question."

9   AR 745.

10          On April 8, 2011, Dr. William Andrews, an orthopedic surgeon, called Dr. Tompkins and

11   left a message requesting a return call within 24 hours, otherwise Dr. Andrews would complete his

12   report "based on the available medical information," but he did not get a response before preparing

13   his report.  AR 748.  Dr. Andrews noted that James had a history of depression, low back pain,

14   and bilateral knee osteoarthritis, and has had degenerative disc disease and leg pain, necessitating

15   multiple injections and oral pain medications.  AR 748.  Dr. Andrews noted that James "did very

16   well" when he saw Dr. Tompkins in September 2009—Dr. Tompkins had stated that although she

17   was going to need a knee replacement at some point, "as long as she was doing well he would not

18   replace her knees."  AR 748.  Dr. Andrews reviewed an April 7, 2010, report of James's

19   pelvis/bilateral hip x-rays, which said that it was an "unremarkable examination."  AR 748.

20          Dr. Andrews said that James "has a painful situation in chronic back pain with radicular

21   leg pain and [ ] degenerative arthritis of the knees," and she would not be able to function in "a

22   heavy job" or a "situation where she is on uneven ground," but there is "nothing orthopedically

23   relevant on these issues that would preclude her from working in a sedentary to light capacity

24   occupation."  AR 749.  Based on the medical documents reviewed, Dr. Andrews concluded that

25   James "was not disabled from any job from an orthopedic perspective from 08/18/10 through

26   present."  AR 749.

27          On June 9, 2011, Sedgwick sent James a letter informing her that her claim for LTD

28   benefits was denied because "[c]linical information [did] not document a severity of [her]

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1    condition(s) that support[ed] [her] inability to perform any occupation as of August 18, 2010."

2    AR 773.  Sedgwick pointed out that its QRU and three independent physician advisors reviewed

3    all of her submitted medical information, including those from Drs. Balytsky, Tompkins,

4    Swanson, Becnel, Davis, and Bacharach, Redwood Regional Medical Group, Petaluma Open

5    MRI, and LabCorp from February 8, 2007, through March 28, 2011.  AR 772.  Sedgwick repeated

6    each of the independent physician advisors' findings.  These included Dr. Webb's conclusion that

7    there were "no medical records highlighting any objective or severe psychiatric complaints in any

8    detailed mental status examination," and that "no other mental health providers [were] brought

9    into [James's] treatment which would have been typical for a severe or disabling illness."  AR

10   773.  Dr. Lewis had also found that despite the fact that James "routinely reported chronic

11   subjective pain in the low back . . . physical examinations have not demonstrated clinically

12   significant abnormalities."  AR 773.  Further, although "clinical findings suggested degenerative

13   changes," Dr. Lewis said that they "did not suggest any significant abnormal pathology that would

14   have clinically significant functional limitations on [James's] ability to fulfill work activities."

15   AR 773.  In addition, Dr. Andrews found that although the medical information indicated that

16   James was "treated for chronic back pain with radicular leg pain and degenerative arthritis of the

17   knees . . . there were no clinical findings that supported [her] inability to work."  AR 773.  Finally,

18   the letter noted the Transitional Skills Analysis that identified four alternate occupations James

19   was qualified to perform based on her "training, education and experience."  AR 773; *see also* AR

20   585.  Accordingly, she was deemed ineligible for LTD benefits.

21                                    **PROCEDURAL BACKGROUND**

22            James filed this action on December 12, 2012.  Dkt. No. 1.  The administrative record was

23   lodged on January 30, 2014.  Dkt. Nos. 27, 28.  The plan filed its motion for summary judgment

24   on March 4, 2014.  Dkt. No. 35.  James filed her motion for summary judgment on the same day.

25   Dkt. Nos. 40, 42.  A hearing on both motions was held on May 12, 2014.[7]

26   _____

27   [7] Along with its brief in opposition to James's motion for summary judgment, the plan moved to
     strike Exhibits 1-8 to the Declaration of Laurence F. Padway in Support, Dkt. No. 34.  Dkt. No.
28   45.  The plan argues that the exhibits are unauthenticated, lack foundation, are prejudicial, and are
     not part of the administrative record.  Because I do not rely on any of those exhibits, the motion to

**LEGAL STANDARD**

**I.     JUDICIAL REVIEW OF ERISA DENIAL OF BENEFITS**

Under Section 502 of the Employee Retirement Income Security Act ("ERISA"), a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  A claim of denial of benefits in an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

When the plan grants the plan administrator discretion to determine eligibility for benefits or to construe the terms of the plan, then a court may only review the administrator's decision regarding benefits for an abuse of discretion.  *Id.*  A court "can set aside the administrator's discretionary determination only when it is arbitrary and capricious."[8]  *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004).  In such a situation, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 706 (9th Cir. 2012).  The court must only "consider whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'"  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (citation omitted).

"[T]he plan administrator's decision can be upheld if it is 'grounded on *any* reasonable basis.'"  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) (citation omitted); *Jordan*, 370 F.3d at 875.  "In other words, where there is no risk of bias on the part of

---

strike is DENIED as moot.
[8] Courts sometimes refer to the abuse-of-discretion standard interchangeably with "arbitrary and capricious."  The Ninth Circuit has made clear that there is no substantive difference.  *Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir. 1996), o*verruled on other grounds by Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999).

the administrator, the existence of a 'single persuasive medical opinion' supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation." *Montour*, 588 F.3d at 630. An administrator does not commit an abuse of discretion merely because "the record may contain evidence that could support a contrary conclusion." *Ordway v. Metro. Life Ins. Co.*, 634 F. Supp. 2d 1120, 1123 (S.D. Cal. 2007). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). "A finding is clearly erroneous when although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal punctuation omitted).

If the plan does not grant the administrator discretion to determine benefits, then review of the administrator's decision is conducted under the *de novo* standard. *Firestone Tire & Rubber Co.*, 489 U.S. at 115. Under the *de novo* standard, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). The normal summary judgment standard applies under *de novo* review. *See Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).

If "the same entity that funds an ERISA benefits plan also evaluates claims . . . the plan administrator faces a structural conflict of interest: since it is also the insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the administrator retains money for itself." *Montour*, 588 F.3d at 630. Where such a conflict of interest is alleged and the administrator has discretion to decide eligibility for benefits, the abuse-of-discretion standard still applies and the alleged conflict is but one factor in the analysis, with appropriate weight given to the administrator's determination depending upon the seriousness of the alleged conflict. *Id.* at 631. "[A] higher degree of skepticism is appropriate where the administrator has a conflict of interest." *Salomaa*, 642 F.3d at 676. As the Ninth Circuit has said,

The level of skepticism with which a court views a conflicted administrator's decision may

22

be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968-69 (citations omitted). Furthermore, "[t]he district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* at 970.

## II.   THE APPLICABLE STANDARD

James appears to make two arguments about the appropriate standard to apply here. First, James argues that there is insufficient evidence showing that the plan delegated its discretion to determine benefits to Sedgwick and thus the *de novo* standard should apply. Second, James appears to suggest that the plan has a conflict of interest.

### A.  Evidentiary Issues

As an initial matter, James complains that the plan has not included in the administrative record anything that shows that the plan delegated its claims administration to a third party and that the claims process is fair and free from conflict. Pl. Opp'n (Dkt. No. 46) 2-3. James also argues that the Adkins and Hagestad declarations, which the plan offered as evidence showing a lack of conflict, should be deemed inadmissible because Adkins and Hagestad were not disclosed as potential witnesses since no Rule 26 initial disclosures and no (or insufficient) discovery took place. Pl. Opp'n 3-6.

#### 1.  Adkins and Hagestad Declarations

While a review of the merits of an administrator's decision concerning benefits is generally limited to the administrative record, a district court has discretion to consider evidence outside the record to discern whether the plan administrator has a conflict of interest. *Abatie*, 458 F.3d at 970. Courts occasionally allow limited discovery in ERISA cases when there is an alleged conflict. *See, e.g.*, *Zewdu v. Citigroup Long Term Disability Plan*, 264 F.R.D. 622, 626 (N.D. Cal. 2010)

1   (James, J.).

2        Generally, Federal Rule of Civil Procedure 26(a)(1)(B)(i) exempts "an action for review on

3   an administrative record" from the usual requirement to make initial disclosures in civil actions.

4   But there is "scant case law" on whether Rule 26 applies in ERISA cases seeking review of an

5   administrative record where, as here, the existence of a conflict of interest is at issue.  *Peterson v.*

6   *AT&T Umbrella Ben. Plan No. 1*, No. 10-cv-3097-JCS, 2011 WL 5882877, at *5 (N.D. Cal. Nov.

7   23, 2011).

8        *Peterson v. AT&T Umbrella Benefit Plan No. 1*, a case presenting nearly identical

9   arguments as those before me, is instructive.  There, the plaintiff argued that two declarations

10  submitted by the defendant should be struck because the defendant did not previously disclose the

11  witnesses and the information contained in their declarations in violation of Rule 26.  2011 WL

12  5882877, at *1.  The Honorable Joseph Spero noted that a few "courts have ordered parties to

13  comply with Rule 26 disclosure requirements in cases involving ERISA disability claims where

14  the court found that discovery was appropriate on the question of whether there was a conflict of

15  interest."  2011 WL 5882877, at *5.  While he agreed that discovery was appropriate in such

16  situations, in the case before him, "the parties disputed whether initial disclosures were required

17  and the Court resolved that dispute by not issuing an order requiring initial disclosures but rather,

18  issuing only discovery orders specifically identifying certain types of evidence that Defendant was

19  required to produce on the question of conflict of interest."  *Id.* at *6.  Judge Spero reasoned,

20  "When Defendant represented to the Court that it had produced all of the documents required

21  under the Court's orders, the Court found that no further discovery was necessary.  Under these

22  circumstances, the Court concludes that the initial disclosure requirements of Rule 26 do not apply

23  in this action."  *Id.*  Because there was no discovery order requiring the defendants to reveal the

24  identities of the witnesses before their declarations were submitted, Judge Spero declined to

25  preclude the declarations simply because initial disclosures were not exchanged.  *Id.* at *8.

26        In this case, James raised the prospect of initial disclosures and discovery concerning the

27  conflict issue as early as May 2, 2013, Dkt. No. 11 at 2-3, but no initial disclosures were ordered,

28  Dkt. No. 21 at 3.  In a September 6, 2013, joint case management statement, James indicated that

United States District Court
Northern District of California

24

United States District Court
Northern District of California

she sought discovery related to any conflict of interest and the fairness of claims administration. Dkt. No. 21 at 5. At the case management conference held on September 12, 2013, the parties noted a dispute concerning the scope of discovery. Dkt. No. 22. While I did not then order initial disclosures or any specific discovery, I instructed the parties to file a joint discovery letter if the dispute was not resolved and granted leave to exceed my usual page limitation. No such letter was filed. Later, in a January 28, 2014, joint case management statement, the parties represented that "[t]here are no discovery issues remaining." Dkt. No. 23 at 3. Just over two months later, the parties filed their motions for summary judgment.

Based on the foregoing, James's complaint is unpersuasive. With regard to the adequacy of discovery, James knew since as late as May 2013 that she intended to raise the issue of a conflict of interest. That the plan would likely present evidence to rebut the allegations of a conflict of interest and unfairness is hardly surprising. At no point, however, did James move to compel discovery on the issue. This was the case even after I invited the parties to file a discovery letter if the need arose. Over four months later, both parties represented that there were no discovery issues remaining. James had ample time to seek discovery, but did not do so—she cannot credibly claim prejudice. Whatever information James claims that she does not have is not in her hands because of her lack of diligence. Like the plaintiff in *Peterson*, James should have moved for discovery earlier and cannot now assert that she did not have an adequate opportunity to seek the information she needed. Because I may consider evidence outside the administrative record for the limited purpose of determining whether a conflict of interest exists, the Adkins and Hagestad declarations are admissible. *Abatie*, 458 F.3d 970. As in *Peterson*, I find that "the late disclosure of these witnesses was harmless" and will not exclude them under Federal Rule of Civil Procedure 37 because they do not conflict with anything in the record and James has not thereby been prejudiced.

### 2. Completeness of the Administrative Record

James also appears to argue that the administrative record is incomplete. Pl. Mot. (Dkt. No. 42) 15-16; Pl. Opp'n 5; Pl. Reply (Dkt. No. 47) 8. Although she does not say so, she presumably means to argue that any decision concerning benefits made based on an incomplete

1   record would necessarily constitute an abuse of discretion.  She contends that although federal

2   regulations require that a plan provide a claimant "upon request" copies of documents "relevant to

3   the claimant's claim for benefits," the administrative record "is lacking in showing an effort at

4   claims neutrality."  Pl. Mot. 15-16 (citing 29 C.F.R. § 2560.503-1(h)(2)(iii)).  James says that she

5   "did not conduct discovery on the policies and procedures which insured that Mrs. James received

6   a 'full and fair' review of her claim" because she relied on the plan's representation in the

7   September 6, 2013, joint case management statement that the administrative record the plan

8   produced to her on August 9, 2013, was complete and "includes all the information specified in 29

9   C.F.R. 2560.503-1(m)(8)," which lists the category of information "relevant" to a claimant's claim

10  for benefits that must be made available to the claimant upon request.  Pl. Opp'n 5; 29 C.F.R.

11  § 2560-503-1(h)(2)(iii).

12         James's complaint is unconvincing.  Her claim of reliance on the plan's representation in

13  the case management statement is belied by the fact that James asserted in the very same statement

14  that the administrative record was incomplete.  Dkt. No. 21 at 3.  In addition, James has not

15  contested the plan's representation in that statement that she "has already received a copy of the

16  claims administrator's guide to disability, as well as its internal procedures."  Dkt. No. 21 at 6.

17  Nor has she stated that the plan's representation in the same statement that, "to resolve this issue

18  without further motion, Defendant will also produce the service agreement between AT&T

19  Services Inc. and Sedgwick . . . detailing the financial arrangement between the entities," has not

20  been honored.  Dkt. No. 21 at 7.  I instructed James to raise any such issues with me if they were

21  not resolved, and she never did so.

22         In any event, I am unpersuaded that the administrative record is incomplete.  "In the

23  ERISA context, the administrative record consists of the papers the insurer had when it denied the

24  claim."  *Montour*, 588 F.3d at 632 n.4 (quotation marks omitted).  Even if the administrative

25  record did not contain the "policies and procedures" for ensuring fair reviews or the plan's

26  delegation agreement with Sedgwick, there is no evidence that any such documents was before the

27  claims administrator when it denied James's application for LTD benefits.  James points to 29

28  C.F.R. § 2560.503-1(h)(2)(iii) in suggesting that the administrative record is incomplete, but that

United States District Court
Northern District of California

provision only requires a plan to provide a claimant "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits"—it does not mandate what papers the claims administrator must have before it when it considers claims and, therefore, what must be in the administrative record.  The fact that the plan's policies and procedures and delegation agreement might not have been in the administrative record does not thereby make it incomplete.[9]

### B.   The Plan Delegated Discretion To Sedgwick.

Although James acknowledges that the plan has discretion to determine eligibility for claims, she states that nothing in the administrative record shows that the plan delegated its claims administration to Sedgwick.  Pl. Opp'n 2-3; Pl. Mot. 17-18 (arguing that the administrative record does not show "to whom the [p]lan delegated discretion to decide the appeal" or that "the person or entity so delegated agreed to be a fiduciary under ERISA").  She points out "the plan decided not to produce a copy of its claimed agreement with Sedgewick [sic]."  Pl. Reply 7.  "In the absence of that documentation, we cannot agree that the Plan's agents who actually decided the claim and appeal in this case were delegated any discretion."  Pl. Mot. 18.  James therefore appears to suggest that the *de novo* standard applies.

A court looks to the insurance plan to determine whether it confers discretion to any other party.  29 U.S.C. § 1002(16)(A)(i); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1087 n.1, 1089 (9th Cir. 1999).  Where the administrator delegates its discretionary authority to a fiduciary, the "arbitrary and capricious" standard applies to the fiduciary as well.  *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1284 (9th Cir. 1990).  The Ninth Circuit has recently affirmed a district court's finding that the same disability plan here "granted discretion to the plan administrator to make eligibility determinations and in turn to delegate that discretion to a claims administrator."  *Whatley-Bonner v. Pac. Telesis Grp. Comprehensive*

---

[9] While the definition of "relevant" includes anything that "was relied upon," "submitted," or "considered" in "making the benefit determination," 29 C.F.R. § 2560.503-1(m)(8)(i)-(ii), it also includes other categories of information, *see* 29 C.F.R. § 2560.503-1(m)(8)(ii)-(iv).  Accordingly, the universe of documents to which the plan must provide James "reasonable access" is broader than what must be in the administrative record.

*Disability Ben. Plan*, 542 F. App'x 620, 621 (9th Cir. 2013).  Accordingly, "[b]ecause the claims administrator has discretion, its benefits decision 'will not be disturbed if reasonable.'"  *Id.*

The facts here show that the plan administrator delegated the claims administration duties to the IDSC and the QRU, and that both handled James's claims.  AR 833-34, 836.  The disability plan expressly states, "The Claims Administrator has been delegated authority by the Plan Administrator to determine whether a particular Eligible Employee . . . is entitled to benefits under the Program."  AR 834.  Further, the plan states that "[t]he Claims Administrator determines all claims for benefits under the Program" and gives contact information for the claims administrator.  AR 833.  Similarly, the plan provides that "[t]he Appeals Administrator has been delegated authority by the Plan Administrator to determine whether a claim was properly decided by the Claims Administrator" and "determines all appeals of denied claims under the Program"; it also gives contact information for the appeals administrator.  AR 833-34.

The contact information section in the plan identifies the IDSC as the claims administrator and the QRU as the appeals administrator.  AR 836.  The claims and appeals administrators therefore "have sole discretion to interpret the Program, including, but not limited to, interpretation of the terms of the Program, determinations of coverage and eligibility for benefits, and determination of all relevant factual matter."  AR 834.  This language undoubtedly grants the claims and appeals administrators authority and discretion to make decisions concerning eligibility.  Because the IDSC and QRU are part of Sedgwick, which was given full discretion to make benefits determinations and to interpret the terms of the disability plan, the abuse of discretion standard applies.  James has pointed to no evidence to the contrary.

**C. There Is No Evidence Of A Conflict Of Interest.**

James appears to suggest that a higher level of scrutiny applies in reviewing the denial of her LTD benefits.  Without explicitly saying so, she seems to argue that the plan is actually administering the benefits.  Pl. Opp'n 1-2.  In support of her contention, James cites to *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, in which the Ninth Circuit held that an employer-funded and employer-administered insurance plan may present a conflict of interest even if the plan's benefits are paid out of a trust.  544 F.3d 1016, 1026 (9th Cir. 2008).

*Burke* is distinguishable.  Here, the facts show that the plan is self-funded and Sedgwick is the third-party claims administrator.  Sedgwick is not financially associated with AT&T Services, Inc., does not have a role in the plan's funding, and is paid a flat fee for its services regardless of its claims approval.  Def. Opp'n Adkins Decl. ¶ 6; Def. Opp'n Hagestad Decl. ¶ 5.  Where the party that must pay the benefits and the party that administers the benefits are not the same, there is little risk, if any, of a conflict of interest.  *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  James has pointed to no evidence of any such conflict.

James also suggests that there may be issues of fairness or bias in the claims process.  Pl. Opp'n 3.  While James complains that the plan did not submit any evidence to show fairness or lack of bias in administering claims, James herself has pointed to no facts showing that there is any unfairness or bias.  The ordinary abuse-of-discretion standard applies in this case.

## DISCUSSION

The abuse-of-discretion standard is a high one since the plan's denial of James's benefits "can be upheld if it is 'grounded on *any* reasonable basis.'"  *Montour*, 588 F.3d at 629 (emphasis added).  However, the plan has shown no reasonable basis for denying James's LTD claims. While the plan repeatedly asserts that there is no "objective" evidence showing that James was incapable of working, it arbitrarily ignored the diagnoses of her treating physicians, it did not explain why the evidence before it was insufficient apart from its bare assertion that it was, it did not explain what James should have done to perfect her claim, and it did not conduct a reasonable inquiry into James's eligibility.  Based on the evidence before me, the plan abused its discretion in concluding that James was ineligible for LTD benefits.

## I.     THE PLAN IGNORED JAMES'S TREATING PHYSICIANS' CONCLUSIONS.

"[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). However, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.* at 834.  Courts also may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Id.*  But as one judge in this district explained, "the [Ninth Circuit]

implied that in refusing a claimant's reliable evidence, the plan administrator should themselves be 'credit[ing] reliable evidence that conflicts with a treating physician's evaluation.'" *Farhat v. Hartford Life & Acc. Ins. Co.*, 439 F. Supp. 2d 957, 973 (N.D. Cal. 2006) (Hamilton, J.).  That judge held that a plan administrator abused its discretion where it "did not rely on other contradictory evidence," but "simply dismissed" a treating physician's "opinion as insufficient based on the absence of supporting medical evidence." *Id.*; *see also Rowell v. Aviza Tech. Health & Welfare Plan*, No. 10-cv-5656-PSG, 2012 WL 1672497, at *15 (N.D. Cal. May 14, 2012) (finding abuse of discretion where plan's reviewer "discredited reliable evidence based on the treating physicians' evaluations without [pointing to] at least equally reliable evidence that suggests sufficient functional capacity").

The plan abused its discretion by ignoring James's treating physicians' conclusion that she could no longer work.  The two conditions that James claims are primarily responsible for her inability to work are her chronic pain and depression.  Dr. Swanson, James's psychiatrist, has stated that James was "not to work again" and that "her condition has already deteriorated too much to be employed." AR 591, 690.  Dr. Balytsky, James's pain specialist, said that it was her "professional opinion that Mrs. James needs to apply for permanent disability" because "she will [not] be able to return to work under her medical conditions." AR 321.  Both doctors have treated James over a significant period of time, and both have repeated these conclusions on multiple occasions. *See, e.g.*, AR 194, 670.  For example, in a January 8, 2010, Initial Physician Statement, Dr. Balytsky concluded that James "can't function in a high stress job at AT&T when severely depressed – it's too demanding." AR 504.  Eight months later in an August 4, 2010, office visit note, Dr. Balytsky stated that "there is no way this woman could return to demanding work." AR 591.  However, the plan's reviewing physicians refused to credit such evidence supporting James's claims for little apparent reason.  Neither the plan's initial denial letter nor the plan's letter upholding that denial even acknowledged the fact that James's treating physicians concluded that she was incapable of working again. AR 603, 772-73.  As the Ninth Circuit has said, "Weighty evidence may ultimately be unpersuasive, but it cannot be ignored." *Salomaa*, 642 F.3d at 679.  Here, the plan ignored critical evidence both in denying James's claim and affirming that

1    denial.

2        In addition to ignoring James's treating physicians' conclusions, the plan appears to have

3    ignored evidence in James's favor upon which they relied or simply brushed them aside as

4    "conclusory."  *See* Def. Mot. (Dkt. No. 35) 19.  When he rejected the opinions of James's

5    psychiatrist, Dr. Webb said that "there are no medical records highlighting any objective or severe

6    psychiatric complaints in any detailed mental status examination" and thus "[t]he findings do not

7    support an inability for Ms. James to perform any job."  AR 742.  But in concluding that James

8    might consider retiring, Dr. Swanson has observed that James "doesn't have the energy and ability

9    to concentrate that is necessary for work," her ability to concentrate is impaired, and she is

10   agitated, anxious, and depressed.  AR 10.  He concluded that she is "not able to RTW [return to

11   work] due to persistent pain and increased depressed state, some nausea," and because she

12   appeared "overwhelmed by the combination of pain and depression"; he also observed that her

13   "anxiety is up" even with medication.  AR 9.  But despite these findings by James's treating

14   physician, Dr. Webb "simply dismissed" the "opinion as insufficient based on the absence of

15   supporting medical evidence."  *Farhat*, 439 F. Supp. 2d at 973.

16       While Dr. Lewis more directly addressed James's medical history, AR 744, he ignored the

17   opinion of James's pain specialist that James's chronic pain prevented her from working and

18   reached arbitrary and capricious conclusions.  He recognized that James "routinely reported

19   chronic *subjective* pain," yet he dismissed those complaints because "*physical* examinations have

20   not demonstrated clinically significant abnormalities."  AR 745 (emphases added).  And though

21   Dr. Lewis acknowledged that James's "subjective symptoms have been treated with a myriad of

22   medications and injections, which did not appear to have any clinically significant change," and

23   that "objective findings suggest degenerative change," he conclusorily asserted that such

24   observations "do not suggest any significant abnormal pathology that would have clinically

25   significant functional limitations particularly in the claimant's ability to fulfill sedentary work

26   activities."  AR 745.  In other words, he conceded that her medication was not working and that

27   there was "objective" evidence of a deteriorating condition, but he still concluded that James could

28   work.  Dr. Lewis also said that a sedentary occupation would not "cause undue levels of pain" for

United States District Court
Northern District of California

31

1    James despite the fact that Dr. Balytsky concluded that James could not sit for more than 15

2    minutes at a time without experiencing pain.  AR 745.  But he does not explain how he reached

3    any of these conclusions.

4           More troubling, the plan and its reviewing physicians also appear to have simply misstated

5    or failed to consider crucial evidence in the record.  For example, Dr. Lewis noted that James's

6    "[r]ange of motion was not quantified to demonstrate any significant loss" and that "the provided

7    objective findings . . . do not suggest any significant abnormal pathology that would have

8    clinically significant functional limitations."  AR 745.  Dr. Balytsky, however, has noted on

9    multiple occasions the substantial restrictions on James's ability to move and work.  For example,

10   on January 29, 2010, Sedgwick received a "Physical Capacities Evaluation:  Sedentary" form from

11   Dr. Balytsky.  AR 176, 277-78.  Dr. Balytsky reported that James would not be able to stand or sit

12   for more than 10-15 minutes, nor would she be able to lift or bend; she also said that although

13   James could maneuver a mouse and view a computer screen for up to four hours a day, she would

14   not be able to work for more than an hour a day.  AR 277.  In particular, James would need a

15   break every 15 minutes for 10 minutes.  AR 277.  Dr. Balytsky stated that James's restrictions

16   were "permanent" and that she could not provide a return-to-work plan for James; she also noted

17   that a sit/stand work station would not help James.  AR 278.

18          Similarly, on January 4, 2011, Dr. Balytsky completed a "Medical Source Statement of

19   Ability To Do Work-Related Activities (Physical)" for James.  AR 692-97.  She determined that

20   James could not sit or stand for more than one hour without interruption, and that she could sit no

21   more than three hours and stand no more than two hours in an eight-hour workday.  AR 693.  For

22   the remainder of the eight hours, James "has to have downtime in bed."  AR 693.  The statement

23   lists other restrictions in movement, and Dr. Balytsky concluded that James "has chronic low back

24   pain [and] arthritis," which "can be exaggerated by activities [and] stress."  AR 697.  In the face of

25   such detailed findings, Dr. Lewis and the plan inexplicably asserted that there was a lack of

26   objective evidence supporting James's claim and determined that James would be able to continue

27   to "fulfill work activities."  AR 773.  These conclusions are "without support in inferences that

28   may be drawn from the facts in the record.'"  *Salomaa*, 642 F.3d at 676.

The plan's denial of James's claim for LTD benefits relied substantially on the Transferrable Skills Analysis it conducted which concluded that James was able to work in four alternate occupations and therefore she does not meet the definition of long-term disabled, but that analysis appears to have been plagued by serious errors. First, while the analysis purports to take account of James's "medical restrictions and limitations," the job accommodation specialist who conducted the analysis specifically noted that a case manager instructed him to assume that "Ms. James can perform sedentary work." AR 585. But that assumption lacks support; it flies in the face of Dr. Balytsky's repeated conclusion that James could not sit or stand for more than 15 minutes at a time, and that a sit/stand work station would not help—as the analysis itself states, "[s]edentary work involves sitting most of the time." AR 586. Second, the analysis does not explain why these alternate occupations may be suitable for James if she is not able to perform her current position. A cursory review of the four alternative occupations listed—information clerk, telephone solicitor, call center representative, and customer service representative—shows that they are quite similar to James's previous position as a "service representative" who "was responsible for interviewing customers and recording information into computers." AR 586. Third, while the "Overview" of the analysis claims to have taken account of James's medical history, the "Transferable Skills Analysis" portion, which identifies the four alternative occupations, does not discuss her limitations due to chronic pain or depression at all; rather it is based only on her "reported work experience and education." In fact, the entire analysis never mentions James's psychiatric condition. The plan's conclusion based on this flawed analysis that James does not meet the definition of long-term disabled strongly suggests that it acted arbitrarily and capriciously.[10]

The plan also did not take account of evidence in James's favor insofar as the plan failed to have its physician reviewers speak with Drs. Balytsky or Tompkins. Drs. Lewis and Andrews did attempt to contact Drs. Balytsky and Tompkins, but the reviewers only gave the treating

---

[10] It is also telling that the job accommodation specialist who performed this analysis does not appear to be a medical professional and is in a very weak position to disregard the conclusions of James's treating physicians.

physicians 24 hours to return their calls, otherwise the report would be completed without their input.  AR 744, 748.  Neither Dr. Balytsky nor Dr. Tompkins was able to return the calls within the allotted time period.  But doctors are busy professionals.  If Drs. Lewis and Andrews allowed a reasonable period of time for a response to their telephone messages, they likely would have been able to speak with James's treating physicians, who were very familiar with her medical condition.  *See May v. AT&T Umbrella Ben. Plan No. 1*, No. 11-cv-2204 JCS, 2012 WL 1997810, at *16 (N.D. Cal. June 4, 2012).  Similarly, in its initial denial of James's claim, the plan's physician advisors, Drs. Givens and Sherman, also failed to speak with Drs. Balytsky and Swanson before completing their report.  Conducting a review of James's eligibility for LTD benefits without the benefit of her treating physicians' input effectively amounts to ignoring a large portion of evidence in James's favor, and giving James's treating physicians only 24 hours to return a phone call before disregarding the need to consult them is arbitrary and capricious.

Nor has the plan pointed to any evidence that James *can* work.  In upholding the denial of LTD benefits for James, the plan only cites the absence of evidence showing that James was unable to work without noting any contrary evidence.  *See* AR 772-74.  Likewise, Drs. Webb, Lewis, and Andrews only claim that there is a lack of evidence supporting a finding of long-term disability in their rationale for finding James ineligible for benefits, but nowhere do they identify any evidence that she can work.  *See* AR 742, 745, 749.  Finally, while the plan's original denial letter noted observations and procedures conducted by James's treating physicians, it also determined that James was not eligible for LTD benefits due to the lack of "specific" or "objective" findings indicating that she was "functionally impaired."  AR 602-03.  But the plan did not point to any affirmative evidence supporting its argument that James was actually able to work.  Without "rely[ing] on other contradictory evidence," the plan abused its discretion by failing to identify "reliable evidence that conflicts with [the] treating physican[s'] evaluation."  *Farhat*, 439 F. Supp. 2d at 973; *Rowell*, 2012 WL 1672497, at *15.

The plan argues that it did not abuse its discretion by noting that two of James's eye doctors and her orthopedic surgeon never concluded that she could not return to work.  Def. Mot. 20; Def. Opp'n (Dkt. No. 44) 20 n.17.  That argument is disingenuous.  The eye doctors were only

United States District Court
Northern District of California

treating James for cataracts and not her two most aggravating conditions—chronic pain and depression. And while Dr. Tompkins, the orthopedic surgeon, provided pain treatments and injections for James, he merely said that James's condition could "improve" within "3-6 months" with treatment; he did not "opine[ ] that Plaintiff could return to work in '3-6 months'" as the plan incorrectly claims. AR 284; Def. Mot. 20. The plan also points out that James's primary care physician, Dr. Davis, determined on April 7, 2010, that James's hip x-rays were "unremarkable" and that James's radiologist, Dr. Schmidt, concluded that James had "[n]o acute fracture or focal osseous abnormality" and her "[h]ip joints and sacroiliac joints appear unremarkable." Def. Mot.; AR 346, 353. But the plan does not explain why these discrete observations are inconsistent with James's suffering from debilitating pain or depression or her inability work.

The plan asserts that its initial denial of James's claim for LTD benefits and subsequent affirmation of that denial were based on "substantial evidence." Def. Mot. 22-25. But it only considered part of the record and abused its discretion in failing to take account of the other more compelling evidence supporting James's claim that she suffered from conditions rendering her eligible for LTD benefits. My conclusion is the same as the Ninth Circuit's in *Boyd*: based on "the entire evidence," I am "left with the definite and firm conviction that a mistake has been committed" in this case. *Boyd*, 410 F.3d at 1178.

## II.      THE PLAN FAILED TO CONSIDER JAMES'S OVERALL CONDITION.

A plan abuses its discretion if it carves a claimant's overall disability into discrete parts and does not consider the disability as a whole where it may be appropriate to do so. In *Rodgers v. Metropolitan Life Insurance Company*, the defendant plan "attempt[ed] to defeat [the plaintiff's] claim [for disability benefits] by dividing her condition into discrete parts and arguing that, because the evidence for any single ailment did not support a finding of disability, [she] was not disabled under the terms of the Plan." 655 F. Supp. 2d 1081, 1088 (N.D. Cal. 2009) (Wilken, J.). There, the plan's consulting physicians only looked at separate issues of which the plaintiff complained, but "did not address the statements of [her] treating physicians that the combination of mental and physical symptoms prevent her from working." *Id.* On the other hand, the plaintiff's treating physicians took "a more holistic approach" and "conclude[d] that her illness is

greater than the sum of its parts, and that it is the combination of all of the symptoms that prevents her from returning to work." *Id.*  Accordingly, Judge Wilken ruled that the plan "may not arbitrarily refuse to credit these opinions" and abused its discretion when it failed to consider the totality of the plaintiff's condition and denied her claim.

In denying James's claim, the plan ignored James's treating physicians' consistent conclusion that she is unable to work due to the interaction of her physical and psychiatric conditions.  For example, on June 8, 2009, James's psychiatrist, Dr. Swanson, said that James was "not able to return to work because of persistent pain and increased depressed state"—she is "overwhelmed by the *combination* of pain and depression."  AR 15, 83 (emphasis added).  Similarly, on August 8, 2009, he determined that James "is not able to return to work at this time because of a *combination* of back pain and depression."  AR 108 (emphasis added).  After Dr. Swanson examined James on June 1, 2010, he wrote that her "constant pain *leads to an increase* in onset of depression and further disability."  AR 208, 715 (emphasis added).  Accordingly, she "couldn't possibly work" because it "would increase pain."  AR 208, 715.  He thus instructed that she was "not to return to work ever."  AR 715.

The plan here did precisely what the Judge Wilken criticized Metropolitan Life Insurance Company for doing in *Rodgers*.  The plan's three reviewing physicians, Drs. Webb, Lewis, and Andrews, only concluded that James was not long-term disabled from a psychiatric, "pain management and physical medicine and rehabilitation," and orthopedic perspective, separately and respectively.  AR 741, 745, 749.  Similarly, the letters denying James's claim for benefits and upholding that denial also do not assess her illness holistically.  No analysis was done based on James's overall condition and whether it prevented her from working in any occupation despite the fact that Dr. Swanson indicated that her chronic physical pain and psychiatric condition were linked, with the former augmenting the latter.  There is also no evidence that any of the reviewing physicians consulted one another in reaching their conclusions, nor is there any evidence that the plan attempted to conduct a comprehensive review of James's state.

As in *Rodgers*, because the plan here failed to consider James's overall condition in denying her claim, dissecting it instead into smaller bits that were separately considered, it abused

1   its discretion.

2   **III.      THE PLAN FAILED TO CONSIDER SUBJECTIVE EVIDENCE.**

3          "[C]onditioning an award on the existence of evidence that cannot exist is arbitrary and

4   capricious." *Salomaa*, 642 F.3d at 678.  "Many medical conditions depend for their diagnosis on

5   patient reports of pain or other symptoms, and some cannot be objectively established," but "a

6   disability insurer [cannot] condition coverage on proof by objective indicators . . . where the

7   condition is recognized yet no such proof is possible." *Id.*  The United States Court of Appeals for

8   the Eleventh Circuit has observed, "There is, quite simply, no laboratory [ ] test to diagnose

9   chronic pain syndrome. . . . Chronic pain syndrome is a severely debilitating medical condition

10  that may be fully diagnosed only through long-term clinical observation . . . ." *Lee v. BellSouth*

11  *Telecomms., Inc.*, 318 F. App'x 829, 837 (11th Cir. 2009).  Similarly, courts should "consider[ ]

12  the unique nature of psychiatric disabilities, which often involve subjective complaints." *Burnett*

13  *v. Raytheon Co. Short Term Disability Basic Ben. Plan*, 784 F. Supp. 2d 1170, 1184 (C.D. Cal.

14  2011).

15         In denying James's claim for LTD benefits, the plan abused its discretion by failing to

16  consider subjective evidence in her favor.  With regard to her chronic pain, although the plan

17  acknowledged that James was being "treated with a myriad of medications and injections, which

18  did not appear to have any clinically significant change," and that "the provided clinical findings

19  suggested degenerative changes," the plan nevertheless concluded that the objective evidence

20  concerning her chronic pain was insufficient to qualify her for LTD benefits.  AR 773.  For

21  example, while noting that James suffered "chronic subjective pain," Dr. Lewis focused on the

22  absence of objective proof of that pain, such as "imaging studies," but he did not establish that

23  debilitating pain must be linked to physical abnormalities.  AR 745.  Similarly, while Dr. Lewis

24  noted that nothing demonstrated "any significant loss and no loss of strength or sensation was

25  reported," nor was there documentation of "significant loss of joint range of motion," he did not

26  consider whether James simply suffered debilitating pain without any attendant loss in range of

27  motion, strength, or sensation.  AR 744-45.  Most importantly, the plan and Dr. Lewis appeared to

28  have disregarded wholesale James's consistent subjective complaints of pain—pain for which she

United States District Court
Northern District of California

1    underwent numerous treatments and took much medication over several years.

2         A plan's denial is "arbitrary to the extent that it was based on [a consulting physician's]

3    implicit rejection of [a] Plaintiff's subjective complaints of pain." *May*, 2012 WL 1997810, at

4    *17. The Ninth Circuit has criticized a plan's rejection of a plaintiff's claim that her self-reported

5    chronic pain syndrome prevented her from working because the plan's reviewer "does not explain

6    why he is unconvinced, nor what [the plaintiff] or [her doctor] would need to do to convince him."

7    *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008). Here,

8    the plan and Dr. Lewis focused almost exclusively on the alleged absence of objective evidence to

9    deny James LTD benefits premised on her chronic pain and appear to have implicitly rejected her

10   subjective complaints of pain. But pain is an inherently subjective condition, and it is unclear

11   what objective evidence the plan wished to see to prove that James's pain prevented her from

12   working.[11] Neither the plan nor Dr. Lewis explains why James's history of pain and pain

13   treatment since 2007 were insufficient to find her unable to work and essentially disregarded them.

14   This constitutes an abuse of discretion.

15        With regard to James's depression, the plan ignored her treating psychiatrist's conclusions

16   that James was unable to work again and relied instead on the absence of a few circumstantial

17   inferences and of vaguely-defined "objective" evidence to reject her disability claim. Dr.

18   Swanson diagnosed James with "major depression" because her "severe back pain [led] to

19   depression and anxiety," and she "appear[ed] depressed" and cried. AR 242. He found that James

20   was "very anxious" even with medication; was "withdrawn"; had "difficulty with [short term]

21   memory"; had "no appetite"; and "can't concentrate." AR 95. In particular, he observed that her

22   back pain "ha[d] been worsened by work," she "couldn't get out of bed," her depression continued

---

[11] As the Ninth Circuit has observed in a Social Security case, "despite our inability to measure
and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of
entirely precluding a claimant from working. Because pain is a subjective phenomenon,
moreover, it is possible to suffer disabling pain even where the degree of pain, as opposed to the
mere existence of pain, is unsupported by objective medical findings. Referring to such pain as
'excess pain,' our cases have established a clear rule regarding its assessment: Once a claimant
submits objective medical evidence establishing an impairment that could reasonably be expected
to cause some pain, it is improper as a matter of law for an ALJ to discredit excess pain testimony
solely on the ground that it is not fully corroborated by objective medical findings." *Fair v.
Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) (internal quotation marks omitted).

despite the fact that she was taking medication, and her "constant back pain [was] very distracting and [made] it difficult to do her job properly." AR 243. He thus determined that James could not function in a high-stress job when she was "severely depressed," that she should not return to work, and that she should go on permanent disability. AR 242-43. He noted that his treatment for her was "just for maintenance" but was not "expect[ed] to improve the patient's physical or cognitive functioning." AR 242. Dr. Swanson diagnosed her with "major depression." AR 95.

On the other hand, in rejecting her claim, the plan noted that James (i) was "not found to be at risk or psychotic"; (ii) was not "referr[ed] to any intensive outpatient program or psychiatric hospital"; and (iii) had "no other mental health providers brought into [her] treatment which would have been typical for a severe or disabling illness." AR 773. But the plan does not explain why a person suffering debilitating depression must also be "at risk or psychotic" or why a referral to another provider (despite the fact that James was already regularly seeing Dr. Swanson and despite the fact that a referral is merely "typical" in such situations) is a dispositive factor in determining psychiatric disability. Similarly, the plan said that "there were no medical records highlighting any objective or severe psychiatric complaints in any detailed mental status examination." AR 773. It does not explain, however, why Dr. Swanson's conclusion that James is prone to being "severely depressed" is not a "severe psychiatric complaint" or why his observations are not "objective" evidence; it also does not explain what constitutes a "*detailed* mental status examination" in contrast to what Dr. Swanson did with James during her many visits with him.

"By effectively requiring 'objective' evidence for a disease that eludes such measurement," the plan "has established a threshold that can never be met by claimants who suffer . . . no matter how disabling the pain." *Minton v. Deloitte & Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1220 (N.D. Cal. 2009) (Wilken, J.). It abused its discretion in denying James's claim for LTD benefits by ignoring the evidence of depression James has put forth without a reasonable basis, while only pointing to the absence of certain discrete indicators and evidence of an imprecise and amorphous nature. *See Moody v. Liberty Life Assur. Co. of Boston*, 595 F. Supp. 2d 1090, 1099 (N.D. Cal. 2009) (Patel, J.).

IV.     **THE PLAN FAILED TO IDENTIFY WHAT INFORMATION IT REQUIRED.**

When a plan under ERISA denies a claim for benefits, it must provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."  29 C.F.R. § 2560.503–1(g)(iii).  That information must be given "in a manner calculated to be understood by the claimant."  29 C.F.R. § 2560.503–1(g); *Saffon*, 522 F.3d at 870.  The Ninth Circuit has faulted a plan administrator where it "denied the claim largely on account of absence of objective medical evidence, yet failed to tell [the claimant] what medical evidence it wanted."  *Salomaa*, 642 F.3d at 679.  "If the plan is unable to make a rational decision on the basis of the materials submitted by the claimant, it must explain what else it needs."  *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997).

The plan denied James's claim for LTD benefits because it argues that James failed to provide any "objective medical evidence" of an inability to function in the workplace.  Def. Opp'n 20.  The plan points to nothing in the record, however, showing that it explained to James what might constitute such objective evidence.  While the plan asserts that it "informed Plaintiff of the specific type of medical and mental health evidence necessary to support her LTD claim" in the "Quality Review Unit Appeal Procedures," Def. Mot. 20, that document only lists very generally defined and vague categories of information, such as "[a] clear outline of your level of functionality," "[a] description of how your level of functionality impacts your ability to work," "[f]indings from formal mental status examination[s]," "[f]indings from physical examinations," and "[d]osage of medications if used," AR 605.  But as discussed above, James *has* submitted this information, such as her doctor's determinations from their meetings with her, descriptions about the extent to which she is able to move and work, conclusions about how she is likely permanently disabled and unable to return to work, and information about her medication.  The plan complains that this information is somehow insufficiently "objective," but it does not explain why.  Nor does its appeals procedure identify any particular tests, measurements, or types of analyses that would suffice.  Similarly, although the plan discussed the appeals process with James over the phone, those communications also failed to identify "what medical evidence it wanted" so that James

United States District Court
Northern District of California

40

could perfect her claim.[12]  *See* AR 461; Def. Mot. 14; *Salomaa*, 642 F.3d at 679.

The plan largely premised its denial on an alleged *lack* of evidence supporting James's claim—evidence of a kind it does not specify.  But as one court explained, "Where [the plan] had before it substantial, reliable evidence indicating the existence of a disability, it could not rely simply on a lack of evidence to deny [the plaintiff's] claim.  This is not a case where an administrator credited other reliable evidence over a claimant's treating physicians."  *Mitchell v. Metro. Life Ins. Co.*, 523 F. Supp. 2d 1132, 1147-48 (C.D. Cal. 2007), *aff'd sub nom. Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192 (9th Cir. 2010).  Such is the case here.  For example, the denial letter said that

> [T]here is no medical information to substantiate your inability to perform your sedentary job duties.  The notes do not provide specific objective physical examination findings to indicate functional impairment.  There are no specific measurements of range of motion.  There was no specific physical examination to indicate functional impairment.  There was no new neurological testing and motor strength testing.  There is no recent imaging studies or any other type of studies or findings to indicate how the employee is functionally impaired from her job duties or any other type of job duties.

AR 600.  As discussed above, James did provide some of this information.  The plan, however, did not explain why the information provided was insufficient or specifically identify what should be provided instead.  The plan therefore failed its duty under ERISA.

---

[12] In his report reviewing James's appeal, Dr. Lewis, who reviewed James's chronic pain condition, noted that her file lacked imaging studies and electrodiagnostic studies.  AR 744.  But it is unclear why such tests are relevant to James's chronic pain, which is largely subjective.  As the Ninth Circuit said in one ERISA case,

> The initial denial said [the claimant] should provide "x-rays, CT, MRI reports, etc. that support your physician's assessment," but did not tell him what x-rays etc. it wanted.  The request was of course absurd, since x-rays, computerized tomography, and magnetic resonance imaging are not used to diagnose chronic fatigue syndrome.  A layman might be fooled by this statement of reasons into thinking he left something relevant out of his claim package, but fooling someone unfamiliar with the medical terms with irrelevant medical mumbo jumbo violates the statutory duty to write a denial "in a manner calculated to be understood by the claimant."

*Salomaa*, 642 F.3d at 679-80.  While the plan does not appear to have told James that she had to provide "imaging" and "electrodiagnostic" studies, like the plan in *Salomaa*, it appears to have based its denial on the absence of tests which have no clear relation to the conditions of which James complained.

Neither Dr. Webb and nor Dr. Andrews identify *any* particular missing evidence that would have been relevant in reviewing James's claim.  *See* AR 742, 749.

The Ninth Circuit has explained,

[W]here the denials were based on absence of some sort of medical evidence or explanation, [ ] the administrator was obligated to say in plain language what additional evidence it needed and what questions it needed answered in time so that the additional material could be provided. An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.' Nor does it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo.

*Salomaa*, 642 F.3d at 680. That is precisely what the plan did here. A "specific physical examination" or "specific objective physical examination findings"—the plan's own words—is far from the sort of "plain language" necessary under ERISA. While the plan's denial letter and letter upholding the denial cursorily recited excerpts from materials provided by James's treating physicians, they do not meaningfully explain why the treating physicians' conclusions or the facts in the materials are insufficient to find that James is eligible for LTD benefits. In the face of many facts showing that James suffered debilitating pain and severe depression, the plan nakedly asserted that other information was absent. It therefore abused its discretion in denying James's claim.

## V.     THE PLAN FAILED TO CONDUCT ITS OWN INVESTIGATION.

In considering whether an abuse of discretion occurred, a court may take into account "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records." *Montour*, 588 F.3d at 630. "Though the lack of an in-person examination is not determinative, it is a relevant consideration, especially with respect to conditions that are not susceptible to objective verification." *Lavino v. Metro. Life Ins. Co.*, No. 08-cv-2910, 2010 WL 234817, at *12 (C.D. Cal. Jan. 13, 2010). "[W]here the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits. This is of particular importance where the medical determination is psychiatric in nature. Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time." *Lavino v. Metro. Life Ins. Co.*, 779 F.

1    Supp. 2d 1095, 1112-13 (C.D. Cal. 2011) (citations and internal quotation marks omitted).

2            Here, the plan did not conduct its own in-person medical evaluation of James and instead

3    reviewed her medical records only.  Because James's two primary conditions are chronic pain and

4    severe depression—both largely subjective conditions—conducting an in-person medical

5    examination would have weighed against a finding of arbitrariness on the part of the plan.  The

6    plan did not conduct such an inquiry but still discounted the professional opinions of those who

7    directly treated James over an extended period of time and found her unable to work.  "This was

8    an occasion when an independent medical examination was in order to determine the credibility of

9    [the claimant's] evidence.  [The plan] did not exercise this option, choosing instead to assert a lack

10   of evidence without attempting to confirm for itself whether [the claimant] suffered from disabling

11   conditions."  *Mitchell*, 523 F. Supp. 2d at 1148.  This indicates an abuse of discretion by the

12   plan.[13]  *Kreeger v. Life Ins. Co. of N. Am.*, 766 F. Supp. 2d 991, 1000 (C.D. Cal. 2011) ("By

13   failing to conduct any form of physical examination, this factor also weighs in favor of finding

14   that [the plan] abused its discretion.").

15   **VI.    JAMES SHOULD BE PROVIDED WITH LTD BENEFITS.**

16           "[R]emand for reevaluation of the merits of a claim is the correct course to follow when an

17   ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a

18   wrong standard to a benefits determination."  *Saffle v. Sierra Pac. Power Co. Bargaining Unit*

19   *Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996).  "It is not the court's

20   function *ab initio* to apply the correct standard to [the participant's] claim."  *Id.* (quoting *Henry v.*

21   *Home Ins. Co.*, 907 F. Supp. 1392, 1398 (C.D. Cal. 1995)).  Remand is not appropriate, however,

22   where "no new evidence could produce a reasonable conclusion permitting denial of the claim or

23   remand would otherwise be a 'useless formality.'"  *Miller v. United Welfare Fund*, 72 F.3d 1066,

24

25   _____

     [13] The plan cites two cases for the proposition that it has no obligation to conduct its own
26   investigation of James's condition.  Def. Opp'n 22-23 (citing *Ramos v. Bank of Am.*, 779 F. Supp.
     2d 1058, 1075 (N.D. Cal. 2011), *vacated by Ramos v. Bank of Am.*, No. 08-cv-1375 PJH, 2012
27   WL 379445 (N.D. Cal. Feb. 6, 2012), and *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182,
     1192 (C.D. Cal. 2008)).  While it is true that ERISA does not *require* a plan to conduct its own
28   investigation, as the Ninth Circuit has indicated, a plan's decision to do so may be a relevant
     consideration in determining whether it abused its discretion.  *See Montour*, 588 F.3d at 630.

1   1071 (2d Cir. 1995); *see also Canseco v. Constr. Laborers Pension Trust for S. Cal.*, 93 F.3d 600,

2   609 (9th Cir. 1996) ("Unlike cases wherein we have remanded to the plan administrator, no factual

3   determinations remain to be made in this case.").

4         Here, remand is a useless formality.  The plan has represented that the administrative

5   record is complete.  Def. Reply (Dkt. No. 49) 4-5 ("Any other documents are extraneous and

6   outside the Administrative Record").  The only evidence of record that considers James's overall

7   condition of chronic pain and depression is that of her treating physicians, who conclude that

8   James could never work again, should retire, and should receive permanent disability benefits.

9   The plan abused its discretion in failing to meaningfully consider the facts identified in this Order,

10  and no new evidence could permit a conclusion permitting denial of the claim.  The appropriate

11  remedy is that the plan provide James with LTD benefits.

12                                  **CONCLUSION**

13        Having considered all of the circumstances of this case and the evidence in the record, I

14  conclude that the plan abused its discretion in denying James's claim for LTD benefits based on

15  the alleged lack of objective evidence of her limitations, thereby discounting all other evidence in

16  the record in her favor and imposing ill-defined requirements that she could not possibly satisfy.

17  Without meaningfully explaining to her what she needed to do to perfect her claim as ERISA

18  requires the plan to do, the plan ignored overwhelming evidence presented to it that she suffers

19  from debilitating conditions which her doctors have concluded render her unable to ever work

20  again.  In doing so, the plan acted arbitrarily and capriciously.

21        James's motion for summary judgment is GRANTED and the plan's motion for summary

22  judgment is DENIED.  I ORDER that the parties meet and confer and submit a proposed judgment

23  that is consistent with this Order within seven days.  James may also file a motion for reasonable

24  attorney's fees and costs thereafter in accordance with Civil Local Rule 7.

25        **IT IS SO ORDERED.**

26  Dated: June 2, 2014

27  

28  WILLIAM H. ORRICK
    United States District Judge